# 23-7904(L)

(Consolidated with Docket Nos. 24-46(XAP), 24-388(XAP), 24-209(Con), 24-1978(Con), 23-6915(Con), 23-6917(Con), 24-2203(Con))

## United States Court of Appeals
## for the Second Circuit

**23-7904(L), 24-46(XAP), 24-388(XAP), 24-209(Con), 24-1978(Con)**

UNITED STATES OF AMERICA,

*Appellee and Cross-Appellant,*

vs.

DANIEL SMALL, DAVID LEVY, MARK NORDLICHT,

*Appellants and Cross-Appellees,*

*(For Continuation of Caption See Inside Cover)*

On Appeal From The United States District Court
for the Eastern District of New York

No. 1:16-cr-640-6, Honorable Brian M. Cogan, Senior District Judge

**OPENING BRIEF AND SPECIAL APPENDIX FOR DAVID LEVY**

Kim M. Watterson
REED SMITH LLP
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA 15222
(412) 288-7996
kwatterson@reedsmith.com

Charles P. Hyun
REED SMITH LLP
599 Lexington Avenue
New York, NY 10022
(212) 521-5400
chyun@reedsmith.com

*Attorneys for Appellant and Cross-Appellee David Levy*

**23-6915(L), 23-6917(Con)**

UNITED STATES OF AMERICA,

*Appellant*,

vs.

DAVID LEVY, MARK NORDLICHT,

*Appellees*,

**24-2203**

UNITED STATES OF AMERICA,

*Appellant*,

vs.

MARK NORDLICHT,

*Appellee*.

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ……………………………………….… 1

JURISDICTIONAL STATEMENT…………………………………….… 2

STATEMENT OF ISSUE PRESENTED FOR REVIEW ……………….… 3

STATEMENT OF THE CASE………………………………………….… 3

    A.    Nature Of The Case …………………………………….… 3

    B.    Statement Of The Facts ………………………………….… 6

        1.    Overview Of Platinum And Black Elk ……………….… 6

        2.    The Black Elk Bond Indenture……………………….… 7

        3.    Beechwood Is Founded By Mark Feuer And Scott Taylor…10

        4.    The Initial Private Consent Solicitation …………….…11

        5.    The Second Public Consent Solicitation And Renaissance Asset Sale ……………………………………………….… 14

        6.    The Public Consent Solicitation Closes …………….…16

    C.    Procedural History ……………………………………….…20

        1.    The Government's Trial Theories And Mid-Course Pivot In Its Theory On The Black Elk Scheme ……………….…20

        2.    The Jury's Verdict, The District Court's Ruling On Post-Trial Motions, And The First Appeal …………………….…23

        3.    The District Court's Orders On Remand…………….…24

SUMMARY OF ARGUMENT……………………………………….…27

STANDARD OF REVIEW ………………………………………….…29

ARGUMENT ................................................................................29

I.  Levy's Convictions For Conspiracy To Commit Securities Fraud And For Securities Fraud Must Be Vacated Because They Were Based On The Now-Rejected Right-To-Control Theory ........................................29

    A.  Levy's Convictions Were Indisputably Premised On A Right-To-Control Theory ......................................................29

    B.  *Ciminelli's* Elimination Of The Right-To-Control Theory Applies Equally To Federal Securities Fraud ........................32

II. Levy Joins The Co-Appellants' Applicable Arguments .....................43

CONCLUSION................................................................................43

- ii -

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Chadbourne & Parke LLP v. Troice*,
  571 U.S. 377 (2014)......................................................................41

*Chem. Bank v. Arthur Andersen & Co.*,
  726 F.2d 930 (2d Cir. 1984) ........................................................40

*Ciminelli v. United States*,
  598 U.S. 306 (2023)...............................................................*passim*

*In re Carter-Wallace, Inc. Sec. Litig.*,
  150 F.3d 153 (2d Cir. 1998) ........................................................41

*Kelly v. United States*,
  590 U.S. 391 (2020)......................................................................35

*McDonnell v. United States*,
  579 U.S. 550 (2016)......................................................................35

*Romano v. Kazacos*,
  609 F.3d 512 (2d Cir. 2010) ........................................................40

*SEC v. Govil*,
  86 F.4th 89 (2d Cir. 2023) ...........................................................42

*SEC v. Tex. Gulf Sulphur Co.*,
  401 F.2d 833 (2d Cir.1968) ..........................................................41

*SEC v. Zanford*,
  535 U.S. 813.................................................................................41

*Skilling v. United States*,
  561 U.S. 358 (2010)......................................................................34

*United States v. Blaszczak*,
  947 F.3d 19 (2d Cir. 2019)...........................................................39

*United States v. Landesman*,
  17 F.4th 298 (2d Cir. 2021)………………………………………………*passim*

*United States v. Rajaratnam*,
  719 F.3d 139 (2d Cir. 2013) ……………………………………………29

*United States v. Wallach*,
  935 F. 2d 445 (2d Cir. 1991) ……………………………………………37

**Statutes**

15 U.S.C. § 78j …………………………………………………………35

15 U.S.C. § 78j(b)…………………………………………………… 35, 40

15 U.S.C. § 78ff …………………………………………………………35

18 U.S.C. § 1348(b)………………………………………………………36

**Regulations**

17 C.F.R. § 240.10b-5……………………………………………………35

## PRELIMINARY STATEMENT

The Government's case against David Levy and several other individuals was premised on two separate alleged schemes—referred to throughout the case as the "Platinum Scheme" and the "Black Elk Scheme." The jury acquitted Levy on all counts related to the Platinum Scheme. As for the Black Elk Scheme, on which the jury convicted, one thing is beyond debate: the Government's fraud theory, as confirmed by its closing argument, was built on the assertion that Levy and the other defendants deprived Black Elk bondholders of information that they allegedly would have liked to have known in deciding how to vote on a proposed amendment to a bond indenture. That is a quintessential right-to-control theory—and was the theory on which the jury convicted, as the district court's jury instructions confirm.

That theory, however, is no longer legally valid and cannot sustain Levy's convictions. After the first appeal in this case—which resulted in this Court's reversal of the district court's entry of a judgment of acquittal for Levy—the United States Supreme Court decided *Ciminelli v. United States*, 598 U.S. 306 (2023) and held that the right-to-control theory cannot form the basis for a conviction under the federal fraud statutes. As the Court explained, a "right-to-control" theory is invoked when the Government asserts that the defendant deprived a victim of "potentially valuable economic information necessary to make discretionary economic decisions." *Id.* at 309 (citation and quotation marks omitted). But, as

the Court held, "[t]he right to valuable economic information . . . is not a traditional property interest" protected by the federal criminal fraud statutes and thus cannot support a conviction under those statutes as a matter of law. *Id.* at 316.

The district court agreed that *Ciminelli* barred Levy's conspiracy to commit wire fraud conviction and granted Levy's renewed motion for a judgment of acquittal on that count. But it further concluded that *Ciminelli*'s bar did not apply to the conspiracy to commit securities fraud and securities fraud convictions. That conclusion cannot be reconciled with either *Ciminelli*'s holding or the reasoning used to reach it. This Court, accordingly, should reverse and direct the entry of a judgment of acquittal for Levy on the conspiracy to commit securities fraud and securities fraud counts.[1]

## JURISDICTIONAL STATEMENT

The district court had jurisdiction pursuant to 18 U.S.C. § 3231. Defendant David Levy appeals from the judgment entered on January 11, 2024 in the United States District Court for the Eastern District of New York following an order entered by the Honorable Brian M. Cogan on July 12, 2023 denying, in part, Levy's motion for a judgment of acquittal pursuant to Federal Rule of Criminal

---

[1] Levy also joins in all applicable arguments made by Daniel Small and Mark Nordlicht to the extent they are not inconsistent with the arguments raised by Levy.

Procedure 29, as well as his alternative motion for a new trial pursuant to Rule 33. LSPA-1; LSPA-14. Levy filed a timely notice of appeal on January 17, 2024. LA-250. This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUE PRESENTED FOR REVIEW

Whether the district court erred in concluding that United States Supreme Court's decision in *Ciminelli v. United States*, 598 U.S. 306 (2023), which held that the right-to-control theory cannot form the basis for a conviction under the federal fraud statutes, did not bar Levy's convictions for conspiracy to commit securities fraud and securities fraud.

## STATEMENT OF THE CASE

### A. Nature Of The Case

On December 14, 2016, a grand jury returned an eight-count indictment against seven individuals relating to their alleged participation in two allegedly fraudulent schemes: one involving the operations of a hedge fund known as Platinum Partners L.P. ("Platinum Scheme") and the other involving amendments to a public bond indenture of a company called Black Elk Energy Offshore Operations, LLC ("Black Elk Scheme"). LA-135-183.

Three of the indicted individuals—Levy, Mark Nordlicht, and Joseph SanFilippo—were tried in a nine-week jury trial (that began in April 2019) before the Honorable Brian M. Cogan in the United Stated District Court for the Eastern

District of New York. LA-83; *United States v. Landesman*, 17 F.4th 298, 304 (2d Cir. 2021).[2] A fourth co-defendant, Daniel Small, was severed from the trial at the last minute due to counsel unavailability. LSPA-2.

On July 9, 2019, the jury returned a verdict acquitting Levy and Nordlicht on all counts relating to the Platinum Scheme (Counts One through Five) but convicting them on the counts related to the Black Elk Scheme (Counts Six through Eight—namely, conspiracy to commit securities fraud, conspiracy to commit wire fraud, and securities fraud).[3] LA-184-86; LA-203; *Landesman*, 17 F.4th at 317.

The district court granted Levy's motion for a judgment of acquittal and Nordlicht's motion for a new trial. LA-187-223. The Government appealed, and this Court reversed and remanded for further proceedings. *See generally Landesman*, 17 F.4th 298.

Following remand, Levy and Nordlicht brought renewed motions for a judgment of acquittal and a new trial based on issues not determined by the district court or this Court and based on newly discovered evidence. LA-224-25. Those

---

[2] We cite this Court's earlier opinion, *United States v. Landesman*, 17 F.4th 298 (2d Cir. 2021), for certain background facts that provide important context but may not necessarily be essential to the issues raised in this appeal.

[3] The jury also acquitted SanFilippo on the counts related to the Platinum Scheme; he was not charged as to the Black Elk Scheme.

motions were denied on May 9, 2022. LA-224-249. Small's trial followed.[4] LA-121.

Levy and Nordlicht then brought renewed motions for a judgment of acquittal and a new trial, based on grounds the district court did not address in either its September 27, 2019 or May 9, 2022 decisions, on new evidence adduced during Small's trial, and on the grounds that the United States Supreme Court's recent decision in *Ciminelli v. United States*, 598 U.S. 306 (2023) constituted an intervening change in the law that required vacatur of the convictions. LSPA-1-13. The district court denied the motions for a new trial, granted the motions for a judgment of acquittal as to the conspiracy to commit wire fraud count in light of *Ciminelli*, and denied the motions for judgment of acquittal on the conspiracy to commit securities fraud and securities fraud counts. LSPA-13.[5]

---

[4] Small went to trial in the summer of 2022. On August 12, 2022, the jury returned a verdict acquitting Small on Count Seven but convicting him on Counts Six and Eight. LA-123.

[5] The district court sentenced Levy to time served with no supervision to follow and imposed a $200.00 special assessment and $5,000.00 fine based, in part, on the court's conclusion that the amount of loss under Sentencing Guideline § 2B1.1 was zero. LSPA-14-17; District Court Dkt. 1005. Levy anticipates that the sentence will be a subject of the Government's appeal and will say more about the sentence in its principal brief and reply brief.

Levy's appeal, as well as the appeals of co-defendants Nordlicht and Small, and the Government's appeal followed. LA-130-32; LA-134; LA-250. District The appeals were consolidated. Court of Appeals Dkt. 42.

## B. Statement Of The Facts

### 1. Overview Of Platinum And Black Elk

In 2003, Nordlicht co-founded a successful New York-based hedge fund, Platinum Partners L.P. ("Platinum"). *Landesman*, 17 F.4th at 305. Platinum consisted of multiple investment funds, including Platinum Partners Value Arbitrage Fund, L.P. ("PPVA"), Platinum Partners Credit Opportunities Master Fund, L.P. ("PPCO"), and Platinum Partners Liquid Opportunity Master Fund, L.P. ("PPLO") (collectively, the "Platinum Funds"). *Id.* at 303.

Fresh out of college, Levy joined Platinum in around 2008, eventually working his way up from an entry-level position to a portfolio manager role. *Id.* at 305; LA-257. As a portfolio manager, Levy was responsible for overseeing certain investments and opportunities, including Platinum's investment in a company called Black Elk Energy Offshore Operations, LLC ("Black Elk"), a Houston-based oil and gas exploration company that held and managed valuable oil and gas assets in the Gulf of Mexico. *Landesman*, 17 F.4th at 305.

Levy and Small, another portfolio manager at Platinum, co-managed Platinum's position in Black Elk. *Id.* at 305. Gradually increasing its position in

Black Elk over time, by 2014, PPVA owned approximately 85% of the common equity of Black Elk and the Platinum Funds held most of its preferred equity. *Id.* The value of Black Elk's oil and gas reserves continued to increase in value during that time period, creating substantial returns for PPVA investors. LA-681-89.

In addition to direct equity investments, Black Elk raised funds for its oil and gas operations through various forms of debt instruments. *Landesman*, 17 F.4th at 305. Black Elk's senior-most debt was a revolving line of credit, followed in priority by a $150 million issuance of senior secured notes due in 2015 with an annual interest rate of 13.75% ("Black Elk Bonds"), and a Series E preferred security issued in 2013 that functioned like debt carrying an interest rate of 20% that could increase to 36% if still outstanding after a year. LA-282-83; LA-397; LA-681-62.

### 2. The Black Elk Bond Indenture

The relationship between Black Elk and its bondholders was governed by a public bond indenture (the "Indenture"). LA-397-479. The Indenture contained several provisions relevant here, including those governing the use of proceeds from an asset sale (Section 4.10), a limitation on Black Elk's annual capital expenditures (Section 4.21), the circumstances under which a default under the Indenture could be called and waived (Section 6.01 and 6.04, respectively), and the procedure by which the Indenture could be amended (Section 9.02).

***Provisions regarding proceeds from asset sales.***  Under Section 4.10 of the Indenture, Black Elk had four options for the use of proceeds from an asset sale. LA-440-42.  Only one of those options allowed Black Elk to provide any of the proceeds of such a sale to bondholders.  LA-441.  Under the terms of the Indenture, bondholders were only entitled to periodic interest payments; they were not entitled to receive any other payments, such as those that may result from an asset sale.  LA-441.  For that reason, Black Elk had absolute discretion to decide how to use the proceeds from an asset sale and was under no obligation to distribute such proceeds to bondholders.  LA-308-09; LA-311.  In other words, under the Indenture, bondholders did not have any "priority" when it came to the distribution of asset sale proceeds.

***Provisions regarding default.***  Section 4.21 of the Indenture placed limitations on the amount of funds the company could spend in a given year (*i.e.*, the maximum capital expenditures).  LA-445.  Section 6.01 provided that upon notice from 25% of all bondholders, Black Elk may be declared in default of the Indenture.  LA-445.  However, under Section 6.04, an election of 50% of the bonds was effective to waive any default called by other bondholders.  LA-447.

***Provisions regarding amending the Indenture.***  Pursuant to Section 9.02 of the Indenture, its terms could be amended with the consent of 50% of the outstanding bonds.  LA-455-56.  However, Section 2.09 expressly excluded bonds

- 8 -

held by "affiliates" of Black Elk from being considered outstanding for the purpose

of determining whether 50% of bonds consented to the amendment (the "Affiliate

Rule"). LA-429. More specifically, Indenture's Affiliate Rule provided as

follows:

> In determining whether the Holders of the required principal amount
> of Notes have concurred in any direction, waiver or consent under
> Section 9.02 hereof or otherwise, Notes owned by the Permitted
> Holders, the Issuers or any Guarantor, or by any Person directly or
> indirectly controlling or controlled by or under direct or indirect
> common control with the Permitted Holders, the Issuers or any
> Guarantor, will be considered as though not outstanding. . . .

LA-429.

Section 1.01, in turn, defined "affiliate" and "control" as follows:

> "*Affiliate*" of any specified Person means any other Person directly
> or indirectly controlling or controlled by or under direct or indirect
> common control with such specified Person. For the purposes of this
> definition, "*control*," as used with respect to any Person, means the
> possession, directly or indirectly, of the power to direct or cause the
> direction of the management or policies of such Person, whether
> through the ownership of voting securities, by agreement, or
> otherwise; *provided* that beneficial ownership of 10% or more of the
> Voting Stock of a Person will be deemed to be control. For the
> purposes of this definition, the terms "*controlling*," "*controlled by*"
> and "*under common control with*" have correlative meanings.

LA-402 (emphasis in original).

### 3. Beechwood Is Founded By Mark Feuer And Scott Taylor

In 2013, an entity known as "Beechwood" was form by Mark Feuer and Scott Taylor with the financial backing from certain founders of Platinum. *Landesman*, 17 F.4th at 307. Beechwood, a reinsurance company, was paid a premium by primary insurers to invest those companies' funds. *Id*. The Beechwood entities included Beechwood Bermuda International Ltd. ("BBIL") and Beechwood Re ("bRe"), and they invested Beechwood's funds through an asset-managing arm named B Asset Management ("BAM"). *Id*. at 303-04; LA-609-16. Feuer and Taylor were Beechwood's CEO and President, respectively, and collectively controlled 91% of the voting shares of Beechwood. LA-237; LA-609-16.

Shortly after Beechwood was founded, a number of Platinum Partners employees transitioned to Beechwood. *Landesman*, 17 F.4th at 307. Levy joined Beechwood in early 2014—for a short stint lasting less than a year—as Chief Investment Officer, focusing on Beechwood's private equity positions. *Id*. at 305, 307. Despite his full-time employment with Beechwood, Levy, given his in-depth knowledge of certain of Platinum's portfolio investments, continued to assist the Funds with respect to certain investments such as Black Elk. *Id*. at 307.

To ensure the separateness of Beechwood and Platinum, Feuer and Taylor engaged legal counsel to structure Beechwood in such a way that it would not be

an affiliate of Platinum. *Id.* Feuer and Taylor told their employees, including Levy, that Beechwood and Platinum were not affiliates. *Id.*

### 4. The Initial Private Consent Solicitation

In early 2014, a group of Black Elk bondholders holding at least 25% of the Black Elk Bonds, asserted a potential default related to the capital expenditure covenant set forth in Section 4.21 of the Indenture. *Landesman*, 17 F.4th at 309. Black Elk and Platinum (as Black Elk's majority shareholder) entered into negotiations with these bondholders to avoid a default. *Id.* at 309-10; LA-334-36.

Nordlicht formulated a strategy to avoid the potential default: Platinum would "buy out" the bondholders so that they no longer held the 25% of the bonds required to declare a default. LA-488. And in order to avoid the potential of threatened defaults going forward, Nordlicht further proposed to aggregate at least 50% of the outstanding Black Elk Bonds (*i.e.*, the amount needed to both waive a threatened default and amend the Indenture) to companies friendly to Black Elk and Platinum. *Landesman*, 17 F.4th at 309-10. This proposed strategy was shared with Black Elk's general counsel, Marizza Piche, who communicated it to Black Elk's outside counsel, Rob Shearer at BakerHostetler, for review. LA-488.

Beyond a discrete compliance concern that was not at issue at trial, neither Attorney Shearer nor Attorney Piche expressed any concern with this proposal. *Landesman*, 17 F.4th at 310-11; LA-552. To the contrary, Attorney Shearer

- 11 -

testified that there was no problem with selling bonds to friendly companies as long as they were not affiliates of Platinum in order to have those companies then vote as Platinum desired. LA-337.

In Spring 2014, Black Elk, Platinum, and their respective counsel began working to amend the Indenture in response to the bondholders' threat of default. The proposed amendments sought primarily to address the Indenture's capital expenditure covenant but also included proposed changes to the company's ability to incur additional debt. *Landesman*, 17 F.4th at 310. An amendment to Section 4.10 of the Indenture relating to the use of asset sale proceeds was not proposed or even considered at the time. *Id.*

To effectuate these proposed amendments, Black Elk and Platinum Partners retained a significant team of experienced lawyers. BakerHostetler continued in its role as outside counsel to Black Elk and had lawyers in addition to Shearer involved in the engagement. LA-342-43. Black Elk also had the assistance of its General Counsel, Attorney Piche, and its CFO, Jeffrey Shulse, who was also a lawyer. LA-345. Blank Rome served as outside counsel to Platinum Partners and had several lawyers working on the matter, and that team was also assisted in-house by Small, a Platinum Partners portfolio manager who also was a lawyer. LA-343-45. Additionally, the firm of Emmet, Marvin & Marvin, LLP ("Emmet Marvin") had multiple lawyers engaged as counsel to Black Elk's trustee for the

bonds, BNY Mellon (the "Trustee"), which would ultimately have to approve and accept the proposed amendments to the Indenture. LA-298-99; LA-324; LA-343-44.

This large group of experienced and reputable attorneys ultimately advised that the Platinum Funds that owned Black Elk Bonds could vote those bonds in favor of amending the Indenture, and as the Platinum Funds owned more than 50% of the outstanding Black Elk Bonds, those votes alone would be sufficient to amend the Indenture. LA-345-48; LA-354. Consistent with that advice, the three Platinum Funds, which at the time collectively held about $93 million in Black Elk Bonds (or about 62% of the issued bonds)—submitted consents (*i.e.*, votes) in the spring of 2014 in favor of the proposed amendments to the Indenture. LA-351; LA-554-66; *Landesman*, 17 F.4th at 310. At no point during this initial amendment process did any lawyer involved raise any issue regarding the Indenture's Affiliate Rule, which the Government contended precluded PPVA, as 85% owner of Black Elk, from voting the bonds it owned to accomplish the goal of amending the Indenture. LA-354; *Landesman*, 17 F.4th at 310-11.

Based on the consents, Attorney Shearer and BakerHostetler drafted and signed a legal opinion indicating that the firm had reviewed the Indenture and that all conditions necessary for the Indenture's amendment had been met. *Landesman*, 17 F.4th at 311. BakerHostetler also drafted (and had its client sign) an Officer's

- 13 -

Certificate on behalf of Black Elk making the same representation. LA-567-71. This paperwork was then submitted to Emmet Marvin, counsel for Black Elk's Trustee, who under the terms of the Indenture was permitted to rely on these two documents in approving and accepting any amendments to the Indenture. LA-572.

Ultimately, the amendments to the Indenture did not close in the spring of 2014 for reasons unrelated to the Indenture's Affiliate Rule. *Landesman*, 17 F.4th at 311; LA-355-56. As a result, Platinum and Black Elk were required, at the Trustee's insistence and Platinum's expense, to mount a public (and more expensive) Consent Solicitation and Tender Offer process.

### 5. The Second Public Consent Solicitation And Renaissance Asset Sale

By the summer of 2014, numerous financial issues were impacting Black Elk's operations, including an explosion in late 2012 on one of its offshore oil platforms that continued to put a cash flow strain on the company, and rampant mismanagement and inappropriate spending by Black Elk's own executives and employees. *Landesman*, 17 F.4th at 308-09. Given the Indenture's limits on capital expenditures, these expenses were particularly problematic to PPVA as Black Elk's financial backer. Black Elk's operational troubles were exacerbated by its financing obligations. More specifically, Black Elk Bonds were costing the company 13.75% in annual interest, and the Series E preferred equity was costing

- 14 -

the company 20% in annual interest.  LA-282-83; LA-397; LA-681-62.  Despite this turmoil and strain on cash flow, the underlying value of Black Elk's oil and gas reserves remained steady.  *Landesman*, 17 F.4th at 308.

Around June 2014, Black Elk decided to undertake a sale of assets to Renaissance Offshore, LLC (the "Renaissance Sale"), which, upon closing, would bring in a substantial amount of money to the company.  *Id.* at 309.  Under the Indenture, Black Elk was permitted to pay off the bonds prior to their maturity date of December 1, 2015 for a premium, which as of June 2014 was 6.875% above par.  LA-301-03.  At time of the first Consent Solicitation, and before selling $30 million in Black Elk Bonds to Beechwood, the Platinum Funds collectively owned approximately $93 million of the Black Elk Bonds.  *Landesman*, 17 F.4th at 312, 310.  Thus, even without amending the Indenture, PPVA could have caused Black Elk to use the proceeds of the Renaissance Sale to repurchase Platinum's Black Elk Bonds, thereby netting Platinum roughly $100 million.  LA-340.

Rather than retire the bonds, however, PPVA determined that a revamped Indenture amendment process should be undertaken not only to relieve Black Elk of the restrictive capital expenditure provision, but also to permit Black Elk to first pay off the more costly Series E preferred equity (which was costing the company 20% in annual interest) with the Renaissance Sale proceeds.  LA-481.  Paying preferred equity holders meant that Platinum would receive only $77 million of

- 15 -

the Renaissance Sale proceeds. LA-386-87. In other words, PPVA took the less lucrative path, opting to amend the Indenture and pay off the preferred equity for $77 million rather than repurchase the Black Elk Bonds for $100 million.

And to be sure, paying off the preferred equity had no effect on the value of the Black Elk Bonds. The quarter before the public consent solicitation, Sterling Valuation Group ("Sterling"), an independent third-party valuation company engaged by Platinum, valued PPVA's common equity interest in Black Elk in the range of $114 million to $156 million after deducting both the approximately $150 million in bonds and $100 million in preferred equity. LA-689. In other words, Black Elk had sufficient assets to satisfy Black Elk's obligations to both the preferred shareholders and the bondholders. This was subsequently confirmed by Sterling in its next quarterly report, which concluded that as of September 30, 2014—after the Consent Solicitation, the Renaissance Sale, and the payment of the preferred equity—Black Elk could retire all of the remaining bonds and still have common equity valued between $46 million and $58 million. LA-885.

### 6. The Public Consent Solicitation Closes

As the Consent Solicitation and Tender Offer drafting process began in June 2014, Shearer, the corporate partner at BakerHostetler leading the legal effort, "realized' that the Affiliate Rule in Section 2.09 of the Indenture had not been previously considered: that, in any vote to amend the Indenture, bonds owned by

- 16 -

an entity that controlled Black Elk should not be deemed outstanding. LA-360-62. To that end, Attorney Shearer's associate, Brittany Sakowitz, informed Small that the number of bonds held by affiliates of Black Elk, which included PPVA as the 85% owner of Black Elk, would need to be excluded from the Consent Solicitation vote. *Landesman*, 17 F.4th at 313. In response to Attorney Shearer's inquiries, Small informed Shearer that PPVA owned $18,321,000 in Black Elk Bonds. *Id.* at 313-14. Attorney Shearer did not, however, make any further inquiry regarding the Black Elk Bonds owned by PPCO and PPLO despite conceding that he was aware that those Platinum entities had owned nearly $43 million of bonds less than two months before when Platinum had voted all of its bonds in the initial effort to amend the Indenture. LA-348-50; LA-374; LA-554. As a result, the Consent Solicitation went out to Black Elk bondholders stating that PPVA "and its affiliates" owned bonds worth $18.3 million. LA-500.

The Consent Solicitation also included information on the proposed changes to the Indenture, including the proposed application of Renaissance Sale proceeds to first extinguish the higher interest paying Black Elk preferred equity. LA-501. The Consent Solicitation offered bondholders three options: (1) sell back (*i.e.*, "tender") their bonds for one hundred cents on the dollar ("par") thereby consenting to the proposed amendments; (2) consent to the proposed amendments without tendering their bonds; or (3) remain silent and withhold their consent for

- 17 -

the proposed amendments. LA-492. The Consent Solicitation also provided detailed information regarding the substantial financial risks facing the holders of the Black Elk Bonds should they choose not to tender their bonds for par in this transaction. LA-501-02.

Despite the ambiguity as to whether PPCO and PPLO should also be considered "affiliates" under Section 2.09 of the Indenture for purposes of vote counting, Attorney Shearer—who was "fully aware that the Platinum entities together had about 62 million in Black Elk bonds"—ultimately decided to take a more conservative approach and exclude them (along with the PPVA bonds) from the calculation of whether a majority of bondholders had consented to the amendments. LA-378-79.[6] After the exclusion of the $61,614,000 consents made by PPVA, PPCO, and PPLO, $48,951,000—or 55%—of the outstanding bonds had actually validly consented. LA-377-79. In other words, counting only the indisputably valid consents, the 50% threshold required under Section 9.02 to amend the Indenture was easily cleared.

All told, Attorney Shearer determined that the Consent Solicitation had passed based on votes that turned out be comprised of $37,017,000 held by the Beechwood funds (which had consented and not tendered); $600,000 of bonds held

---

[6] The Government conceded in its closing that "there were certain bonds that were not counted"—the "ones that the defendants told [Mr. Shearer] about." LA-390.

by unidentified bondholders (which had also consented and not tendered); and $11,333,000 of bonds held by unidentified bondholders (which had tendered and thus consented). LA-377-79; LA-535-48. Following the passage of the vote and the amendment of the Indenture, the proceeds from the Renaissance Sale were used to pay the tendering bondholders, and then to retire the high interest preferred equity. LA-549-51.

Levy, for his part, was not involved in the process of drafting the Consent Solicitation and had little to no involvement overall.

There is no evidence that Levy ever communicated with Attorney Shearer regarding that process; or that he had discussions with Shearer or anyone else regarding the Affiliate Rule; or that he played any role in determining what information should or should not be included in the Consent Solicitation or the final documents prepared by BakerHostetler in connection with the Consent Solicitation. LA-318-22; LA-383; LA-257-58; LA-261-62; LA-269-70; LA-274-76; LA-279; LA-286; LA-289; LA-304-05; LA-312; LA-321-22. And Attorney Shearer never told Levy that the structure formulated in spring 2014 by more than 12 lawyers at three different law firms—under which the Platinum Funds were permitted to vote their Black Elk Bonds in order to amend the Indenture—was in any way infirm. LA-362-63; LA-368. To that end, Attorney Shearer testified at trial that he had no knowledge of any wrongdoing by Levy and

- 19 -

that he could not even recall the specifics of any conversations with Levy about the Consent Solicitation. LA-321-22. In other words, there was no evidence that Levy had ever misled Shearer in any way.

Another witness the Government called to testify about the alleged scheme, cooperating witness Naftali Manela (who was CFO of PPCO until 2014), similarly testified that he was unaware of Levy's participation in any wrongdoing. LA-270. And the same goes for other witnesses like bondholders Dixon Yee and Israel Wallach. LA-304-05; LA-312. Similarly, there is no evidence that Levy played any role in selling Black Elk Bonds to Beechwood or in Beechwood voting its bonds. Nor could he have. According to Manela, the "ultimate bosses" at Beechwood were Feuer and Taylor. LA-273.

## C. Procedural History

### 1. The Government's Trial Theories And Mid-Course Pivot In Its Theory On The Black Elk Scheme

As noted, this case began with an indictment alleging that Levy, co-defendants Nordlicht and Small, and others engaged in two schemes. The first—the so-called Platinum Scheme—alleged that defendants engaged in a scheme to overvalue the assets of Platinum's flagship investment fund, PPVA, and otherwise lie to the investors in that fund, to enrich themselves at the expense of PPVA's investors. The second—the so-called Black Elk Bond Scheme—alleged a scheme

to change Black Elk's bond Indenture by rigging the vote on the Consent Solicitation so that defendants could enrich themselves at the expense of the Black Elk bondholders.

At the trial of Levy and Nordlicht, the Government focused—overwhelmingly—on the Platinum Scheme, devoting most of the nine-week trial to it, and which ultimately resulted in an acquittal of Levy on all counts related to this scheme. LA-184-86. On this scheme, the Government called as witnesses four PPVA investors, three cooperators, and a host of other witnesses in an effort to prove that PPVA's assets had been intentionally overvalued, that investors had been lied to about the liquidity of PPVA's portfolio, and that investors had been materially misled about PPVA's ability to meet investor redemption requests. *See* District Court Dkt. 785.

The Black Elk scheme received far less attention and the Government devoted far less trial time to it. The Government called just a handful of witnesses to provide evidence on the alleged scheme (including Attorney Shearer, Beechwood employee Israel Wallach, and cooperating witness Manela) and just two witnesses in an effort to establish materiality (bondholders Dixon Yee and Todd Pulvino). *See* District Court Dkt. 785; LA-192-201.

Moreover, in the middle of the trial, the Government changed its theory on the Black Elk scheme. The indictment alleged that the defendants defrauded the

- 21 -

bondholders by rigging the Consent Solicitation process—that is, *secretly controlling the outcome* of the vote by withholding the information that certain affiliated entities of Black Elk were also participating in the vote. *See* LA-161-69. In alignment with that initial theory, the Government, in its opening statement, told the jury the vote "was a complete sham" and "guaranteed from the start" and also saying that that the "defendants *actually voted* all of those bonds that they hid away in companies they secretly controlled, bonds that alone made up *more than half* of the total number of bonds and guaranteed the vote would pass." LA-254-55 (emphasis added). In other words, the central misrepresentation allegedly made to the bondholders was that this was an open vote, even though the defendants secretly controlled more than half of the bonds and so it was guaranteed that the amendment would be adopted.

That theory, however, completely unraveled when Attorney Shearer's testified that he *did not count* any of the Platinum Fund's votes which meant that the defendants *did not in fact control the vote*. LA-378-79. With its theory of the case contradicted, the Government reverted to a new theory that focused on the Black Elk bonds Nordlicht had informed the lawyers he intended to sell to "friendly" companies (*i.e.*, Beechwood funds). More specifically, the Government's new theory was that Black Elk Bonds were "hidden" in Beechwood funds and that Platinum Partners and Nordlicht "controlled" the Beechwood funds,

- 22 -

thus making Beechwood an affiliate of Black Elk, thereby necessitating the exclusion of Beechwood's bonds from the vote under the Indenture.  LA-390. Under this new theory, while the vote of the Black Elk Bonds owned by Beechwood's affiliates did not guarantee any particular outcome, it increased the likelihood that the amendment to the Indenture would pass, and this was information the bondholders would have liked to have known when deciding how to vote on the Consent Solicitation.  *See* LA-391-93 (Government arguing in closing that "bondholders would have wanted to know" that companies affiliated with Platinum were voting in the Consent Solicitation and "would have made a different decision about what to do with their bond[s]" if they had known).

### 2. The Jury's Verdict, The District Court's Ruling On Post-Trial Motions, And The First Appeal

On July 9, 2019, the jury returned a verdict acquitting Levy on all counts related to the Platinum Scheme but convicting him on all counts relating to the Black Elk Scheme.  LA-184-86.

Levy then moved, pursuant to Federal Rule of Criminal Procedure 29, for a judgment of acquittal as to all counts relating to Black Elk Scheme because the evidence was insufficient to support his conviction for multiple reasons, including that there was insufficient evidence of criminal intent.  District Court Dkt. 785.

- 23 -

Levy argued, alternatively, that a new trial was required under Federal Rule of Criminal Procedure 33.  District Court Dkt. 785.

On September 27, 2019, the district court entered an order granting Levy's motion for judgment of acquittal and conditionally granting his motion for a new trial based on its conclusion that the "evidence of Levy's criminal intent is insufficient to sustain a guilty verdict."  LA-214.  Since that conclusion was sufficient to grant Levy's motions, the court did not reach the other arguments he raised.  LA-218 ("Because the Court grants the motion for a judgment of acquittal, the Court need not and does not reach Levy's additional grounds for moving for a judgment of acquittal.").

The Government appealed.  On November 5, 2021, this Court reversed the district court's order granting Levy's post-trial motions.  *Landesman*, 17 F.4th 298.  More specifically, this Court vacated the district court's judgment of acquittal and conditional grant of a new trial as to Levy and remanded for further proceedings consistent with its opinion.  *Id.* at 319-32, 342.

### 3.    The District Court's Orders On Remand

On remand, Levy renewed his Rule 29 and Rule 33 motions based on previously unconsidered grounds, including that: (i) the trial evidence showed that the number of bonds owned by Platinum entities was not material; (ii) the Government's theory that Beechwood was an affiliated entity in violation of the

Trust Indenture Act was incorrect as a matter of law and therefore invalid evidence of his intent; (iii) the Government constructively amended the indictment by impermissibly shifting its theory in the middle of trial; (iv) newly discovered evidence regarding Platinum's alleged control of Beechwood necessitated a new trial; (v) no fraud actually occurred because the amended and original Indenture permitted Black Elk to use proceeds of the asset sale for purposes other than repurchasing debt; and (vi) the Government engaged in prosecutorial misconduct by knowingly eliciting false testimony. District Court Dkt. 886, 888. On May 9, 2022, the district court denied both motions. LA-224-49.

In the meantime, on August 12, 2022, the jury returned a verdict convicting Small on Counts Six and Eight and acquitting him on Count Seven. LA-123. Levy and Nordlicht jointly renewed their Rule 33 motions based on evidence that was presented at Small's trial. District Court Dkt. 971, 972. Before those motions were decided, the Supreme Court issued its opinion in *Ciminelli v. United States*, 598 U.S. 306 (2023), which held that the right-to-control theory was not a valid basis to convict under the federal fraud statutes. In light of the Supreme Court's ruling, the district court permitted Levy and Nordlicht to submit additional briefing addressing the impact of *Ciminelli* on their convictions, which the district court

- 25 -

construed as renewed motions for a judgment of acquittal. District Court Dkt. 999.[7]

On July 12, 2023, the district court issued an order that denied Levy's new trial motion, denied his motion for a judgment of acquittal as to the conspiracy to commit securities fraud and securities fraud counts, but granted his motion for a judgment of acquittal as to the conspiracy to commit wire fraud count. LSPA-1-13.

With respect to the wire fraud conspiracy conviction, the district court found that "no reasonable jury could find beyond a reasonable doubt that Nordlicht and Levy intended to defraud bondholders of the proceeds of the Renaissance sale except under a 'right-to-control' theory." LSPA-10. In reaching this conclusion, the district court reasoned that "the bondholders never had a claim to the Renaissance proceeds, as the original indenture permitted Black Elk to use asset sale proceeds in a variety of ways that didn't include paying back bondholders" and also noted that "the Government has not pointed to a single exhibit or portion of witness testimony in support of its argument that Nordlicht and Levy misled bondholders with the intent to deprive them of the Renaissance proceeds. . . ."

---

[7] At the May 16, 2023 hearing on loss calculation—just five days after *Ciminelli* was decided—the district court directed the parties to submit additional briefing regarding the impact of *Ciminelli* on defendants' pending renewed post-trial motions. *See* LA-128; District Court Dkt. 1000 at 2-3.

LSPA-10-11.  Recognizing that *Ciminelli* "rejected the Second Circuit's right-to-control theory as inconsistent with 'traditional concepts of property,' the text of 18 U.S.C. § 1343, and the structure and history of the federal fraud statutes," the district court granted Levy's motion for judgment of acquittal as to the wire fraud conspiracy count.  LSPA-10; LSPA-12.

Despite its conclusion that all of the Black Elk Scheme convictions were based on a right-to-control theory, the district court summarily rejected the application of *Ciminelli* to the securities fraud convictions.  In a footnote spanning just three sentences, the district court—while acknowledging that "Defendants' supplemental briefing argues that *Ciminelli* also requires vacatur of their securities fraud convictions"—simply noted that 15 U.S.C. §§ 78j and 78ff did not "include a requirement that 'money or property' be the object of a securities fraud" and "decline[d] to read such a requirement into a statutory scheme distinct from that at issue in *Ciminelli*."  LSPA-10.

## SUMMARY OF ARGUMENT

As the district court concluded, there can be no doubt that the Government relied on the right-to-control theory to obtain the convictions against Levy on all counts related to the Black Elk Scheme—Counts Six, Seven, and Eight (securities fraud, conspiracy to commit wire fraud, and conspiracy to commit securities fraud).  But, as the United States Supreme Court's unanimous decision in *Ciminelli*

- 27 -

*v. United States*, 598 U.S. 306 (2023) instructs, the right-to-control theory is not a valid basis for pursuing a conviction under the federal criminal fraud statutes. *Id.* at 316. As the Court explained, a "right-to-control" theory is invoked when the Government asserts that the defendant deprived a victim of "potentially valuable economic information necessary to make discretionary economic decisions." *Id.* at 309 (citation and quotation marks omitted). But the "right" to valuable economic information "is not a traditional property interest" protected by the federal criminal fraud statutes, *id.* at 316, which should not be construed "in a manner that leaves [their] outer boundaries ambiguous," *id.* at 314 n.4 (citation and quotation marks omitted).

Heeding those instructions, the district court correctly concluded that *Ciminelli* barred the wire fraud conviction and entered a judgment of acquittal for Levy on that count. Yet, in a summary fashion, the court denied the motion as to the securities fraud convictions. In doing so, the district court erred as a matter of law—misreading and misapplying *Ciminelli*'s reasoning.

As explained below, although involving a wire fraud conviction, *Ciminelli*'s holding and reasoning applies equally to claims for conspiracy commit securities fraud and securities fraud and, accordingly, bars the convictions on those counts as well. This Court should so hold and vacate Levy's convictions for securities fraud and conspiracy to commit securities fraud.

- 28 -

## STANDARD OF REVIEW

This Court "review[s] legal questions *de novo*[.]"  *United States v. Rajaratnam*, 719 F.3d 139, 153 (2d Cir. 2013).

## ARGUMENT

**I.    Levy's Convictions For Conspiracy To Commit Securities Fraud And For Securities Fraud Must Be Vacated Because They Were Based On The Now-Rejected Right-To-Control Theory**

As the district court correctly found, Levy's convictions as they relate to the Black Elk Scheme could only have been—and indeed were—premised on the now-overruled right-to-control theory.  Thus, the only question up for debate is whether *Ciminelli*'s rejection of the right-to-control theory applies with equal force to the convictions under the securities fraud statutes.  For the reasons discussed below, it does.

**A.    Levy's Convictions Were Indisputably Premised On A Right-To-Control Theory**

To start, there can be no debate that both of the Government's securities fraud counts relied on the right-to-control theory—which the Supreme Court has defined as a fraud theory based on the contention that "the defendant schemed to deprive a victim of potentially valuable economic information necessary to make discretionary economic decisions."  *Ciminelli*, 598 U.S. at 310.    As the Government alleged in bringing this criminal case, the defendants deprived the Black Elk bondholders of valuable economic information—namely, the fact that

- 29 -

Platinum-affiliated entities owned Black Elk Bonds, would vote those bonds in connection with the Consent Solicitation, and thus would control the vote. The same goes for the theory to which the Government pivoted mid-trial—even though the bonds held by Beechwood were not enough to control the vote, the bondholders would have wanted to know about Beechwood's alleged relationship with Platinum and that Beechwood's votes would be counted. The record fully bears out that the Government advanced a right-to-control theory of fraud.

*First*, that is the exact theory the Government argued to the jury during its closing. The Government told the jury that:

> The bondholders *would have wanted to know* if this vote was rigged, that it was corrupt. They *would have wanted to know* that, that the people who were supposed to be not influencing the vote were the very people who had their hands in it making sure it went their way. Dixon Yee and Todd Pulvino told you how important this would have been to them. *They said if they had known the truth about what was happening here*, that Platinum controlled 98 million in bonds and the vote was fixed from the start, *they would have made a different decision* about what to do with their bond[s] or they would have tried to somehow undo this illegal vote.

LA-391-93 (emphasis added). In other words, according to the Government, the fraud consisted of depriving the bondholders of information that they would have wanted to know in making the discretionary decision on how to vote on the Consent Solicitation. That is quintessentially a right-to-control theory. *See Ciminelli*, 598 U.S. at 310 (describing the "right-to-control" theory as "showing that the

- 30 -

defendant schemed to deprive a victim of potentially valuable economic information necessary to make discretionary economic decisions").

*Second*, there can be no dispute that the jury *did* convict on this theory given the instructions provided to the jury. Because the right-to-control theory was valid under Second Circuit law at the time of trial, the district court, unsurprisingly, told the jury that "fraud" is simply "a general term" that "encompasses all efforts and means that individuals devise to unlawfully, willfully, and intentionally take advantage of others." LA-395-96. This instruction, coupled with the Government's closing arguments emphasizing that bondholders were deprived of information they "would have wanted to know" makes it highly likely, if not certain, that Levy was convicted based on the right-to-control theory.

The district court agreed on that point. In ruling on Levy's post-trial motions, the district court found that "no reasonable jury could find beyond a reasonable doubt that Nordlicht and Levy intended to defraud bondholders of the proceeds of the Renaissance sale *except* under a 'right-to-control' theory." LSPA-10 (emphasis added). As the court explained, "the bondholders never had a claim to the Renaissance proceeds" and "[e]ven if bondholders did have such a claim, the Government has not pointed to a single exhibit or portion of witness testimony in support of its argument that Nordlicht and Levy misled bondholders with the intent to deprive them of the Renaissance proceeds. . . ." LSPA-10.

- 31 -

Moreover, "the entire point of a security interest is to ensure you can still receive something of value in the event a debtor doesn't pay you back," and so, as the district court further noted, it would be "absurd to claim that defendants intended to defraud Black Elk's bondholders of a security on a debt while simultaneously offering to pay off that debt." LSPA-11. In other words, the alleged scheme itself did not and could deprive the bondholders of anything but certain information they allegedly might have wanted to know.

Because Levy's conviction could only have been premised on the right-to-control theory, the district court concluded that *Ciminelli* compelled a vacatur of Levy's wire fraud conviction as a matter of law. But the court did not finish the job that *Ciminelli* mandates and erred as a matter of law in failing to apply *Ciminelli*'s holding, and the reasoning used to reach it, to the securities fraud and conspiracy to commit securities fraud counts. As explained below, that decision cannot stand.

**B.**    ***Ciminelli's* Elimination Of The Right-To-Control Theory Applies Equally To Federal Securities Fraud**

Given that Levy's conviction was unquestionably premised on the right-to-control theory, the central question is whether the Supreme Court's holding in *Ciminelli* that "[t]he right-to-control theory cannot be squared with the text of the federal fraud statutes, which are 'limited in scope to the protection of property

rights,'" *Ciminelli*, 598 U.S. at 314, applies with equal force to the federal securities fraud statutes. The answer to that question is "yes."

In *Ciminelli*, the Government charged defendants with a conspiracy to commit wire fraud based on their payment to an associate of the Governor of New York in exchange for qualifications for state-funded contracts that would ensure the selection of *Ciminelli's* company. *Ciminelli*, 598 U.S. at 310. The Government argued that the defendants defrauded Fort Schuyler Management Corporation, the contracting party, by depriving it of the "valuable economic information" necessary to make a discretionary economic decision, *i.e.*, the awarding of the contracts. *Id.* at 310. The jury found Ciminelli guilty of wire fraud on this theory and the Second Circuit affirmed on the ground that by "rigging the RFPs to favor their companies, defendants deprived Fort Schuyler of potentially valuable economic information." *Id.* (citation and quotation marks omitted).

By a unanimous vote, the Supreme Court reversed, holding that the Government's right-to-control theory impermissibly expanded the scope of the federal fraud statutes. In so holding, the Court stressed that federal fraud statutes, as a category, are limited in scope: "***the federal fraud statutes*** criminalize only schemes to deprive people of traditional property interests." *Id.* at 309 (emphasis added). Accordingly, the Court rejected an expansive interpretation of the federal

wire fraud statute that encompassed not simply schemes to deprive alleged victims of traditional money or property interests but also "schemes to deprive the victim of potentially valuable economic information necessary to make discretionary economic decisions." *Id*. (citation and quotation marks omitted). "The right to valuable economic information needed to make discretionary economic decisions," the Supreme Court explained, "is not a traditional property interest." *Id*. at 316. And so, a "right-to-control theory cannot form the basis for a conviction under the federal fraud statutes." *Id*.

Reinforcing that holding, the Court went on to explain the unacceptable consequences that flow from utilizing a right-to-control theory to support a conviction under the federal fraud statutes: "Because the theory treats mere information as the protected interest, almost any deceptive act could be criminal," and that, in turn, "vastly expands federal jurisdiction without statutory authorization." *Id*. at 315.

The breadth of the Supreme Court's holding in *Ciminelli*—which speaks to "the federal fraud statutes" generally, *Ciminelli*, 598 at 314—is not surprising. That is because *Ciminelli*, as groundbreaking as it might seem to be, is just the most recent in a series of Supreme Court decisions limiting the scope of the types of "fraud" theories that can be employed to secure a conviction under the federal fraud statutes. *See Skilling v. United States,* 561 U.S. 358 (2010) (limiting honest

- 34 -

services wire fraud to schemes involving kickbacks and bribes); *McDonnell v. United States*, 579 U.S. 550 (2016) (limiting honest services fraud to "official acts"); *Kelly v. United States*, 590 U.S. 391 (2020) (holding that federal wire and mail fraud statutes reach only "tangible" property interests). And, this term, the Supreme Court will decide in *Kousisis v. United States*, Case No. 23-909, whether fraudulent inducement of a contract satisfies the federal mail and wire fraud statutes.

Yet, despite *Ciminelli's* broad pronouncements, the district court concluded that it does not apply to the securities fraud statutes. It reasoned that "in drafting 15 U.S.C. §§ 78j and 78ff, Congress did not include a requirement that 'money or property' be the object of a securities fraud" and "decline[d] to read such a requirement into a statutory scheme distinct from that at issue in *Ciminelli*." LSPA-10. The court further observed that "the securities laws criminalize not only schemes 'to defraud' but 'any manipulative [or] deceptive device or contrivance,' § 78j(b), including material misstatements or omissions. . . ." LSPA-10.

That reasoning—an attempt to confine *Ciminelli*'s import—is irretrievably flawed. True, the securities fraud statute under Title 15, with which Levy was charged, does not explicitly contain the words "money or property" *See* 15 U.S.C. §§ 78j, 78ff; 17 C.F.R. § 240.10b-5. And, yes, another criminal securities fraud

statute under Title 18, by contrast, does contain the words "money or property," making it illegal "to obtain, by means of false or fraudulent pretenses, representations, or promises, any ***money or property*** in connection with the purchase or sale of . . . any security of an issuer with a class of securities registered under section 12 of the Securities Exchange Act of 1934. . . ." 18 U.S.C. § 1348(b) (emphasis added).

But the absence of the magic words "money or property" in Title 15's antifraud statutes does not undermine the applicability of *Ciminelli* to the securities fraud convictions here,[8] and if the Supreme Court were to be confronted with the

---

[8] The right-to-control theory asserted here differs from a securities fraud case charging that the defendant disseminated false information in the market to dupe investors into buying a security at an artificially inflated price. In such a case, the defendant seeks to deprive purchasers of money by getting them to ***pay more*** for the security than it is truly worth. By contrast here, the Government's theory was that, had the defendant disclosed that the affiliated bonds would vote, then the bondholders "would have made a different decision about what to do with their bond[s]," namely tender them at par. LA-391-92. In other words, the Government argued that bondholders were deprived of their ***right to make an informed decision*** by the alleged fraud, but it could not argue that the bondholders actually lost money in the Consent Solicitation because, once the results of the vote were announced, the price of Black Elk Bonds did not drop, and in fact increased, in the following weeks, *see* District Court Dkt. 1005, and, as the district court correctly noted, "the bondholders never had a claim to the Renaissance proceeds" and there was no evidence that the defendants "misled bondholders with the intent to deprive them of the Renaissance proceeds," LSPA-10-11.

question, it would undoubtedly hold that the reach of *Ciminelli* extends to securities fraud under Title 15. That is true for several reasons.

*First*, the very decision from this Court that first recognized the right-to-control theory, and which was expressly overruled by the Supreme Court, *United States v. Wallach*, 935 F. 2d 445 (2d Cir. 1991), involved securities fraud convictions under Title 15. In *Wallach*, defendants were charged with, among other things, "one count of securities fraud, in violation of 15 U.S.C. §§ 78j(b), 78ff, 18 U.S.C. § 2, and 17 C.F.R. § 240.10b-5." *Id*. at 449. In articulating the contours of the now rejected right-to-control theory, the *Wallach* court explicitly did so in the context of a shareholder's supposed right to accurate information—reasoning that "the right to complete and accurate information is one of the most essential sticks in the bundle of rights that comprise a stockholder's property interest." *Id*. at 463.

In overruling *Wallach*, the Supreme Court specifically criticized this "'bundle of stocks' metaphor of property rights" finding that it "cannot compensate for the absence of an interest that itself 'has long been recognized as property,' particularly in light of our rejection of attempts to construe the federal fraud statutes 'in a manner that leaves [their] outer boundaries ambiguous.'" *Ciminelli*, 598 U.S. at 314 n.4 (citation omitted). While it is true that the Supreme Court did not explicitly state that securities fraud actions under Title 15 cannot be

premised on the right-to-control, the Supreme Court (i) discussed at length and overruled *Wallach*, a criminal case involving securities fraud under Title 15; (ii) rejected the notion that a stockholder's right to complete and accurate information is a recognized property interest; and (iii) relied on its rejection of the right-to-control theory in the shareholder context as the analytical basis for eliminating the right-to-control theory all together. *See Ciminelli*, 598 at 313-14 & n.4. There, accordingly, can be no doubt that *Ciminelli* extends equally to securities fraud under Title 15.

*Second*, limiting *Ciminelli's* reach to only those statutes that expressly contain the words "money or property" would undermine Congress's intent to provide the Government with a broader enforcement scheme in Title 18 as compared to Title 15.[9] To start, the Supreme Court based its rejection of the right-to-control theory, in part, on its "inconsisten[cy] with the structure and history of the federal fraud statutes[,]" noting that it was first recognized by this Court "in 1991—decades after the wire fraud statute was enacted and over a century after the mail fraud statute was enacted." *Id.* at 314-15. The securities fraud statute

---

[9] As discussed above, the district court's rationale for declining to apply *Ciminelli* to 15 U.S.C. §§ 78j and 78ff was explicitly premised on the absence of a "money or property" language in those statutes. LSPA-10 n.4. While no reported decision has yet addressed whether the reasoning of *Ciminelli* extends to 18 U.S.C. § 1348(b), because this statute, like the wire fraud statute, does contain a "money or property" requirement, it clearly does.

under Title 15 dates just as far back—to 1934—and so there is no reason to think that its drafters contemplated a right-to-control theory as a basis for criminal liability under that statute.

But equally important, as this Court has recognized, the Title 18 securities fraud statute "was intended to provide prosecutors with a different—and broader—enforcement mechanism to address securities fraud than what had been previously provided in the Title 15 fraud provisions." *United States v. Blaszczak*, 947 F.3d 19, 36-37 (2d Cir. 2019) (vacated on other grounds). As this Court explained, "Section 1348 was added to the criminal code by the Sarbanes-Oxley Act of 2002 in large part to overcome the 'technical legal requirements' of the Title 15 fraud provisions" and "Congress intended for Section 1348 to 'supplement the patchwork of existing technical securities law violations with a more general and less technical provision, with elements and intent requirements comparable to current bank fraud and health care fraud statutes.'" *Id*. at 36. In other words, 18 U.S.C. 1348 was intended to **broaden** the reach of the securities fraud statute under Title 15 and, by definition, make Title 15 the more **restrictive** of the two. But if *Ciminelli* were interpreted to extend only to Title 18—because it contains the words "money or property"—the opposite would become true, and Government would be free to prosecute individuals under a right-to-control theory

- 39 -

under Title 15 even though they are barred from doing so under Title 18. That, in turn, would undermine Congress's intent.

*Third*, while the antifraud statutes under Title 15 do not use the magic words "money or property," their very purpose is "to protect persons who are deceived in securities transactions—to make sure that buyers of securities get what they think they are getting and that sellers of securities are not tricked into parting with something for a price known to the buyer to be inadequate or for a consideration known to the buyer not to be what it purports to be." *Chem. Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 943 (2d Cir. 1984). In other words, the very purpose of Title 15 is to protect buyers and sellers (*i.e.*, persons exchanging ***money***) from entering into transactions for securities (*i.e.*, ***property***) based on fraudulent pretenses. The mere fact that the specific words "money or property" are absent does not meaningfully distinguish Title 15 securities fraud from other federal fraud statutes, as the entirety of that statutory scheme is intended to regulate ***money*** transactions related to a specific type of ***property*** interest—securities.

Indeed, that "money or property" must be the object of the alleged securities fraud under Title 15 is further confirmed by its essential elements. To establish securities fraud under Title 15, a plaintiff must establish that the fraud was done "in connection with the purchase or sale of any security. . . ." 15 U.S.C. § 78j(b); *Romano v. Kazacos*, 609 F.3d 512, 521 (2d Cir. 2010) ("§ 10(b)'s 'in connection

- 40 -

with' requirement is met where a fraudulent scheme and a purchase or sale of securities 'coincide.'") (citing *SEC v. Zanford*, 535 U.S. 813, 822). Given that essential element, securities fraud necessarily involves money or property (*i.e.*, a security).

On that front, *Chadbourne & Parke LLP v. Troice*, 571 U.S. 377 (2014) is instructive. There, the Supreme Court observed that "every securities case in which this Court has found a fraud to be 'in connection with' a purchase or sale of a security has involved victims who took, who tried to take, who divested themselves of, who tried to divest themselves of, or who maintained *an ownership interest* in financial instruments that fall within the relevant statutory definition." *Id.* at 388 (emphasis original). In other words, the object of a securities fraud necessarily involves money or property. Indeed, in construing the "in connection with" element of a securities fraud violation, this Court explicitly held that "Congress . . . 'intended . . . that the device employed, whatever it might be, be of a sort that would cause reasonable investors to rely thereon, and, in connection therewith, so relying, cause them to purchase or sell a corporation's securities. . . .'" *In re Carter-Wallace, Inc. Sec. Litig.*, 150 F.3d 153, 156 (2d Cir. 1998) (quoting *SEC v. Tex. Gulf Sulphur Co.*, 401 F.2d 833, 860 (2d Cir. 1968)). Thus, any securities fraud claim, by its very nature, necessarily involves *money* (*i.e.,* "purchase or sell") *and property* (*i.e.*, "securities").

- 41 -

*Finally*, if there were any remaining doubt that *Ciminelli*'s core holding—that the federal antifraud statutes do not criminalize activities that merely deprive others of information—applies with full force to securities fraud and thereby forecloses convictions based on a right-to-control theory, this Court has already suggested that it does. In *SEC v. Govil*, 86 F.4th 89 (2d Cir. 2023), this Court observed that *Ciminelli* "cast doubt—albeit in a different context—on the proposition that mere deception without harm to property rights is sufficient to state a federal fraud claim." *Id*. at 105. Although *Govil* dealt with the disgorgement phase following judgment in an SEC enforcement action, this Court nevertheless rejected the lower court's theory that the investors were victims because they "were told a 'lie'" as "not far from the theory rejected in *Ciminelli*." *Id*. That theory, as this Court explained, amounted to an assertion that "investors were . . . denied the right to make an informed decision when considering whether to make the investment." *Id*. But under *Ciminelli*, "'the right to make informed decisions about the dispositions of one's assets' is not a property interest and offending that right does not result in pecuniary harm." *Id*. Accordingly, this Court found that the district abused its discretion in ordering disgorgement. *Id*. at 111.

Though decided in a different context, this Court's reasoning in *Govil* applies with equal force here. At trial, the Government did not argue (let alone

- 42 -

prove) that the object of the alleged securities fraud was to deprive bondholders of a recognized property interest. Rather, the Government's theory was that defendants sought to deprive the bondholders of information that they "would have wanted to know" in deciding how to vote their Black Elk Bonds. After *Ciminelli*, it is clear that such information is not a recognized property interest. Levy's conviction on the securities fraud counts therefore must be vacated.

## II. Levy Joins The Co-Appellants' Applicable Arguments

Pursuant Rule 28(i) of the Federal Rules of Appellate Procedure, Levy joins all applicable arguments raised in co-appellants Small and Nordlicht's briefs, including arguments in support of a judgment of acquittal under Rule 29 and arguments alternatively supporting a new trial under Rule 33.

## CONCLUSION

This Court should reverse and direct the entry of judgment of acquittal for Levy on Count 6 (conspiracy to commit securities fraud) and Count 8 (securities fraud). In the alternative, this Court should vacate Levy's convictions on Count 6 and Count 8 and remand for a new trial.

Dated: December 30, 2024    Respectfully submitted,

          /s/ *Kim M. Watterson*
          Kim M. Watterson
          REED SMITH LLP
          Reed Smith Centre
          225 Fifth Avenue
          Pittsburgh, PA 15222
          (412) 288-7996
          kwatterson@reedsmith.com

          Charles P. Hyun
          REED SMITH LLP
          599 Lexington Avenue
          New York, NY 10022
          (212) 521-5400
          chyun@reedsmith.com

          *Attorneys for Appellant and Cross-Appellee David Levy*

- 44 -

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2)(A) and 32(a)(7)(B), and Local Rule 32.1(a)(4)(A), because it contains 10,020 words, excluding the parts exempted by Fed. R. App. P. 32(f).

This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in CG Times 14-point font.

*/s/ Kim M. Watterson*
Kim M. Watterson

# SPECIAL APPENDIX

-i-

# TABLE OF CONTENTS

                                                    **Page**

Memorandum Decision and Order, filed July 12, 2023 ……………… LSPA-001

Judgment in a Criminal Case, filed January 11, 2024……………… LSPA-014

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
                                                              :
   UNITED STATES OF AMERICA,                                  :
                                                              :
   - against –                                                :   **MEMORANDUM DECISION AND**
                                                              :   **ORDER**
   MARK NORDLICHT and                                         :
   DAVID LEVY,                                                :   16-cr-00640 (BMC)
                                                              :
                          Defendants.                         :
                                                              :
------------------------------------------------------------- X

**COGAN,** District Judge.

Before the Court is (1) defendant Mark Nordlicht's renewed motion for a new trial under

Fed. R. Crim. P. 33, in which defendant David Levy joined, and (2) defendants' supplemental

briefing addressing the Supreme Court's recent decision in Ciminelli v. United States, 143 S. Ct.

1121 (2023), which the Court construes as a renewed motion for a judgment of acquittal pursuant

to Fed. R. Crim. P. 29.  For the reasons that follow, both motions for a new trial are denied.  The

Court grants judgment of acquittal on Nordlicht and Levy's convictions for conspiracy to

commit wire fraud and otherwise denies their motion for a judgment of acquittal.

## BACKGROUND

Nordlicht and Levy were tried in 2019, and a jury found them guilty of three of the eight

counts charged in the indictment, namely, securities fraud, conspiracy to commit securities fraud,

and conspiracy to commit wire fraud.  I granted Nordlicht's motion for a new trial under Rule 33

and also granted Levy's motion for judgment of acquittal under Rule 29.  See United States v.

Nordlicht, No. 16-cr-00640, 2019 WL 4736957, at *1 (E.D.N.Y. Sept. 27, 2019).  I also

alternatively granted Levy's Rule 33 motion in the event that his judgment of acquittal was later

reversed.  The Second Circuit did reverse, United States v. Landesman, 17 F.4th 298 (2d Cir.

**LSPA-001**

2021), holding that this Court erred in granting Levy's Rule 29 motion and abused its discretion in granting both defendants a new trial.

Back before this Court on remand, Nordlicht and Levy filed renewed Rule 29 and Rule 33 motions, which were denied. United States v. Nordlicht, No. 16-cr-640, 2022 WL 1469393, at *1 (E.D.N.Y. May 10, 2022). After that, in the summer of 2022, Nordlicht and Levy's co-defendant, Daniel Small, went to trial. Small was charged in the same scheme as Nordlicht and Levy and was originally set to be tried jointly with them, but Small's trial was ultimately severed at the last minute due to counsel unavailability. The jury found Small guilty of securities fraud and conspiring to commit securities fraud but not guilty of conspiring to commit wire fraud.

Nordlicht and Levy now renew their Rule 33 motion for a third time, based in part on additional evidence adduced at Small's trial.

## **DISCUSSION**

### I. **Legal Standard**

Under Rule 29(c), "[i]f the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." "When a defendant moves for a judgment of acquittal, the Court must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt." United States v. Mariani, 725 F.2d 862, 865 (2d Cir. 1984).

"A reasonable mind must be able to conclude guilt on each and every element of the charged offense." Id. "However, all reasonable inferences are to be resolved in favor of the prosecution and the trial court is required to view the evidence in the light most favorable to the Government with respect to each element of the offense." Id. "The evidence is to be viewed not

in isolation but in conjunction," id., "as each fact may gain color from others," Landesman, 17 F.4th at 319.  Moreover, "the Government need not negate every theory of innocence."  Id.

As a result, "a defendant challenging the sufficiency of the evidence bears a heavy burden."  Id.  The "high degree of deference afforded to a jury verdict is especially important when reviewing a conviction of conspiracy . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel."  Id. at 320.  However, a conviction based on speculation alone cannot stand.  Specious inferences should not be indulged "because it would not satisfy the Constitution to have a jury determine that the defendant is *probably* guilty." United States v. Lorenzo, 534 F.3d 153, 159 (2d Cir. 2008) (quoting Sullivan v. Louisiana, 508 U.S. 275, 278 (1993)).

Rule 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."  The Second Circuit has recently described the circumstances under which a district court may grant a Rule 33 motion for a new trial to those in which the "evidence preponderates heavily against the verdict to such an extent that it would be 'manifest injustice' to let the verdict stand."  United States v. Archer, 977 F.3d 181, 187 (2d Cir. 2020).  Granting a Rule 33 motion is an abuse of discretion unless "the evidence was patently incredible," the evidence "defied physical realities," "an evidentiary or instructional error compromised the reliability of the verdict," or "the government's case depend[ed] upon strained inferences drawn from uncorroborated testimony."  Landesman, 17 F.4th at 331.  Although "this is not an exhaustive list," the Second Circuit has cautioned that granting Rule 33 motions is only appropriate "in the most extraordinary circumstances."  Id. at 330-31.

## II.      The BakerHostetler Memo and Hoffman's 3500 Materials

Nordlicht and Levy argue, first, that they were convicted on the "demonstrably false theory" that they hid Platinum's relationship with Beechwood from Black Elk and Black Elk's law firm, BakerHostetler.  The Government's theory, they claim, is belied by the July 1, 2014 memo from BakerHostetler litigator Paul Francis to Black Elk's then-CEO, John Hoffman, and then-General Counsel, Marizza Piché.[1]  The memo notes: "Platinum [h]as stated that it intends to pay $60 Million of the funds to redeem $60 Million of the currently outstanding secured bond holder debt of $150 Million, which will leave $90 Million in bond debt in the hands of so-called 'friendly' bond holders, most of which is held by Platinum itself."  Nordlicht and Levy also highlight Shearer's testimony that in April or May of 2014, before the public consent solicitation process, Shearer learned that Platinum owned roughly $100 million in Black Elk bonds.  In defendants' view, this evidence fatally undermines the Government's theory of scienter.

This Court relied on the BakerHostetler memo and Shearer's knowledge of Black Elk's ownership when granting defendants new trials back in 2019.  See Nordlicht, 2019 WL 4736957, at *17-18.  The Second Circuit disagreed, concluding neither Shearer's knowledge nor the BakerHostetler memo negated the jury's finding regarding Nordlicht's criminal intent.  Addressing the BakerHostetler memo, the Second Circuit emphasized there was no evidence in the record that (1) Nordlicht provided the information that formed the basis for this memo, (2) the memo was completed at Nordlicht's request, (3) the memo opined on the affiliate status of any of the Platinum-related entities, or (4) Nordlicht received or relied on any such memo in formulating his views about the affiliate rule.  See Landesman, 17 F.4th at 338.

---

[1] This memo was excluded as hearsay at both trials.

4

**LSPA-004**

Nordlicht and Levy now argue that point (1) was false because Hoffman's 3500 materials reveal that the relevant information in the BakerHostetler memo did, in fact, come from Nordlicht. The Court agrees with defendants that Hoffmann's 3500 materials reveal that the information about "friendly" bondholders in the BakerHostetler memo must have come from Nordlicht, as Hoffman told the Government that, prior to meeting with Nordlicht, he "did not know who the bond holders were." Yet, as the Government points out, these 3500 materials were produced to defendants long before the Nordlicht-Levy trial, and defendants did not call Hoffman as a witness or raise this argument in any of their previous post-trial submissions. As a result, this argument is untimely. See Fed. R. Crim. P. 33(b)(2) ("[A]ny motion for a new trial grounded on any reason other than newly discovered evidence must be filed within 14 days after the verdict or finding of guilty.").

Timeliness aside, the Court agrees with the Government that this argument fails on the merits under Landesman. Nordlicht was charged with misleading bondholders, not with deceiving Black Elk's management, and his disclosure to Hoffman was not reasonably calculated to reach bondholders. When Nordlicht shared this information with Hoffman, he had no idea that Hoffman would turn around and tell Francis, especially since Hoffman went to Francis for advice on whether he should sue Platinum, Nordlicht's company. Nor was there any reason to think Hoffman, a litigator, would share that information with Shearer, the deal lawyer overseeing the consent solicitation process.

The Second Circuit was clearly focused on the information Nordlicht concealed from Shearer. See Landesman, 17 F.4th at 337-38. But even if Nordlicht had called up Shearer in July 2014 and told him that $90 million in bonds were held by Platinum and "friendly" bondholders – that wouldn't necessarily reveal an intent to comply with the affiliate rule unless

5

**LSPA-005**

Nordlicht also "identif[ied] his 'friendly holders,'" "explain[ed] why they were not considered 'affiliates,'" or "ask[ed] any questions or s[ought] further advice regarding the application of the Affiliate Rule." Id. at 332.[2]  Nordlicht and his co-defendants had every opportunity to raise the question of Beechwood's affiliate status with Shearer before the public consent solicitation, but they chose not to.  This, combined with other circumstantial evidence of criminal intent, persuaded a jury beyond a reasonable doubt that Nordlicht and Levy intended to deceive bondholders.  Although I disagreed with that finding, this question has already been decided decisively in the Government's favor.

Nordlicht and Levy also argue that the Government "knew or should have known" that they misled this Court and the Second Circuit when they represented that Nordlicht "had no involvement" in the BakerHostetler memo.  They argue the Government's false statements violated due process and warrant a new trial.

The Government's prior presentation to this Court – that "any information in the [BakerHostetler memo] came <u>not</u> from Platinum, the Defendants, or their co-conspirators" – was certainly misleading, if not outright false.  We now know that this information came from Nordlicht via Hoffman.  But, again, defendants have had Hoffman's 3500 materials since 2018 and did not raise this issue until now.  The most likely explanation is not, as defendants suggest, that the Government intentionally misled this Court and the Second Circuit but rather that the Government (like defendants) simply overlooked it.

---

[2] For this reason, it doesn't much matter whether Shearer learned the contents of the BakerHostetler memo around June 26, 2014, before the public consent solicitation vote.  In assessing defendants' criminal intent, we must look at defendants' conduct, not what Shearer may have learned through the grapevine.  Although one might think it reasonable to rely on lawyers to ask the right questions, Shearer failed to do so, and defendants let him.

Nor does Government bad faith really matter; introducing a false statement in a criminal proceeding can violate due process even where the prosecutor is ignorant of its falsity. See Mills v. Scully, 826 F.2d 1192, 1195 (2d Cir. 1987). Rather, defendants' due process claim fails because they cannot show a "reasonable likelihood" that the Government's statements affected the outcome of the case. See Jenkins v. Artuz, 294 F.3d 284, 292 (2d Cir. 2002). Although the Second Circuit relied on the fact that there was "no evidence in the record that Nordlicht provided the information that formed the basis for the [BakerHostetler] memo," Landesman, 17 F.4th at 337, it did so when considering whether Nordlicht concealed PPCO and PPLO's affiliate status. The panel had already separately concluded that Nordlicht concealed Beechwood's status, which is enough by itself to sustain his convictions. As the Landesman panel explained, "even if the district court were correct that the evidence demonstrates that Nordlicht never intended to conceal PPCO and PPLO's affiliate status . . . there is . . . substantial circumstantial evidence from which a jury could conclude that Nordlicht understood that Beechwood was an affiliate and intended to conceal its affiliate status from the bondholders." Id. Of course, the reference to "friendlies" in the BakerHostetler memo likely also refers to Beechwood, but Nordlicht's statements to Hoffman still do not "preponderate[] heavily against a finding that Nordlicht harbored criminal intent" as to Beechwood. For these reasons, the Government's inaccurate statements were harmless.

### III.     Intent to Harm Bondholders

Nordlicht and Levy also argue that two documents introduced at Small's trial show that defendants wanted all non-affiliated bondholders to tender their bonds and be paid in full. The Court agrees; indeed, there is a mountain of evidence that defendants were trying to get rid of debt to save the company. Black Elk was spiraling towards bankruptcy and saddled with two

7

**LSPA-007**

types of onerous debt: $150 million in bonds, on which Black Elk had to pay 13.75% in annual interest, and $110 million in preferred equity at 20% interest, which, if not redeemed after 14 months, escalated to 36%.  A reasonable individual sitting on Black Elk's board would conclude: "If we want to fix this failing company, we need to get rid of some of this debt."  Getting rid of preferred equity was obviously a priority, given the higher interest rate and that the rate was going to increase.  Even so, the evidence at Small's trial made clear that defendants intended to use the proceeds of the Renaissance sale to pay out all non-affiliated bondholders before using the remaining proceeds to pay off the high[er]-interest preferred equity.

For example, on August 9, 2014, shortly before the end of the consent solicitation period, Shulse emailed Nordlicht, informing him that the week ended "with the consents at 67%, so the new indenture passed!" and remarking that although "the tender is still open," it was "interesting that only $2.8 million of the bonds have tendered, I would have expected more … obviously a lot can show up at the last minute."  Nordlicht responded: "That's not really our desired result.  I think some tenders will show up last minute."  In other words, Nordlicht told Shulse that his "desired result" was for bondholders to tender their bonds and receive the proceeds of the Renaissance sale.  Indeed, throughout 2014, Platinum was affirmatively reaching out to independent bondholders to try to buy their bonds.  And during the public consent solicitation process, Platinum encouraged bondholders to tender.  Pulvino, one of the non-affiliated bondholders, testified that during the public consent process, Platinum reached out to bondholders and told them: "[We] really think it would be a good idea for you to tender, [we] would like you to tender your bonds."

The evidence also reflects Nordlicht, Levy, and Small's shared expectation that all independent bondholders would tender and receive the proceeds of the Renaissance sale.  For

**LSPA-008**

example, while the tender offer was outstanding, Small – at Nordlicht's direction – sent

Nordlicht and Levy a chart of the expected uses of the Renaissance proceeds.  The chart showed

that $65 million of the proceeds were being set aside for tendering bondholders, enough to pay

back all non-affiliated bondholders.  Even Shearer, the Government's star witness, testified that

he thought all the bondholders would tender because if "somebody offers all your money back

and interest and you've got a lot of risk, it's a good deal for you, you should take that."  There is

simply no evidence that defendants intended to steal from the bondholders[3] or jump anyone in

line.  Rather, defendants expected that all the bondholders would cash in their bonds and

expressed frustration when they didn't.

However, none of that matters as to Nordlicht and Levy's securities fraud convictions.

As the Government correctly argued in summation at Small's trial: "You can't lie to somebody,

even if you do want to pay them off."  "Intent to harm" is not part of the scienter element of

securities fraud.  United States v. Litvak, 808 F.3d 160, 178 (2d Cir. 2015).  It is enough that

defendants intended to "deceive" or "manipulate" the bondholders.  See Ernst & Ernst v.

Hochfelder, 425 U.S. 185, 193 (1976).  The jury and the Second Circuit found sufficient

evidence that Levy and Nordlicht intended to "deceive" bondholders, Landsman, 17 F.4th at 326,

329, 337, and none of the evidence introduced at Small's trial fatally undermines that finding.

The analysis is different, though, for Nordlicht and Levy's wire fraud conspiracy

convictions.  Wire fraud, unlike securities fraud, does require "an intent to deprive the victim of

money or property."  United States v. Calderon, 944 F.3d 72, 85 (2d Cir. 2019).  At the time

---

[3] The Government argues that defendants did intend to "steal" from the bondholders because – at the time of the public consent solicitation – they were entitled to 106.875 cents per bond, not the 100 cents being offered.  This assumes there would've been 106.875 left for each of the bondholders had Black Elk not paid down some of its debt with the Renaissance sale proceeds.  Moreover, everyone expected that all non-affiliated bondholders would tender, at which point the result of the vote – and the fact that it was rigged – would not have mattered to them.

defendants filed the instant motion, the law in the Second Circuit was that the term "property" in the above standard included "intangible interests such as the right to control the use of one's assets." Id. at 85.  It followed, said the Second Circuit, that a defendant was guilty of wire fraud if he schemed to deprive investors of "potentially valuable economic information" "necessary to make discretionary economic decisions." United States v. Binday, 804 F.3d 558, 570 (2d Cir. 2015).  This was known as the "right-to-control theory" of wire fraud.

While the instant motion was *sub judice*, the Supreme Court decided Ciminelli v. United States, 143 S. Ct. 1121, 1128 (2023), which rejected the Second Circuit's right-to-control theory as inconsistent with "traditional concepts of property," the text of 18 U.S.C. § 1343, and the structure and history of the federal fraud statutes.  This Court thus ordered supplemental briefing to address whether Ciminelli requires vacatur of Nordlicht and Levy's wire fraud conspiracy convictions.[4]

The parties quibble about whether the Government presented a "right-to-control" theory at trial, but either way, no reasonable jury could find beyond a reasonable doubt that Nordlicht and Levy intended to defraud bondholders of the proceeds of the Renaissance sale except under a "right-to-control" theory.  As a preliminary matter, the bondholders never had a claim to the Renaissance proceeds, as the original indenture permitted Black Elk to use asset sale proceeds in a variety of ways that didn't include paying back bondholders.  Even if bondholders did have such a claim, the Government has not pointed to a single exhibit or portion of witness testimony

---

[4] Defendants' supplemental briefing argues that Ciminelli also requires vacatur of their securities fraud convictions, but in drafting 15 U.S.C. §§ 78j and 78ff, Congress chose not to include a requirement that "money or property" be the object of a securities fraud.  The Court declines to read such a requirement into a statutory scheme distinct from that at issue in Ciminelli.  To be sure, Ciminelli held that the "common understanding" of the phrase "to defraud" assumes some damage to property rights, 143 S. Ct. at 1126, but the securities laws criminalize not only schemes "to defraud" but "any manipulative [or] deceptive device or contrivance," § 78j(b), including material misstatements or omissions, 17 CFR § 240.10b–5.

in support of its argument that Nordlicht and Levy misled bondholders with the intent to deprive them of the Renaissance proceeds (and tellingly resorts to citing its own indictment and prosecutor's arguments at trial to support that claim).

The Government tries to rescue the wire fraud convictions by arguing, for the first time, that defendants misled bondholders in order to deprive them of their "contractual protections, priority claim to Black Elk's assets, and their security interest in Black Elk's assets." This is just a restatement of the same argument. The Government may be correct that, in some instances, a contractual right or security interest would constitute "money or property" within the meaning of 18 U.S.C. § 1343. But see Ciminelli, 143 S. Ct. at 1128, 1129 n.4 (rejecting "federal fraud theories that stray from traditional concepts of property" and distinguishing "traditional property interests" from interests that are "useful for protecting and making use of one's property"). But this is not a case where defendants tricked someone into, say, signing over their rights to royalty payments. And if defendants intended to steal the bondholders' contract rights, they wouldn't have been actively encouraging bondholders to extinguish those rights by tendering their bonds.

Moreover, the entire point of a security interest is to ensure you can still receive something of value in the event a debtor doesn't pay you back. It's absurd to claim that defendants intended to defraud Black Elk's bondholders of a security on a debt while simultaneously offering to pay off that debt. The consent solicitation sent to bondholders explicitly stated that the "Proposed Amendments would allow [Black Elk] to apply the Net Proceeds from the Renaissance Sale to . . . purchase for cash" its outstanding bonds. If the bondholders did what defendants wanted and tendered their bonds, there would be no debt to secure. And because defendants' plan was to get all of Black Elk's bonds into the hands of

11

**LSPA-011**

Platinum and Platinum-related entities, the Government's argument amounts to a claim that defendants intended to defraud themselves.

At most, Nordlicht and Levy intended to deprive bondholders of the knowledge that conflicted bonds were voting on the indenture amendments. Ciminelli expressly rejected the notion that nondisclosure of a conflict could serve as the basis for a wire fraud conviction. Specifically, the Supreme Court pointed to United States v. Viloski, 557 F. App'x 28 (2d Cir. 2014) – a Second Circuit case affirming a wire fraud conviction based on an undisclosed conflict of interest – as an example of how the Second Circuit had "vastly expand[ed] federal jurisdiction without statutory authorization" by making "a federal crime of an almost limitless variety of deceptive actions." Ciminelli, 143 S. Ct. at 1128 (citing Viloski). Because no reasonable jury could find that defendants intended to defraud bondholders of anything other than "potentially valuable economic information," Ciminelli, 143 S. Ct. at 1127, Nordlicht and Levy's Rule 29 motion for a judgment of acquittal is granted as to their convictions for conspiracy to commit wire fraud.

The Court grants this motion under Rule 29 rather than Rule 33 because it concludes, in light of Ciminelli, that the evidence at the Nordlicht-Levy trial was insufficient to sustain their convictions for conspiracy to commit wire fraud. The Court construes Nordlicht and Levy's supplemental briefing as a renewed Rule 29 motion on the ground of excusable neglect – namely, an intervening change in the law. See Fed. R. Crim. P. 45(b)(1)(B); see also United States v. Parasmo, No. 19-cr-1, 2023 WL 1109649, at *15 (E.D.N.Y. Jan. 30, 2023).

That said, the Court also alternatively grants a new trial on the wire fraud charge in the interest of justice because (1) it's not clear which theory of intent the jury convicted under, and

(2) evidence at Small's trial (e.g., DX 6793, DX 6405, and Pulvino's testimony) established that defendants lacked the requisite criminal intent to sustain their wire fraud convictions.

## IV.    Control

Nordlicht and Levy also argue, briefly, that testimony at Small's trial further established that Feuer and Taylor, not Nordlicht, controlled Beechwood, such that Beechwood was not under common control with Black Elk.  The Court has already concluded that the evidence at Small's trial was sufficient for a reasonable jury to conclude that Nordlicht "controlled" Beechwood within the meaning of the bond indenture.  See United States v. Small, No. 16-cr-640, 2023 WL 4373392, at *14-15 (E.D.N.Y. July 6, 2023).  I adhere to that determination.

## CONCLUSION

For the foregoing reasons, (1) Nordlicht and Levy's [999] motion for a judgment of acquittal is granted as to their conviction for conspiracy to commit wire fraud (Count 7) but denied as to their securities fraud convictions (Counts 6 and 8); and (2) Nordlicht's [971] renewed motion for a new trial [972], in which Levy joined, is denied as to the securities fraud convictions.

**SO ORDERED.**

_Brian M. Cogan_
U.S.D.J.

Dated: Brooklyn, New York
         July 12, 2023

13

**LSPA-013**

AO 245B (Rev. 10/12/2021)   Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT
### Eastern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA ) <br><br> v. ) <br><br> David Levy ) | **JUDGMENT IN A CRIMINAL CASE** <br><br> Case Number:  1:16-CR-00640-002(BMC) <br><br> USM Number:  89854-053 <br><br> Michael S. Sommer, Esq. <br> Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
   which was accepted by the court.

☑ was found guilty on count(s)   6 and 8 of an eight-count Indictment. _____
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 371 | Conspiracy to Commit Securities Fraud | 12/19/2016 | 6 |
| 15 U.S.C. § 78j(b), & | Securities Fraud | 12/19/2016 | 8 |
| 15 U.S.C. § 78ff | | | |

The defendant is sentenced as provided in pages 2 through ___4___ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☑ The defendant has been found not guilty on count(s)   1-5 _____

☑ Count(s)   7 _____  ☐ is  ☑ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

1/10/2024
Date of Imposition of Judgment

*Brian M. Cogan*
Signature of Judge

Brian M. Cogan, U.S.D.J.
Name and Title of Judge

February 4, 2024
Date

AO 245B (Rev. 09/19) Judgment in Criminal Case
        Sheet 2 — Imprisonment

Judgment — Page __2__ of __4__

DEFENDANT:   David Levy
CASE NUMBER:   1:16-CR-00640-002(BMC)

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

**Time Served.**

☐ The court makes the following recommendations to the Bureau of Prisons:

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ ☐ a.m. ☐ p.m.   on _____.

    ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before 2 p.m. on _____.

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

**LSPA-015**

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
        Sheet 5 — Criminal Monetary Penalties

Judgment — Page __3__ of __4__

DEFENDANT: David Levy
CASE NUMBER: 1:16-CR-00640-002(BMC)

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* |
|---|---|---|---|---|
| TOTALS | $ 200.00 | $ | $ 5,000.00 | $ |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |
| TOTALS | $ 0.00 | $ 0.00 | |

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☑ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

    ☑ the interest requirement is waived for the   ☑ fine  ☐ restitution.

    ☐ the interest requirement for the   ☐ fine  ☐ restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

LSPA-016

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
                       Sheet 6 — Schedule of Payments

Judgment — Page __4__ of __4__

DEFENDANT: David Levy
CASE NUMBER: 1:16-CR-00640-002(BMC)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

A ☑ Lump sum payment of $ _200.00_____ due immediately, balance due

     ☐ not later than _____ , or
     ☑ in accordance with ☐ C, ☐ D, ☐ E, or ☑ F below; or

B ☐ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

C ☐ Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
     _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D ☐ Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of $ _____ over a period of
     _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
     term of supervision; or

E ☐ Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from
     imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F ☑ Special instructions regarding the payment of criminal monetary penalties:
     $5,000.00 due immediately. Payment shall be made to the Clerk of the Court, Eastern District of New York.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

| Case Number Defendant and Co-Defendant Names (including defendant number) | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate |
|---|---|---|---|
| | | | |

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

**LSPA-017**