# 23-7904(L)

## 23-6915(Con), 23-6917(Con), 24-46(XAP), 24-209(Con), 24-388(XAP), 24-1978(Con), 24-2203(XAP)

### United States Court of Appeals for the Second Circuit



UNITED STATES OF AMERICA,

*Appellee-Cross-Appellant,*

v.

URI LANDESMAN, JOSEPH SANFILIPPO, JOSEPH MANN, JEFFREY SHULSE,

*Defendants,*

DANIEL SMALL, DAVID LEVY, MARK NORDLICHT,

*Defendants-Appellants-Cross-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLANT-CROSS-APPELLEE MARK NORDLICHT

RONALD SULLIVAN LAW PLLC
*Attorney for*
*Defendant-Appellant-Cross-Appellee*
*Mark Nordlicht*
1300 I Street NW  Suite 400 E
Washington, DC 20005
(202) 935-4347
*rsullivan@ronaldsullivanlaw.com*



Dick Bailey Service INC
APPELLATE SERVICES
www.dickbailey.com

# **TABLE OF CONTENTS**

*Page*

TABLE OF AUTHORITIES ............................................................................ *iii*

PRELIMINARY STATEMENT ......................................................................... 1

STATEMENT OF APPELLATE JURISDICTION ...................................................... 5

STATEMENT OF ISSUES FOR REVIEW ............................................................ 5

SUMMARY OF ARGUMENT ......................................................................... 6

STATEMENT OF THE CASE .......................................................................... 8

    I.     Platinum Partners, Black Elk, and the Public Consent ............................... 9

    II.    The Government's Indictment and Mr. Nordlicht's Trial ........................... 9

    III.   Mr. Nordlicht's Post-Trial Motions ............................................... 11

    IV.   Mr. Nordlicht's Renewed Post-Trial Motions Subsequent To
            Second Circuit Decision ........................................................ 14

STANDARD OF REVIEW ............................................................................ 17

ARGUMENT ......................................................................................... 19

I.     The District Court Abused Its Discretion In Denying Nordlicht's
       Motion For A New Trial Based On New Evidence That Mr. Nordlicht
       Did Not Control The Management And Policies Of Beechwood ................. 19

       A. Newly discovered evidence in form of testimony of Beechwood
          executives leaves no doubt Beechwood was not an affiliate. .............. 19

       B. The District Court erred in concluding that the new evidence
          would not have likely led to an acquittal. ................................. 21

*i*

II.    The District Court erred in denying a new trial after realizing that all Platinum related bonds were disclosed to John Hoffman by Mark Nordlicht, the person ultimately responsible for making the statement in the consent solicitation. ....................................................................24

    A. The Stunning Revelation that Mark Nordlicht proactively disclosed to John Hoffman CEO of Black Elk all the bonds controlled by Platinum for voting purposes is fatal to the government's case. .............24

    B. The District Court erred in denying the Rule 33 motion with regard to the Francis memorandum. ...................................................................26

III.   A New Trial Must Be Granted Because Of Proof The Defendants Intended And Expected The Bondholders To Tender. ...................................29

IV.   The evidence at trial amounted to a constructive amendment of the indictment or in the alternative, a prejudicial variance. ................................31

    A. The District Court's ruling that Mark Nordlicht intended for the bondholders to tender confirmed a constructive amendment or at a minimum a prejudicial variance of the indictment..................................31

V.    The Government's Misrepresentations Constituted A Due Process Violation................................................................................................38

    a. The Government Misrepresented Mr. Nordlicht's Disclosure of the Purported Scheme to the Jury....................................................................39

    b. The Government Misrepresented Evidence Exculpating Mr. Nordlicht to the District Court and Second Circuit.................................41

APPELLANT JOINS CO-APPELLANTS IN ARGUMENTS...............................43

CONCLUSION ....................................................................................................44

CERTIFICATE OF COMPLIANCE ...........................................................................

*ii*

## TABLE OF AUTHORITIES

***Cases***                                                                                          ***Page(s)***

*Mills v. Scully,*
   826 F.2d 1192, 1195 (2d Cir. 1987) ....................................................................40

*United States v. DeSantis,*
   134 F.3d 760, 764 (6th Cir. 1998) ....................................................................30

*United States v. Forbes,*
   790 F.3d 403, 406 (2d Cir. 2015) ................................................................18, 22

*United States v. Helmsley,*
   985 F.2d 1202, 1205–06 (2d Cir. 1993) ....................................................38, 39, 41

*United States v. Landesman,*
   17 F.4th 298, 318 (2d Cir. 2021) ...............................................................*passim*

*United States v. Litvak,*
   808 F.3d 160, 179 n.24 (2d Cir. 2015) .............................................................30

*United States v. Mariani,*
   725 F.2d 862, 865 (2d Cir. 1984) ....................................................................18

*United States v. Nordlicht,*
   No. 16-CR-00640 (BMC), 2023 WL 4490615, at *3 (E.D.N.Y. July 12,
   2023)..................................................................................................1, 17, 24, 26

*United States v. Nordlicht,*
   No. 16-CR-00640 (BMC), 2023 WL 4490615, at *4 (E.D.N.Y. July 12,
   2023)..................................................................................................4, 34

*United States v. Nordlicht,*
   No. 16-CR-00640 (BMC), 2023 WL 4490615, at *6 (E.D.N.Y. July 12,
   2023)..................................................................................................31

*United States v. Nordlicht,*
   No. 16-CR-640 (BMC), 2022 WL 1469393, at *7 (E.D.N.Y. May 10,
   2022)..................................................................................................38

*United States v. Nordlicht,*
  No. 16-CR-640 (BMC), 2022 WL 1469393, at *8 (E.D.N.Y. May 10,
  2022) ................................................................................................ 17, 22

*United States v. Robinson,*
  430 F.3d 537, 542 (2d Cir. 2005) ............................................................ 17

*United States v. Salmonese,*
  352 F.3d 608, 620 (2d Cir. 2003) ............................................................ 36

*United States v. Sanchez,*
  969 F.2d 1409, 1414 (1992) .................................................................... 18

*United States v. United States v. Davis,*
  No. 13-cr-923, 2017 WL 3328240, at *28 (S.D.N.Y. Aug. 3, 2017) ................... 36

*United States v. Valentine,*
  820 F.2d 565, 569 (2d Cir. 1987) ............................................................ 39

*Zervos v. Verizon N.Y., Inc.,*
  252 F.3d 163, 169 (2d Cir. 2001) ............................................................ 18

## *Statutes/Regulations/Miscellaneous*

17 C.F.R. § 260.0-2(b) ................................................................................ 10

17 C.F.R. § 260.0-2(f) ................................................................................. 10

18 U.S.C. § 3742 .......................................................................................... 5

28 U.S.C. § 1291 .......................................................................................... 5

## PRELIMINARY STATEMENT

Though this Court has considered an appeal in this case before, until now is has never had the chance to do so with all the facts. In short, this conviction is a sham. The defense lawyers know it, the trial judge knows it, and the government lawyers surely know it as well. Newly discovered evidence, when combined with the evidence admitted at trial which this Court has already seen, makes plain that Mark Nordlicht is innocent and therefore should have the judgment against him vacated. At the very least, he should be given a new trial.

It is now clear the original Second Circuit panel made the decision to reverse the District Court's well-reasoned opinion on a severely flawed record. Not only did the Second Circuit not have the benefit of newly discovered evidence, but it is now clear the Government presented evidence and argument not only to the trial court but also to the Second Circuit that was, to quote the trial judge, "certainly misleading, if not outright false." DE 1004 (*United States v. Nordlicht*, No. 16-CR-00640 (BMC), 2023 WL 4490615, at *3 (E.D.N.Y. July 12, 2023)).

Defendant-Appellant Mark Nordlicht was the founder of a hedge fund called Platinum, which consisted of various investment funds including Platinum Partners Value Arbitrage Fund, L.P. ("PPVA"), Platinum Partners Credit Opportunities Master Fund, L.P. ("PPCO"), and Platinum Partners Liquid Opportunity Master Fund, L.P. ("PPLO). Nordlicht and his co-defendants were investment managers

1

who were indicted in 2016 on allegations that they participated in two purported illegal schemes. In the first alleged scheme, the Government claimed that Nordlicht and his co-defendants sought to "defraud investors and prospective investors in funds managed by Platinum." A995 (Indictment). The Government failed to persuade the jury that Nordlicht had done anything illegal in relation to the Platinum investment scheme, and he was acquitted. The Court remarked "they weren't just acquitted, that was a very weak claim." SPA 61 (Sentencing Tr. at 46). The second alleged scheme purportedly involved defrauding third-party holders of Black Elk bonds and to deprive the bondholders of the proceeds of the sale of the vast majority of Black Elk's most lucrative assets through material misrepresentations and omissions about, among other things, Platinum's ownership of and control over the Black Elk bonds.

Stated briefly, the Government's theory of the second alleged scheme was that bondholders were victims of fraud because Nordlicht and others purportedly misrepresented by omission the total amount of Black Elk bonds controlled by Platinum itself and Platinum affiliates in a joint public tender and consent solicitation presented to bondholders, and later improperly caused those bonds to be voted, thereby diverting assets that would have gone to bondholders to preferred stockholders (many of whom were Platinum investors).

2

At trial, the Government first attempted to show that defendants had the majority of votes locked up from the start in entities they secretly controlled, thereby "rigging a vote" with a guaranteed majority to consent to covenant changes that included paying out preferred stockholders ahead of bondholders. After that theory was successfully disproven, the government pivoted mid-trial, however, and asserted the Defendants had stuffed the ballot box by concealing bonds owned by Beechwood, an insurance company that was alleged to be affiliate of Platinum, and therefore an affiliate of an affiliate of Black Elk. According to the government's reading of the indenture, this qualified Beechwood as a legal affiliate as it related to participating in the consent solicitation. The District Court has found, and the government has not disputed, that if Beechwood is not a legal affiliate, the consent would have passed lawfully and there is no crime.

The government's amended theory, too, however, was demonstrably false. **Evidence emerged after trial in civil litigation in the form of witness testimony of all of Beechwood's top executives that proved definitively that Beechwood was not an affiliate as defined by the indenture. Moreover, information that surfaced subsequently at a co-defendant's trial demonstrates that contrary to the government's representation otherwise, Nordlicht proactively disclosed Platinum's control of Beechwood's bonds for voting purposes directly to John Hoffman, the CEO of Black Elk and the person ultimately responsible for**

3

**making the statement in the consent solicitation.** This undermined the very foundation of the government's case that the bonds were concealed. Due to the government's mischaracterization of what was clearly the most consequential piece of evidence in the case, the evidence of the disclosure was not considered by the Second Circuit in its analysis of whether the verdict preponderated heavily towards innocence. Furthermore, based on cumulative evidence presented first at trial and new evidence that surfaced at Small's trial, the District Court found that "there is simply no evidence that [the defendants] intended to steal from the bondholders or jump anyone in line. Rather the defendants expected that all the bondholders would cash in their bonds and expressed frustration when they didn't". *United States v. Nordlicht*, No. 16-CR-00640 (BMC), 2023 WL 4490615, at *4 (E.D.N.Y. July 12, 2023)

The new evidence that surfaced after the Second Circuit decision supported the trial judge's initial instinct to grant a new trial. And it upends this Court's previous decision, which was made without the benefit of the new evidence and was clearly influenced by unconscionable government misconduct, in the form of demonstrably false representations made by the government to this Circuit. Unfortunately, when Nordlicht renewed his Rule 29 Motion and submitted supplemental briefing that the trial court rightly construed as a Rule 33 Motion, the

4

trial judge made several errors of law and reason that we respectfully request this Court correct.

Mark Nordlicht therefore appeals from an order entered on May 10, 2022 and July 12, 2023, in the United States District Court for the Eastern District of New York, by The Honorable Brian M. Cogan, United States District Judge, denying both his renewed motion for a new trial under Fed. R. Crim. P. 33, in which his co-defendant David Levy joined; and what the District Court construed as a renewed motion of judgment of acquittal pursuant to Fed R. Crim. P. 29 (Dkt. 1004). He further appeals from the judgment of conviction entered against him on July 16, 2024, convicting him of securities fraud (Dkt. 1052).

## STATEMENT OF APPELLATE JURISDICTION

This Court has jurisdiction to consider this appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

## STATEMENT OF ISSUES FOR REVIEW

1. Whether the district court erred in concluding that the evidence demonstrated that Nordlicht / Platinum had the ability to direct the management and policies of Beechwood.

2. Whether the District Court erred in denying a new trial based on the fact that all Platinum related bonds were disclosed to John Hoffman.

5

3.  Whether the District Court abused its discretion in ruling that the evidence demonstrated defendants had sufficient scienter for a securities fraud conviction to be sustained.

4.  Whether the District Court erred in ruling that the government's case constructively amendment the Indictment, or in the alternative, was a prejudicial variance from the Indictment.

5.  Whether the District Court abused its discretion by allowing a conviction to stand that was predicated on prosecutorial misrepresentations to the District Court, Second Circuit, and the Jury.

## SUMMARY OF ARGUMENT

The indictment described the Black Elk alleged fraud as follows:

In or about and between November 2011 and December 2016, the defendants MARK NORDLICHT together with others, engaged in a scheme to defraud third-party holders of the BE Bonds (the "Bondholders") and to deprive the Bondholders of the proceeds of the sale of the vast majority of Black Elk's most lucrative assets through material misrepresentations and omissions about, among other things, Platinum's ownership of and control over the BE Bonds.

A947.

To prove these allegations, the government would have to prove three premises. First, that the bondholders were victims. Second, that the defendants intended to deprive the alleged victim bondholders of money. Third, that the fraud was accomplished through concealment of bonds controlled by Platinum. At trial it emerged that the bonds that were alleged to have been concealed were owned by a

6

company called Beechwood, an insurance company of which Mark Nordlicht was a cofounder.

If any one of the government's premises proved to be false, the case would warrant dismissal. But after the Second Circuit reversal of the District Court's original decision, evidence has emerged that upends **all three** premises of the government's case. It turned out Beechwood was not an affiliate as defined by the indenture and was therefore not required to be disclosed. Regardless, the exact relationship with Beechwood and the bonds that Beechwood owned were not only not concealed but in fact **proactively disclosed** by Nordlicht to the CEO of Black Elk. Finally, not only was there no intent to deprive bondholders of money but the intent and expectation was for them to tender and cash out at par plus interest.

Irrespective of the core foundation of the government's case crumbling, even if somehow the government's case could be salvaged—and it cannot—the evidence presented by the government at trial bore little resemblance to the case described in the Indictment and at a minimum, therefore, presents a constructive amendment or prejudicial variance of the Indictment. Moreover, the case was marred by government misconduct, including several misrepresentations to the District Court, the jury, and the Second Circuit.

On any of these bases, the convictions against Mr. Nordlicht should be set aside with prejudice or, in the alternative, a new trial should be ordered.

## STATEMENT OF THE CASE

Platinum Partners was a multi-strategy investment fund with three primary funds: Platinum Partners Value Arbitrage Fund (PPVA), Platinum Partners Credit Opportunities Fund (PPCO), and Platinum Partners Liquid Opportunities Fund (PPLO). Mark Nordlicht founded and was the Chief Investment Officer of all three funds. Platinum was a significant investor in Black Elk, a Houston-based oil and gas company. PPVA owned 85% of Black Elk's common equity. Mr. Nordlicht was charged in December 2016 with two alleged independent fraudulent schemes. The first five counts of the indictment charged Mr. Nordlicht with a scheme to defraud investors in funds managed by Platinum, a hedge fund run by Mr. Nordlicht, and the remaining three counts charged a scheme to defraud the holders of bonds issued by Black Elk Energy Offshore Operations, LLC ("Black Elk"), an oil and gas company controlled by Platinum. More than three-quarters of the nine-week trial focused on the Platinum scheme.

Ultimately, Mr. Nordlicht was acquitted of the first five counts but convicted of the three counts relating to the Black Elk Indenture. DE 773. The District Court explained the relationship between the two charged schemes: "really, Black Elk was the tail of the dog. The main focus was the investment fraud, which had no relationship to Black Elk at all . . . . I really have a question whether the Black Elk fraud . . . . would have been prosecuted all, but for the investment fraud." SPA 61.

## I.      Platinum Partners, Black Elk, and the Public Consent

The government argued that the alleged scheme came to be when Black Elk, facing financial difficulties, sought to pay off its debt by selling assets. Black Elk had two particularly costly classes of debt: $150 million in bonds with 13.75% annual interest payments and $110 million in preferred equity with higher 20% annual interest payments, which, if not redeemed after 14 months, escalated to 36%. Under the indenture governing those bonds, the proceeds of a sale of Black Elk's assets could not be paid to any equity holder prior to paying off the bonds.

Black Elk accordingly initiated a public consent solicitation to amend the indenture in July 2014.[1] It gave bondholders three options: They could (1) tender their bonds for par value, thereby consenting to the amendment, (2) consent to the amendment without tendering their bonds, or (3) keep their bonds and not consent to the amendment. Because any bondholder who tendered their bonds would receive par value, they would have been paid in full. The public consent ultimately passed, and Black Elk proceeded to complete the planned asset sale.

## II.      The Government's Indictment and Mr. Nordlicht's Trial

According to the indictment, the Black Elk scheme sought to "misappropriate proceeds of Black Elk's asset sales" by amending the Black Elk bond indenture to

---

[1] Black Elk first tried to amend the Black Elk bond by a private vote of a majority of the bondholders, but this effort did not succeed. Indictment ¶ 83.

9

benefit the preferred shareholders. A972 (Indictment, ¶ 75). The government's central theory was that Mr. Nordlicht and the other defendants controlled approximately $90 million of the $150 million in outstanding Black Elk bonds, intentionally "conceal[ed] Platinum's ownership of and control" over the bonds from bondholders, then voted the bonds they controlled in the consent solicitation to ensure the bond amendment passed.[2] *Id.*, ¶ 81.

Mr. Nordlicht's alleged suppression of Platinum's interest in Black Elk bonds factored heavily into the government's trial narrative. At the trial's outset, the government told the jury that Mr. Nordlicht intended to defraud the bondholders, and that this intent to defraud could be inferred from Mr. Nordlicht and his co-conspirators' concealment of Platinum's interest in Black Elk bonds from Black Elk and its law firm, BakerHostetler. Specifically, in its opening statement, the government said that the defendants "rigged the vote behind the scenes by hiding over half of the voting bonds in companies they secretly controlled." A529 (Nordlicht Tr. 21:19-20). They "made it look like they weren't participating in the vote, like the rules were being followed," but this was a "complete sham." *Id.* at

---

[2] The government asserted the so-called "affiliate rule" of the Trust Indenture Act of 1939 ("TIA") applied to the amendment vote. Under this rule, votes held by any affiliate of Black Elk could not be counted in a vote to amend the bond indenture. Under the TIA, the "term 'affiliate' means a person controlling, controlled by, or under common control with, another person." 17 C.F.R. § 260.0-2(b). Control, in turn, has a specific legal definition under the Act: "'control' means **the power to direct the management and policies of a person**, directly or through one or more intermediaries, whether through the ownership of voting securities, by contract, or otherwise." § 260.0-2(f) (emphasis added).

21:21-25. The government articulated a different, but related theory, during its closing argument, again telling the jury that "the defendants hid the fact that there were other Platinum funds controlled by Mark Nordlicht that held bonds," A554, meaning that Mr. Nordlicht knew "the fraudulent nature of the scheme" and acted "with the intent to defraud." A553 at 6685:19-20.

## III.   Mr. Nordlicht's Post-Trial Motions

In a post-trial motion, Nordlicht argued there was insufficient evidence that Beechwood was an affiliate of Black Elk under the terms of the indenture. The District Court agreed.

> Even if the jury could fairly conclude that BBIL and BAM were, in fact, properly considered Platinum affiliates under the affiliate rule, there is insufficient evidence that Nordlicht was on notice of their affiliate status. Although Nordlicht clearly played a role at Beechwood, there is insufficient evidence that his role was so extensive that he realized, or ought to have realized, that Platinum and Beechwood were affiliates in virtue of Nordlicht's role at both companies.
>
> Specifically, Manela testified that: Nordlicht gave recommendations to Beechwood but did not have the final say; Feuer and Taylor were the "ultimate bosses at Beechwood;" and Feuer and Taylor worked to ensure that Platinum and Beechwood were not affiliates. Wallach also testified that: Nordlicht maintained an "advisory role" at Beechwood; Nordlicht did not have the authority to order Wallach to buy a particular position or force Wallach to do anything; and Feuer and Taylor "were the ones who ran" Beechwood.

*United States v. Landesman*, 17 F.4th 298, 318 (2d Cir. 2021).

The Second Circuit reversed the District Court's decision citing circumstantial evidence introduced by the government by which the jury could have inferred that

11

Platinum exercised control over Beechwood. The Second Circuit discounted the witness testimony. "In light of the substantial evidence indicating that . . . Platinum exercised control over Beechwood, a jury could have rationally discounted Manela's vague

recollection of Feuer and Taylor's conversation with him and Levy regarding Beechwood's status as a Platinum affiliate, particularly since there was no evidence that Feuer and Taylor were referring to Beechwood's status as an affiliate within the meaning of the Indenture." *Id*. at 330.

Additionally, Mr. Nordlicht relied on the trial evidence to argue he had not concealed the Platinum entity's ownership of Black Elk bonds in a motion for acquittal or, in the alternative, a new trial. *See* DE 768-1 at 6; 9-10. In fact, Platinum had ***repeatedly*** disclosed its ownership of Black Elk bonds to BakerHostetler. Robert Shearer, an attorney at BakerHostetler, testified that he had learned about Platinum's ownership of Black Elk bonds two months before the consent solicitation. *See id.* at 9; A538 (Nordlicht Tr. 5025-26 (R. Shearer) (testifying that he was told sometime between April and May 2014 that Platinum owned 70% of the Black Elk bonds)).

Before the consent solicitation began, Paul Francis, a partner at BakerHostetler, memorialized the firm's knowledge that Platinum and companies friendly to it owned $90 million in Black Elk bonds. Per the memorandum sent to John Hoffman, the CEO of Black Elk, and Marizza Piché, Black Elk's general

counsel, BakerHostetler knew "Platinum . . . *intends* to pay $60 Million of the funds to redeem $60 Million of the currently outstanding secured bond holder debt of $150 Million, *which will leave $90 Million in bond debt in the hands of so-called 'friendly' bond holders, most of which is held by Platinum itself.*" A555 (Francis Memorandum). Francis prepared this memo "based upon information received from or through" Hoffman and Piché. *Id.* At trial, Shearer testified he had seen a memo saying "that Platinum owned $90 million of Black Elk bonds along with companies friendly to it." A544 (Nordlicht Tr. 5079-80). However, he testified that he had not seen the memorandum during the consent solicitation process, and the memo was not admitted into evidence. *Id.* The government argued in response that "any information in the July 1 Memo reflecting Platinum's [Black Elk] Bond holdings came not from Platinum, the Defendants or their co-conspirators, but from John Hoffman and Marizza Piché at Black Elk." DE 787 at 58. Nevertheless, the District Court granted Nordlicht's motion for a new trial and mentioned the Francis memo when explaining there was "insufficient evidence that the affiliate status . . . was even concealed from BakerHostetler, which was responsible for communication with bondholders and which distributed the July 16, 2014 consent solicitation statement." DE 799 at 35.

On appeal, the government argued that Nordlicht and Platinum "had no involvement in [the Francis Memo]," and it therefore "has no bearing on Nordlicht's

13

intent." A786 (Gov't App. Br. at 106). The Court, relying on the government's representations, reversed, holding Mr. Nordlicht's conviction was not a manifest injustice, in part, because he did not "provide[] the information that formed the basis for this memo" and because the memo was "unrelated to Nordlicht." *Landesman*, 17 F.4th at 338. Though the Court could not have known it at the time, this turned out to be demonstrably incorrect.

### IV.     Mr. Nordlicht's Renewed Post-Trial Motions Subsequent To Second Circuit Decision

After the Second Circuit's decision, new evidence from a number of sources unavailable to Mr. Nordlicht at the time of his trial have made two facts undeniably clear: First, he did not control Beechwood. Second, it was he himself who communicated Beechwood's stake in Black Elk.

The first shoe to drop after the Second Circuit decision related to Beechwood's status as an affiliate. Numerous Beechwood employees have now testified in civil litigation that Mr. Nordlicht did not have the ability to direct the management and policies of Beechwood. In depositions, they have asserted that Mr. Nordlicht "didn't have a role" at Beechwood, let alone direct its operations. For example, Beechwood CEO Mark Feuer testified that Mr. Nordlicht "was at best an advisor" to Beechwood but had no ability to control anything there. DE 888. Mr. Feuer further testified that, as CEO, he "was the ultimate decision-maker"—and that, although Mr. Nordlicht often sent his thoughts, Mr. Feuer "ignored most of it" and "threw away most of

14

them." *Id*. Beechwood President Scott Taylor likewise testified that he reported to Mr. Feuer, not Mr. Nordlicht. *Id.* Although Mr. Nordlicht helped get Beechwood "up and running," Mr. Taylor was explicit that Beechwood is a "separate business" from Platinum. *Id.* He explained that Mr. Nordlicht's involvement in Beechwood declined over time and that Mr. Nordlicht simply did not have "authority over Beechwood's affairs." *Id.* And Beechwood General Counsel Christian Thomas, testifying as Beechwood's Rule 30(b)(6) witness, confirmed that Mr. Nordlicht was, at most, "somebody that ideas would be bounced off of" and that anything from Mr. Nordlicht was "simply an idea." Mr. Thomas thus repeatedly testified that Mr. Nordlicht "had no control over Beechwood or any aspect of its operations." *Id.*

Following the comprehensive testimony of the three Beechwood executives that Beechwood was not a Platinum affiliate as defined by the indenture, it emerged during the trial of Daniel Small, nine months after this Court issued its decision in *Landesman*[3], that the government had mischaracterized to the Second Circuit the most consequential piece of evidence in the case, the Francis memorandum. When the context of the Francis memorandum became clear, the District Court, on a sidebar, "question[ed] the government's judgment" in pursuing charges against Mr. Small and urged the U.S. Attorney's Office to "take a fresh look" at whether to

---

[3] Shortly after this Court published its decision in *Landesman*, Mr. Nordlicht unsuccessfully renewed his motion for a new trial under Fed. R. Crim. P. 33.

proceed with the trial. A517 (Small Tr. at 557:16-19; 558:18-20). The Francis memorandum, which was based on discussions between John Hoffman and Mark Nordlicht as communicated to BakerHostetler by Hoffman, indicated clearly that Hoffman was aware of all bonds that were controlled for voting purposes by Platinum, and of Platinum's intent and expectation to buy out the independent bondholders at par plus accrued. **In sum, the new evidence shows that Nordlicht could not have had the *scienter* requisite for a securities fraud offense because rather than seeking to omit or withhold information, he directly and openly communicated it.**

Additionally, at least two other documents demonstrated that far from intending to steal from bondholders, Mr. Nordlicht intended and expected independent bondholders to tender at par plus accrued interest. A spreadsheet showing the "sources and uses" of proceeds from the sale showed "as of 8/13"—the day before the consent solicitation ended—Black Elk expected to pay $65 million to the tendering bondholders. A559 (Small DX 6793). Additionally, when Jeff Shulse, the CFO of Black Elk, e-mailed Mr. Nordlicht, saying, "only $2.8 million of the bonds have tendered," Mr. Nordlicht responded in real time at a time that the consent had passed but the tender was still open "[t]hat's not really our desired result. I think some tenders will show up last minute." *See* DE 790.

16

Mr. Nordlicht accordingly renewed his motion for a new trial. The District Court denied all of the defendant's motions. In relation to the Beechwood witnesses, the District Court concluded that "[a]lthough this new evidence would certainly have strengthened defendants' case, it would not have likely prompted the jury to acquit him." *United States v. Nordlicht*, No. 16-CR-640 (BMC), 2022 WL 1469393, at *8 (E.D.N.Y. May 10, 2022). The District Court judge later disregarded the Francis memorandum by asserting that the "disclosure to Hoffman was not reasonably calculated to reach bondholders." *United States v. Nordlicht*, No. 16-CR-00640 (BMC), 2023 WL 4490615, at *3 (E.D.N.Y. July 12, 2023). In regards to the argument that Mr. Nordlicht intended and expected the bondholders to tender, based on overwhelming evidence the District Court was finally forced to concede that "[t]here is simply no evidence that defendants intended to steal from the bondholders or jump anyone in line. Rather, defendants expected that all the bondholders would cash in their bonds and expressed frustration when they didn't." *Id*. at *4. The District Court ruled, however, that while that was sufficient for the wire fraud count to be dismissed, as far as securities fraud convictions were concerned "[i]t is enough that defendants intended to 'deceive' or 'maniplulate' the bondholders." *Id*. at *5.

## STANDARD OF REVIEW

"The standard of review for a district court's grant [or denial] of a new trial is abuse of discretion." *United States v. Robinson*, 430 F.3d 537, 542 (2d Cir. 2005).

The ultimate test on a Rule 33 motion is whether letting a guilty verdict stand would be a manifest injustice. *See United States v. Sanchez*, 969 F.2d 1409, 1414 (1992). The trial court must be satisfied that "competent, satisfactory and sufficient evidence" in the record supports the jury verdict. *Id*. (internal quotation marks omitted). The district court must examine the entire case, take into account all facts and circumstances, and make an objective evaluation. *See id.* "A district court 'abuses' or 'exceeds' the discretion accorded to it when (1) its decision rests on an error of law (such as application of the wrong legal principle) or a clearly erroneous factual finding, or (2) its decision—though not necessarily the product of a legal error or a clearly erroneous factual finding—cannot be located within the range of permissible decisions." *United States v. Forbes*, 790 F.3d 403, 406 (2d Cir. 2015) (quoting *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 169 (2d Cir. 2001)).

Under Rule 29(c), "[i]f the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." "When a defendant moves for a judgment of acquittal, the Court must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilt beyond a reasonable doubt." *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984). "A reasonable mind must be able to conclude guilt on each and every element of the charged offense." *Id*. "However, all reasonable inferences are to be resolved

18

in favor of the prosecution[,] and the trial court is required to view the evidence in the light most favorable to the Government with respect to each element of the offense." *Id*. "The evidence is to be viewed not in isolation but in conjunction," *id*., "as each fact may gain color from others." *United States v. Landesman*, 17 F.4th 298, 319 (2d Cir. 2021).

## ARGUMENT

### I. The District Court Abused Its Discretion In Denying Nordlicht's Motion For A New Trial Based On New Evidence That Mr. Nordlicht Did Not Control The Management And Policies Of Beechwood

**A. Newly discovered evidence in form of testimony of Beechwood executives leaves no doubt Beechwood was not an affiliate.**

Newly discovered evidence in the form of civil litigation testimony by General Counsel Chris Thomas, CEO Mark Feuer, and President Scott Taylor of Beechwood that Mark Nordlicht did not have the ability to direct management and policies of Beechwood is the sort of direct testimony that the case had previously been lacking. The executives testified that:

- Mr. Nordlicht had no formal role at Beechwood;
- The notion that an undefined "Nordlicht group [would] run the investment allocation side" of Beechwood was never adopted;
- Beechwood management did not report to Mr. Nordlicht;
- Mr. Nordlicht was viewed as an advisor and investor, but not someone who participated in managing the company or had any authority over Beechwood's affairs;
- Mr. Nordlicht had no control over Beechwood's investments and was repeatedly ignored; and

19

- Anything that came from Mr. Nordlicht was "simply an idea," not anything that Beechwood felt compelled to act on or adopt.

Mr. Nordlicht never discovered what Mr. Taylor and Mr. Feuer would say at trial, because they refused to speak to defense counsel despite multiple efforts at outreach. When Counsel for Mr. Levy reached out to Counsel for these witnesses, he was advised that they would not speak with the defense, and if subpoenaed, would invoke their Fifth Amendment privilege against self-incrimination due to a separate investigation being conducted against Beechwood.

Their testimony corroborated the testimony of Israel Wallach and Naftali Manela who had previously testified during trial: Both witnesses who testified on this issue confirmed that Mr. Nordlicht did not control Beechwood. Naftali Manela—a government cooperator—testified. As the District Court itself summarized:

- "Mark Feuer and Scott Taylor were the ultimate bosses at Beechwood." (Tr. 1333.)
- "Nordlicht didn't have the final say and Beechwood could have said no as to whatever Nordlicht recommended." (Tr. 1334.)
- Mark Feuer and Scott Taylor "were very concerned about making sure that [Platinum and Beechwood] weren't the technical word affiliates." (Tr. 1336.)
- "Mr. Feuer had told me conceptually that he was working to make sure that the two companies were not the term affiliates, yes." (Tr. 1340.)

A178-A179

The documentary evidence presented at trial confirmed these witnesses' testimony. For example, Platinum's auditors at CohnReznick, who knew that

20

Beechwood was a Platinum investor, declined to categorize Beechwood as an affiliate. The work papers similarly reflected that Beechwood was not "a related party or an affiliate of any Platinum entity," an assertion CohnReznick did not see fit to challenge. A179.

In addition to Naftali Manela, Israel Wallach and the three Beechwood executives that testified after the Second Circuit Decisions, more Beechwood employees have now come forward as well. In fact, there is now on record, an executive assistant, two traders, a senior controller, the CFO, an operations manager, the General Counsel (who would be disbarred if found to be perjuring himself), the President and the CEO all testifying in some way, shape or form that Mark Nordlicht did not control Beechwood and that Beechwood was not an affiliate of Platinum.

The government has not produced a single Beechwood employee to testify that Mr. Nordlicht controlled Beechwood so all witnesses' testimony to the contrary is unrebutted. In short, the District Court's instinct that Beechwood was not a legal affiliate of Platinum or that Mark Nordlicht didn't believe Beechwood was an affiliate and therefore lacked requisite intent, has been proven spot on correct.

**B. The District Court erred in concluding that the new evidence would not have likely led to an acquittal.**

Courts have employed a five-part test to authorize a new trial when "(1) the evidence [was] newly discovered after trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3)

21

the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal." *United States v. Forbes*, 790 F.3d 403, 406–07 (2d Cir. 2015).  The District Court ruled that:

> the defendants met the first four factors of this test, but the Second Circuit's analysis of the evidence shows why they do not meet the fifth . . . . Although this new evidence would certainly have strengthened defendant's case, it would not have likely prompted the jury to acquit him . . . . Given the Second Circuit's analysis of the direct and circumstantial evidence, it is doubtful that the newly discovered testimony from the Beechwood witnesses would have changed the jury's verdict . . . . a jury would most likely view the testimony of Beechwood's executives as self-serving attempts to create distance from defendants , and not an accurate depiction of Beechwood's role.

*United States v. Nordlicht*, No. 16-CR-640 (BMC), 2022 WL 1469393, at *8 (E.D.N.Y. May 10, 2022).

Respectfully, the inference that because the Second Circuit, *without* the benefit of the Beechwood witnesses would conclude that such evidence would not lead to acquittal is specious. Rule 33 specifically carves out exceptions in cases "where the government's case depends upon strained inferences drawn from uncorroborated testimony." *Landesman*, 17 F.4th at 331.  The government does not dispute that if Beechwood is not an affiliate, there is no crime as the consent would have passed lawfully. As such, the witnesses testifying that Feuer and Taylor alone controlled Beechwood are in effect saying that the defendants are innocent.  Only by subscribing to the theory there is a vast conspiracy whereby anyone who ever worked

22

at Beechwood is lying about a topic that has little consequence to them could one conclude that the new evidence would not lead to an acquittal.

The Second Circuit, unaware of the direct testimony as to the status of Beechwood, based its decision on the fact there was a *lack* of such testimony. "In light of the substantial evidence indicating that Levy knew that Platinum exercised control over Beechwood (and that Levy, in fact, played a pivotal role in the exercise of such control), a jury could have rationally discounted Manela's vague recollection of Feuer and Taylor's conversation with him and Levy regarding Beechwood's status as a Platinum affiliate, particularly since there was no evidence that Feuer and Taylor were referring to Beechwood's status as an affiliate within the meaning of the Indenture." *Id*. at 330.

But there is no longer any mystery. We know exactly what Taylor and Feuer meant and what General Counsel Chris Thomas believed. They ***all*** testified that Mark Nordlicht had no direct or indirect power over the management and policies of Beechwood; that they did not report to him; that he did not control Beechwood's investments; and that the most Mr. Nordlicht could do was offer suggestions and ideas, not instructions or orders.

**II.** **The District Court erred in denying a new trial after realizing that all Platinum related bonds were disclosed to John Hoffman by Mark Nordlicht, the person ultimately responsible for making the statement in the consent solicitation.**

    **A. The Stunning Revelation that Mark Nordlicht proactively disclosed to John Hoffman CEO of Black Elk all the bonds controlled by Platinum for voting purposes is fatal to the government's case.**

Mr. Nordlicht's disclosure to Mr. Hoffman of all bonds related to Platinum, 90 million plus in total as recounted by the Francis memorandum undermines the government's primary argument for securities fraud convictions. The government's representation to the Second Circuit that Mr. Nordlicht was not the source of the information, and that the memo had no bearing on his intent was deemed by the District Court to be "certainly misleading, if not outright false". *Nordlicht*, No. 16-CR-00640 (BMC), 2023 WL 4490615, at *3 (E.D.N.Y. July 12, 2023).

The new evidence of all the Beechwood executives indicating Beechwood was not a legal affiliate had already emerged by the time of the Small trial when it became clear that Nordlicht was the source of the information contained in the Francis memorandum. The District Court Judge was clearly frustrated with the government's intransigence and asked the government to reconsider the case altogether. "I am not accusing the government of any bad faith, but I am asking the government just to take a fresh look and decide if this is really the kind of case . . . . Talk amongst yourselves and see if maybe you think this is not what it was thought of at the beginning." A516. The government's reply is telling. "I understand, Your

Honor. But respectfully, we convicted on this theory before a jury several years ago. That conviction was affirmed by the Court of Appeals. I understand it a close question in Your Honor's mind, but I think in view of that record, to act as though there is something outlandish about the government taking the position that this is a crime is unfair." A517.

But the standard for the government continuing with the case should be interests of justice and not that they were able to get a conviction. The government represented to the second circuit that "The Coconspirators Had No Involvement in the Black Elk Memo to BakerHostetler . . . The district court did not explain how a disclosure made by a party unaffiliated with Nordlicht . . . . negates Nordlicht's intent." A786. The Second Circuit reasonably believed in the good faith of the government and adopted the government's view. "There is no evidence in the record that Nordlicht provided the information that formed the basis for this memo. It is unclear how a memo unrelated to Nordlicht, undisclosed to Shearer negates Nordlicht intent to conceal the PPCO- and PPLO- held bonds." *Landesman*, at 17 F.4th at 338.

But the government knew or should have known the critical importance of the Francis memo. The Francis memorandum recounts exactly what Nordlicht disclosed directly: "Platinum (h)as stated that it intends to . . . redeem $60 Million of the currently outstanding secured bond holder debt of $150 Million, which will leave

$90 Million in bond debt in the hands of so-called friendly bond holders, **most of which are held by Platinum itself.**" A555. The fundamental basis of the government's case was that the Platinum-related bonds were concealed from the bondholders. Yet, there is indisputable evidence that Mark Nordlicht proactively disclosed the 90 million of bonds controlled for voting purposes to John Hoffman, the CEO of Black Elk responsible for the language of the consent solicitation.

### B. The District Court erred in denying the Rule 33 motion with regard to the Francis memorandum.

In response to the defense's motion for a new Rule 33 based on the overwhelming evidence that Mark Nordlicht disclosed all bonds controlled for voting purposes by Hoffman, the District Court nevertheless denied the defendant's Rule 33 "The Court agrees that Hoffman's 3500 materials reveal that the information about 'friendly' bondholders in the BakerHostetler memo must have come from Nordlicht, as Hoffman told the government that, prior to the meeting with Nordlicht, he 'did not know who the holders were' . . . yet these 3500 materials were produced to defendants long before the Nordlicht-Levy trial, and defendants did not call Hoffman as a witness or raise this argument in any of their previous post trial-submissions. As a result, this argument is untimely." *United States v. Nordlicht*, No. 16-CR-00640 (BMC), 2023 WL 4490615, at *3 (E.D.N.Y. July 12, 2023).

The 3500 material was introduced not merely as new evidence, but also to show the government lied to the Second Circuit on the most consequential piece of

26

evidence in the case. The memorandum is not necessary for the purpose of establishing that Hoffman was aware of 90 million of bonds controlled by Platinum for voting purposes. The defendants cannot be guilty of causing Hoffman to make a false statement to bondholders concealing bonds it allegedly controlled if Hoffman was aware of the bonds. The reference to the memo *was* timely introduced at trial and proved definitively that Hoffman was aware of the 90 million Platinum related bonds. He could only have received this information from someone at Platinum whether it was Nordlicht or someone else.

It was the government's misrepresentation to the Second Circuit that the memorandum was unrelated to Platinum that led the original Second Circuit panel to discount the reference to the memo in its entirely. It would be hard to fathom that if the original Second Circuit panel had known that not only had Platinum related bonds not been concealed from Mr. Hoffman, but in fact they had been proactively disclosed to him at the time of the consent solicitation, that this would not have impacted their decision to overturn Judge Cogan's original grant of a new trial.

Judge Cogan further erred when he turned to the merits of the motion. He concluded that "Nordlicht was charged with misleading bondholders, not deceiving Black Elk Management and his disclosure to Hoffman was not reasonably calculated to reach bondholders. When Nordlicht shared this information with Hoffman, he had

27

no idea that Hoffman would turn around and tell Francis. Although I disagreed with that (the Second Circuit's finding, the question has already been decided in the government's favor." *Id*.

While it is true the original Second Circuit panel was focused on communications to Shearer, that is obviously because there were no other communications on the record. Obviously if this Court had been aware that John Hoffman, the person responsible for the consent solicitation, had full knowledge of all the bonds Platinum directly or indirectly controlled for voting purposes, that would have dramatically altered its decision. The District Court has it backwards. Shearer worked at the discretion of Hoffman, not the other way around. The *only* way to communicate to bondholders was through Hoffman, not through Shearer, not through Platinum, only through Hoffman. Hoffman alone was the person ultimately responsible for the statement in the consent solicitation. Any disclosure obligation, if one existed, was Hoffman's. And any disclosure made to him could only be done with the idea that the information would eventually reach the bondholders.

To put it succinctly, the basic theory of this case was that Nordlicht engaged in securities fraud by causing Hoffman to make an omission on the consent solicitation because Nordlicht did not correct Small's alleged omission in his communications with Attorney Shearer of BakerHostetler. That proposition is

28

definitively disproven through evidence that Nordlicht in fact communicated directly to Hoffman that which Small allegedly omitted.

Neither Nordlicht nor the other defendants for that matter can be held liable for joining in a conspiracy to deceive Hoffman (and by extension the bondholders) when the statement drafted by Shearer is clearly contradictory to what Mark Nordlicht told Hoffman. Nordlicht told Hoffman 90 million votes, most of them owned by Platinum, were directly or indirectly controlled for voting purposes. Hoffman, aware of these bonds, could have precluded them from participating. The fact Hoffman may have made a mistake and did not flag or correct a possible mistake in the consent as drafted by BakerHostetler cannot be the basis of a securities fraud conviction.

### III. A New Trial Must Be Granted Because Of Proof The Defendants Intended And Expected The Bondholders To Tender.

Throughout the post-trial proceedings Mr. Nordlicht has continually argued that rather than intending to deceive the bondholders, the intent and expectation was that bondholders would tender their bonds. Due to the overwhelming combination of existing evidence presented at trial and new evidence that emerged after the initial Second Circuit decision, the District Court found just that: that the defendants intended and expected the independent bondholders to be paid back all their money plus accrued interest.

> There is a mountain of evidence that defendants were trying to get rid of debt to save the company….the evidence at Small's trial made clear the defendants intended to use the proceeds of the Renaissance sale to pay out all non-affiliated bondholders before using the remaining proceeds to pay off the higher interest preferred equity….There is simply no evidence that defendants intended to steal from bondholders or jump anyone in line. Rather, defendants expected the bondholders would cash in their bonds and expressed frustration when they didn't.

*Id*. at *4.

The District Court reversed the wire fraud conviction on this basis citing but maintained the securities fraud conviction by making a distinction between an intent to harm and intent to deceive. "Intent to harm is not part of the scienter element of securities fraud." *Id*. at *5.

Though the District Court may be correct in its assertion that intent to harm is not part of the scienter element of securities fraud, that proposition does not mean that *any* lie can qualify as securities fraud.  Respectfully, the District Court's view that the government was correct in summation when they argued at Small's trial "you can't lie to somebody even if you want to pay them off" is incorrect because it is incomplete. Lies are only actionable as violations of securities regulations when they are "made for 'the purpose of inducing the victim of the fraud to part with property or undertake some action that he would not otherwise do absent the misrepresentation or omission.'" *United States v. Litvak*, 808 F.3d 160, 179 n.24 (2d Cir. 2015) (quoting *United States v. DeSantis*, 134 F.3d 760, 764 (6th Cir. 1998).

30

No such statement was made in this case. The district court itself has already ruled that at *most* defendants "intended to deprive bondholders of the knowledge that conflicted bonds were voting on the indenture amendment." *United States v. Nordlicht*, No. 16-CR-00640 (BMC), 2023 WL 4490615, at *6 (E.D.N.Y. July 12, 2023). Deprivation of that knowledge, however, was not calculated to induce bondholders to part with property or to undertake any action they otherwise would not have undertaken. Accordingly, the convictions must be overturned for failure to prove the necessary level of scienter.

## IV. The evidence at trial amounted to a constructive amendment of the indictment or in the alternative, a prejudicial variance.

### A. The District Court's ruling that Mark Nordlicht intended for the bondholders to tender confirmed a constructive amendment or at a minimum a prejudicial variance of the indictment.

Even if the District Court is correct that a mere lie alone without any intent to affect the actions of the allege victims suffices to sustain a securities fraud conviction, those were not the charges that the defendants were on notice they were facing. The indictment was built on a foundation of three distinct allegations.

> In or about and between November 2011 and December 2016, the defendants MARK NORDLICHT together with others, engaged in a scheme to defraud third-party holders of the BE Bonds (the "Bondholders") and to deprive the Bondholders of the proceeds of the sale of the vast majority of Black Elk's most lucrative assets through material misrepresentations and omissions about, among other things, Platinum's ownership of and control over the BE Bonds.

A972.

31

At the heart of the government's case and the first two elements of the allegations was the charge that the bondholders were intended victims and that the intent was to "put one over on the bondholders" by depriving them of proceeds of sales two which they were entitled.

The Indictment included a crucial email by Jeff Shulse, reading "the consent has passed!" A979. The government included this email in its press conference accompanying the indictment. Press Conference, Platinum Partners' Founder & CEO among 5 Indicted in a $1 Billion Investment Fraud, U.S. Dep't of Justice (Dec. 19, 2016), *available at* https://www.justice.gov/usao-edny/video/platinum-partners-founder-cio-among-5-indicted-1-billion-investment-fraud. The government explained their theory that the defendants were celebrating the passing of the vote at the same time as independent bondholders had not tendered. "They celebrated the fact the vote had passed, and they were able to collect the proceeds." This was key to proving the first two premises of the case because, in the government's narrative at the time, the email demonstrated consciousness of guilt, as the defendants exulted in gaining passage of the consent solicitation while depriving bondholders of the monies they would have received if they had tendered and received all their money back plus interest.

The defense decided to challenge the core of the charges head on and opened highlighting this critical email, as at the time of the email exchange, while the

32

consent had passed, the tender was still open. The defense therefore displayed a big demonstrative in the courtroom with the decisive response to that email by Jeff Shulse sent by Mark Nordlicht. "This is not really our desired result. I think tenders will show up last minute". The government objected, and no portion of the Shulse email – which had formed such a focal point of the Indictment – was heard by the jury.

That evidentiary argument was merely a warning of things to come. On the terms of the Indictment, to convict, the government needed to prove the defendants wanted the consent to pass with very few independent bondholders tendering their bonds. That fact was obviously an easily disproven by the email exchange, which is the obvious and easy explanation for why the government decided to object.

In fact, the evidence was overwhelming that the defendants did not want for the bondholders to "stay in". Shearer testified he expected the bondholders to tender. Dixon Yee, an independent bondholder, also testified he thought the defendants wanted the bondholders to tender.

But the evidence in terms of use of proceeds and exculpatory emails all led the District Court to the obvious conclusion that the defendants wanted the bondholders to get all their money back plus interest. "There is simply no evidence that defendants intended to steal from the bondholders or jump anyone in line. Rather, defendants expected that all the bondholders would cash in their bonds and

33

expressed frustration when they didn't." *United States v. Nordlicht*, No. 16-CR-00640 (BMC), 2023 WL 4490615, at *4 (E.D.N.Y. July 12, 2023).

The indictment contained a completely different case than what the prosecution presented to the jury. In fact, the government's case at trial was in direct contradiction of the Indictment. The defendants were convicted based on the government's narrative at trial that they caused a lie to be told to bondholders through a partial disclosure with a service provider, despite making a full disclosure to the CEO of Black Elk who actually is the one who issued the consent solicitation. The defendants did not intend to harm bondholders but allegedly told a half-truth as a backup in case the bondholders didn't tender as the defendants intended and expected them to do, so as to leave open the possibility to vote those bonds not disclosed at the conclusion of the consent.

But that was not the alleged conduct for which the defendants were charged. The Indictment alleged a straightforward scheme to defraud bondholders and to deprive them of vast proceeds of money from an asset sale. But the ultimate circumstances of conviction differed dramatically. The defendants did <u>not</u> intend to divert proceeds from an asset sale away from bondholders, but rather to pay the bondholders first and for the consent to pass without controversy.

If not a constructive amendment, at a minimum, the case the government put on was certainly a prejudicial variance given that the indictment laid out a theory of

34

the case so divergent from both what happened and what the government presented at trial that no defendant could have adequately prepared for it.

But this was not the only way in which the indictment varied from the case brought by the government. The entire theory as to how the defendants allegedly executed the fraud shifted from the indictment to trial. In its opening, the government argued that the consent solicitation to amend the Black Elk bond indenture "was a complete sham" and **"was guaranteed from the start,"** because "the defendants actually voted . . . bonds that alone made up more than half of the total number of bonds and guaranteed the vote would pass." A998 (Tr. 21–22.) But that allegation is false. The undisputed evidence at trial showed that bonds held by the three Platinum entities—Platinum Partners Value Arbitrage Fund (PPVA), Platinum Partners Credit Opportunities Fund (PPCO), and Platinum Partners Liquid Opportunity Fund (PPLO)—were *not* counted in the vote and Platinum did *not* control "more than half of the bonds needed" and thereby "guarantee[] the vote would pass." The government concedes this. That concession alone defeats the theory of the Black Elk bond scheme contained in the Indictment and on which the government opened.

The government's shifting theory of the Black Elk scheme varied from the Indictment and prejudiced Mr. Nordlicht in preventing him from mounting an effective defense. A new trial is necessary when the government's proof at trial "so

35

altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment." *United States v. Davis*, No. 13-cr-923, 2017 WL 3328240, at *28 (S.D.N.Y. Aug. 3, 2017) (quoting *United States v. Salmonese*, 352 F.3d 608, 620 (2d Cir. 2003)). That is exactly what happened here. The indictment charged Mr. Nordlicht with a scheme to defraud *by secretly controlling the outcome* of the vote to amend the Black Elk Indenture. But when that narrative was disproven and it became apparent that the defendants did not and could not control the vote, the government switched theories midtrial— to arguing that Mr. Nordlicht supposedly formed a scheme to defraud *by hiding certain bonds in Beechwood entities* prior to the amendment vote. That theory materially contradicts the one charged and thereby worked a constructive amendment and/or a prejudicial variance.

The government's hit-or-miss approach to trying this case prejudiced Mr. Nordlicht in a number of ways. First, based on the indictment and the pretrial proceedings, Mr. Nordlicht prepared to try a case about whether Platinum guaranteed the outcome of the Black Elk consent solicitation by secretly and wrongfully voting the bonds held by PPVA, PPCO, and PPLO. If the jury could not be persuaded beyond a reasonable doubt that he did this (or conspired to do so), he could not be convicted of the Black Elk scheme charged in the indictment. Beechwood's votes

36

were entirely beside the point, because, as the government concedes, they were not sufficient to ensure the outcome of the vote.

Mr. Nordlicht and his counsel spent two and half years preparing for one trial—developing search terms and identifying custodians to focus the review of some 25 million pages of discovery, interviewing certain witnesses and not others, selecting certain documents and witnesses to rely on at trial and not others, formulating an opening statement, and conducting initial cross-examinations—but suddenly found themselves in the middle of a different trial. The government's disorganized approach to trying this complex criminal fraud trial, involving arcane areas of securities law, complicated mathematical analyses, and legal terms of art deprived Mark Nordlicht of a fair trial. He was prepared to—and did—defeat the allegation in the Indictment that he fraudulently guaranteed the outcome of the vote. When the government attempted to salvage its case, it impermissibly introduced new theories and confusingly presented them to the jury. The Court can have no confidence that the jury convicted Mr. Nordlicht because it found beyond a reasonable doubt that he committed the conduct that the grand jury charged in the Indictment. No conviction obtained under these circumstances can pass muster under the Constitution.

In assessing this argument, the District Court found that "[i]f anything, the part of the government's opening statement, asserting defendants 'guaranteed' the

votes outcome, was a unique deviation from the government's case and a windfall for defendants." *United States v. Nordlicht*, No. 16-CR-640 (BMC), 2022 WL 1469393, at *7 (E.D.N.Y. May 10, 2022). While this approach by the District Court is certainly a creative way of disposing of a motion, clearly the most likely reading of the government's opening is that it reflected the understanding of the Indictment, which was consistent with the government's approach at an accompanying press conference the day the indictment was released.

A new trial is thus warranted in the interest of justice so that Mr. Nordlicht has the chance to fully defend against the case brought against him at trial, which was fundamentally at odds with the case presented in the indictment.

## V. The Government's Misrepresentations Constituted A Due Process Violation

"[T]o challenge a conviction because of a prosecutor's knowing use of false testimony, a defendant must establish that (1) there was false testimony, (2) the Government knew or should have known that the testimony was false, and (3) there was 'any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *United States v. Helmsley*, 985 F.2d 1202, 1205–06 (2d Cir. 1993).

### a. **The Government Misrepresented Mr. Nordlicht's Disclosure of the Purported Scheme to the Jury.**

While these challenges are normally "subject to the requirement of due diligence on the part of the defendant," a defendant does not need to demonstrate diligence when a prosecutor was "directly involved as a participant in the transaction about which [a] witness has allegedly lied." *Helmsley*, 985 F.2d at 1207. This exception applies both when a prosecutor knowingly allows a witness to perjure themselves on the stand **as well as when a prosecutor misrepresents nontestimonial evidence**. For instance, the Second Circuit panel in *Valentine* reversed the defendant's conviction when the prosecutor misrepresented grand jury testimony in closing arguments. *See United States v. Valentine*, 820 F.2d 565, 569 (2d Cir. 1987). There, the prosecutor sought to convict the defendant on a consistent pattern of loans theory and "misrepresented to the jury that a series of similar payments to nine other brokers were all loans to be used for political contributions." *Helmsley*, 985 F.2d at 1207 (discussing *Valentine*). However, four of these nine brokers testified facts to the grand jury that undermined this theory. *See Valentine*, 820 F.2d at 569–70. Even though "the defendant had 'some knowledge' of the misrepresentation," the defendant's failure to rectify this error "does not allow the prosecutor to make misrepresentations." *Helmsley*, 985 F.2d at 1207 (quoting *Valentine*, 820 F.2d at 571).

The prosecutors in Mr. Nordlicht's case similarly misrepresented nontestimonial evidence gathered from Black Elk's CEO Mr. John Hoffman when they were directly involved as participants in his interview with FBI agents. Assistant U.S. Attorney Alicyn Cooley had previously learned that "[a]pproximately a week or two prior to the solicitation offer going out Nordlicht said to Hoffman . . . . that the bonds are in friendly hands and [Platinum] has it under control" during a meeting between the two at Mr. Hoffman's office. *See* DE 971-6 at 1. Notably, "Hoffman had no knowledge of PP owning these bonds prior to his meeting with Nordlicht in July 2014 when Nordlicht and Hoffman had a conversation regarding PP owning bonds." *Id.* at 2.

Despite the prosecutorial team's direct involvement in this transaction with Mr. Hoffman, the prosecutors nevertheless argued to the contrary to persuade the jury to convict Mr. Nordlicht. Ms. Cooley in her closing statements "reinforce[d] the deception by capitalizing on it in closing argument," arguing Mr. Nordlicht's "big lie, the fact that the defendants hid the fact that there were other Platinum funds controlled by Mark Nordlicht that held bonds, those were PPCO and PPLO." *Mills v. Scully*, 826 F.2d 1192, 1195 (2d Cir. 1987); A552 (Nordlicht Tr. 6649:18-21); *see also id.* at 21:19-20 (arguing Mr. Nordlicht and his codefendants "rigged the vote behind the scenes by hiding over half of the voting bonds in companies they secretly controlled").

40

Mr. Nordlicht's alleged concealment is crucial to the government's theory of his criminal intent, namely that Mr. Nordlicht purportedly intended to pass the consent solicitation by hiding his and Platinum's relationship with friendly bondholders from BakerHostetler and Black Elk. His disclosure to Mr. Hoffman ahead of the consent solicitation that the bonds were in friendly hands directly refutes this theory. As a result, the government's misrepresentations about Mr. Nordlicht's alleged nondisclosure "affected the judgment of the jury," since the government offered no alternative theory of Mr. Nordlicht's criminal intent. *Helmsley*, 985 F.2d at 1205–06.

**b. <u>The Government Misrepresented Evidence Exculpating Mr. Nordlicht to the District Court and Second Circuit.</u>**

However, the prosecutors in Mr. Nordlicht's case went a step further by lying to this Court and the District Court to uphold a constitutionally infirm conviction. They repeatedly asserted that Mr. Nordlicht was not the source of the information in the Francis Memo, which cleanly summarizes the scheme Mr. Nordlicht purportedly hid from Black Elk and BakerHostetler:

1. Black Elk has agreed to sell assets to Renaissance for a sale price of $170 Million, which is to close on July 15, 2014.

2. As a result of the disposition of those assets, BEE will be relieved of $60 Million in bond/security obligations on the properties sold.

41

3. As a result of items 1 and 2, BEE will have $230 Million in relatively free funds.

4. Platinum [h]as stated that it intends to pay $60 Million of the funds to redeem $60 Million of the currently outstanding secured bond holder debt of $150 Million, which will leave $90 Million in bond debt in the hands of so-called "friendly" bond holders, most of which is held by Platinum itself.

The memo establishes Mr. Nordlicht disclosed Platinum and the friendly bondholders' stake in the Black Elk bonds prior to the consent solicitation. Because Mr. Hoffman "had no knowledge" of these facts before speaking with Mr. Nordlicht, the information in the Francis Memo plainly came from Mr. Nordlicht. After learning Platinum's plans from Mr. Nordlicht, Mr. Hoffman and Ms. Piché contacted Mr. Paul Francis at BakerHostetler on June 26, 2014 and told him that Platinum intended to use the proceeds from the Renaissance sale to pay preferred equity holders "ahead of so called friendly bond holders." *See* DE 971-8 (email from M. Piché to P. Francis forwarding an email from J. Hoffman). Mr. Francis and Mr. Eric Kristiansen, another partner at BakerHostetler, spoke with Mr. Hoffman and Ms. Piché later that day to "gather[] some general facts and the timeline of transactions on the horizon that would effectuate Platinum's scheme." DE 971-9 at 2. Mr. Francis then wrote what

42

he learned from Mr. Hoffman and Ms. Piché about Platinum's intent in his July 1, 2014 memo.

The prosecutors nevertheless told the District Court that any "information in the July 1 Memo reflecting Platinum's [Black Elk] Bond holdings" did not come "from Platinum, the Defendants or their co-conspirators." DE 787 at 58. In their brief to the Second Circuit panel, the prosecutors asserted Mr. Nordlicht "had no involvement in [the Francis Memo]," and the memo "has no bearing on Mr. Nordlicht's intent." A261. Relying on the government's representations, the Second Circuit panel dismissed the memo as "unrelated to Nordlicht," noting he did not "provide[] the information that formed the basis for this memo." *Landesman*, 17 F.4th at 338.

Accordingly, the prosecution's repeated misrepresentations require this Court to vacate the judgment.

## APPELLANT JOINS CO-APPELLANTS IN ARGUMENTS

Pursuant to Fed. R. App. P. 28(i), Appellant Nordlicht joins in all applicable arguments raised in any co-appellants' briefs consistent with his requested relief.

43

## **CONCLUSION**

For the reasons stated above, the verdict should be vacated. In the alternative, the district court's order denying Nordlicht's renewed motion for a new trial under Fed. R. Crim. P. 33 and denying what the court construed as a renewed motion for the judgment of acquittal pursuant to Fed. R. Crim. P. 29 should be vacated and the case remanded with instructions to grant a judgment of acquittal with regard to the securities fraud charges or, in the alternative, instructions to grant Nordlicht a new trial.

Dated: December 30, 2024

Respectfully submitted,

RONALD SULLIVAN LAW, PLLC

Ronald S. Sullivan Jr., Esq.
1300 I Street NW
Suite 400 E
Washington, DC 20005
(202) 935-4347

44

**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

**Nos. 19-3027, 19-3029**

**Caption: United States v. Levy, Nordlicht**

**CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) OR 32(a)**
**TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND**
**TYPE STYLE REQUIREMENTS**

I certify that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a) and Local Rule 32.1(a). This brief is written in Times New Roman, a proportionally spaced font, has a typeface of 14 points, and contains 10,412 words (as counted by Microsoft Word), excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

RONALD SULLIVAN LAW, PLLC

Ronald S. Sullivan Jr., Esq.
1300 I Street NW
Suite 400 E
Washington, DC 20005
(202) 935-4347

45