# 23-7904(L)

**23-6915(CON), 23-6917(CON), 24-46(XAP),
24-209(CON), 24-388(XAP), 24-1978(CON),
24-2203(XAP)**

*To Be Argued By*:
NICHOLAS AXELROD

# United States Court of Appeals

### For the Second Circuit

◆

UNITED STATES OF AMERICA,

*Appellee-Cross-Appellant,*

—against—

URI LANDESMAN, JOSEPH SANFILIPPO,
JOSEPH MANN, and JEFFREY SHULSE,

*Defendants,*

DANIEL SMALL, DAVID LEVY, and MARK NORDLICHT,

*Defendants-Appellants-Cross-Appellees.*

—————————

**On Appeal From The United States District Court
For The Eastern District of New York**

---

## REPLY BRIEF FOR THE UNITED STATES

---

JOSEPH NOCELLA, JR.,
*United States Attorney,*
*Eastern District of New York*
271-A Cadman Plaza East
Brooklyn, New York 11201
(718) 254-7000

NICHOLAS J. MOSCOW,
DAVID C. PITLUCK,
NICHOLAS AXELROD,
AMANDA SHAMI,
*Assistant United States Attorneys,*
    *Of Counsel.*

i

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................iii

PRELIMINARY STATEMENT ............................................................. 1

ARGUMENT ........................................................................................ 6

POINT ONE - THE DISTRICT COURT ERRED BY
GRANTING NORDLICHT'S AND LEVY'S
MOTION FOR A JUDGMENT OF ACQUITTAL
OR IN THE ALTERNATIVE A NEW TRIAL ................. 6

I.    The District Court Erred by Considering
Evidence Outside the Record ................................................... 6

    A.    The District Court Relied on Evidence from
the Wrong Trial ................................................................ 6

    B.    The Evidence from the Nordlicht-Levy Trial
Does Not Support the District Court's
Decision ........................................................................ 10

II.   The District Court's Reliance on *Ciminelli*
Was Erroneous ....................................................................... 20

    A.    There Was No Basis to Revisit the Jury's
Verdict ........................................................................... 21

    B.    Levy Confuses the Scheme to Defraud with
the Object of the Fraud ................................................. 24

    C.    The District Court Misinterpreted the Wire
Fraud Statute's Intent Requirement ............................. 27

POINT TWO - THE DISTRICT COURT'S ERRORS
    AFFECTED THE GUIDELINES
    CALCULATION AND SENTENCING ......................... 31

I.    The Black Elk Scheme Resulted in a Loss to
      Investors ................................................. 31

II.   The District Court Erred by Adopting a Loss
      Calculation Based on a Supposed Lack of
      Market Price Impact .................................... 41

POINT THREE - THE DISTRICT COURT'S NUMEROUS
    ERRORS  REQUIRE REMAND AND
    DE NOVO RESENTENCING ................................ 45

I.    De Novo Resentencing of Nordlicht and Levy
      Is Required ............................................... 45

II.   The District Court's Grant of  Rule 29 and
      Rule 33 Relief Is Not Harmless ...................... 47

III.  The District Court's Guidelines Error Was Not
      Harmless;  the Sentences Were Based on the
      Same Flawed Reasoning ............................... 50

CONCLUSION ................................................... 57

iii

# TABLE OF AUTHORITIES

Page

### FEDERAL CASES

*Ciminelli v. United States*,
　598 U.S. 306 (2023)....................................................... passim

*Dhinsa v. Krueger*,
　917 F.3d 70 (2d Cir. 2019) .................................................49

*Gall v. United States*,
　552 U.S. 38 (2007).............................................................56

*Kassir v. United States*
　3 F.4th 556 (2d Cir. 2021)..................................................48

*Kousisis v. United States*,
　145 S. Ct. 1382 (2025).................................................. passim

*Molina-Martinez v. United States*,
　578 U.S. 189 (2016)...........................................................52

*Ray v. United States*,
　481 U.S. 736 (1987).......................................................48-49

*United States v. Abiodun*,
　536 F.3d 162 (2d Cir. 2008) ..............................................40

*United States v. Avenatti*,
　81 F.4th 171 (2d Cir. 2023).......................................10-11, 13

*United States v. Barajas-Nunez*,
　91 F.3d 826 (6th Cir. 1996)................................................50

*United States v. Barbera*,
　No. 21-CR-154 (JGK),
　2023 WL 6066249 (S.D.N.Y. Sept. 18, 2023)........................23

*United States v. Bennett,*
  839 F.3d 153 (2d Cir. 2016) .......................................................... 51-52

*United States v. Berkovich,*
  168 F.3d 64 (2d Cir. 1999) ................................................................ 28

*United States v. Binday,*
  804 F.3d 558 (2d Cir. 2015) .......................................................... 55-56

*United States v. Bryson,*
  101 F. Supp. 3d 147 (D. Conn. 2015) ............................................... 35

*United States v. Clark,*
  274 F.3d 1325 (11th Cir. 2001) .................................................... 49-50

*United States v. Coscia,*
  866 F.3d 782 (7th Cir. 2017) ............................................................ 43

*United States v. Desnoyers,*
  637 F.3d 105 (2d Cir. 2011) ............................................................. 46

*United States v. Desnoyers,*
  708 F.3d 378 (2d Cir. 2013) .......................................................... 46-47

*United States v. Dhinsa,*
  243 F.3d 635 (2d Cir. 2001) ............................................................. 51

*United States v. Dickler,*
  64 F.3d 818 (3d Cir. 1995) ............................................................... 44

*United States v. Ebbers,*
  458 F.3d 110 (2d Cir. 2006) .................................................. 41, 42, 43

*United States v. Feldman,*
  647 F.3d 450 (2d Cir. 2011) ................................................ 51, 52, 54-55

*United States v. Fishbein,*
  No. 21-CR-296 (PAC),
  2023 WL 5035179 (S.D.N.Y. Aug. 8, 2023) ....................................... 23

v

*United States v. Frenkel,*
    682 F. App'x 20 (2d Cir. 2017) ............................................. 35

*United States v. Gordon,*
    710 F.3d 1124 (10th Cir. 2013) ........................................... 44

*United States v. Hart,*
    273 F.3d 363 (3d Cir. 2001) ................................................ 37

*United States v. Jass,*
    569 F.3d 47 (2d Cir. 2009) ................................................. 50

*United States v. Jiau,*
    734 F.3d 147 (2d Cir. 2013) ............................................... 11

*United States v. Landesman,*
    17 F.4th 298 (2d Cir. 2021) ......................................... passim

*United States v. Lange,*
    834 F.3d 58 (2d Cir. 2016) ................................................. 28

*United States v. Meadows,*
    No. 22-3155-cr,
    2025 WL 786380 (2d Cir. March 12, 2025) .................................50-51

*United States v. Morris,*
    80 F.3d 1151 (7th Cir. 1996) .............................................. 37

*United States v. Motovich,*
    No. 21-CR-497 (WFK),
    2024 WL 2943960 (E.D.N.Y. June 11, 2024) ...............................25-26

*United States v. Newnam,*
    4 F.3d 987 (4th Cir. 1993) ................................................ 37

*United States v. Nordlicht,*
    No. 16-CR-640 (BMC),
    2022 WL 1469393 (E.D.N.Y. May 10, 2022) ................................. 16

*United States v. Offill,*
    666 F.3d 168 (4th Cir. 2011) .............................................. 44

*United States v. Orrego-Martinez*,
  575 F.3d 1 (1st Cir. 2009) ...................................................9

*United States v. Rigas*,
  583 F.3d 108 (2d Cir. 2009) ..............................................46

*United States v. Rossomando*,
  144 F.3d 197 (2d Cir. 1998) ..............................................28

*United States v. Runner*,
  No. 18-CR-578 (JS),
  2023 WL 3727532 (E.D.N.Y. May 30, 2023)......................25

*United States v. Rutkoske*,
  506 F.3d 170 (2d Cir. 2007) ...................................... 41, 42, 43

*United States v. Seabrook*,
  968 F.3d 224 (2d Cir. 2020) ..............................................55

*United States v. Stitsky*,
  536 F. App'x 98 (2d Cir. 2013) .........................................35

*United States v. Torres*,
  No. 21-2665-cr,
  2023 WL 378942 (2d Cir. Jan. 25, 2023) ...........................48

*United States v. Turk*,
  626 F.3d 743 (2d Cir. 2010) .........................................34-35

*United States v. Tuzman*,
  No. 21-2229-cr,
  2024 WL 1173044 (2d Cir. Mar. 19, 2024) ........................21-22, 23, 24

## STATE CASE

*MacLaren v. Cochran*,
  44 Minn. 255 (1890) ...........................................................29

## STATUTES

18 U.S.C. § 1343 ...................................................................28

18 U.S.C. § 3013(a) .................................................... 49

18 U.S.C. § 3553 ....................................................... 52

18 U.S.C. § 3663 ....................................................... 37

18 U.S.C. § 3664 ....................................................... 37

## RULES AND SENTENCING GUIDELINES

Fed. R. Crim. P. 29 ............................................ passim

Fed. R. Crim. P. 33 ........................................... 22, 48

U.S.S.G. § 2B1.1 ............................................... passim

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

Docket Nos. 23-7904 (L)
23-6915 (Con), 23-6917 (CON), 24-46 (XAP), 24-209 (Con),
24-388 (XAP), 24-1978 (CON), 24-2203 (XAP)

UNITED STATES OF AMERICA,

*Appellee-Cross-Appellant*,

-against-

URI LANDESMAN, JOSEPH SANFILIPPO, JOSEPH MANN, and
JEFFREY SHULSE,

*Defendants*,

DANIEL SMALL, DAVID LEVY, and MARK NORDLICHT,

*Defendants-Appellants-Cross-Appellees*.

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

REPLY BRIEF FOR THE UNITED STATES

PRELIMINARY STATEMENT

This Court should reverse the district court's order entering a

judgment of acquittal and alternatively granting a new trial as to Levy

and Nordlicht on Count Seven. As set forth in the government's opening

brief, the court relied on evidence outside the record of the Nordlicht-Levy trial to revisit its conclusion (and this Court's) that Nordlicht and Levy acted with fraudulent intent. In doing so, the court impermissibly reweighed the evidence and misapplied the Supreme Court's decision in *Ciminelli v. United States*, 598 U.S. 306 (2023). These errors permeated the sentencing and the court's calculation of the Guidelines,[1] which were based on the court's erroneous view that Nordlicht and Levy intended to repay the bondholders in full.

In response, the defendants do not meaningfully dispute that the numerous property interests identified in the government's opening brief constitute "money or property" under the wire fraud statute. The Black Elk scheme targeted $77 million in proceeds from the Renaissance Sale and neutered the bondholders' contractual rights under the Indenture. The defendants instead rely on the district court's *ipse dixit* claim that there was a "mountain" of evidence supporting its erroneous conclusion that Nordlicht and Levy intended to repay bondholders in full.

---

[1] All defined terms are used as set forth in the government's opening brief.

But if such a "mountain" exists, neither the district court nor the defendants have been able to find it. In support of its decision, the court cited only documents from Small's trial that were not introduced at the Nordlicht-Levy trial. Moreover, even had Nordlicht and Levy intended to repay bondholders in full, that would not be a defense to wire fraud, as the decision in *Kousisis v. United States*, 145 S. Ct. 1382 (2025), makes clear. Their material misrepresentations in connection with a scheme seeking to obtain the bondholders' contractual rights, and specifically the Renaissance Sale proceeds, constituted a fraud, irrespective of how they hoped the fraud would affect other investors.

The defense of the district court's loss calculation is similarly unpersuasive. The evidence at both trials established that the non-tendering bondholders lost money in the Black Elk bankruptcy and that the conspirators understood at the time of the fraud that a bankruptcy in which Black Elk would have an approximately $100-million loss was inevitable. The court disregarded these facts only because it had found already that the conspirators intended for the bondholders to tender. In sidestepping these facts, the court mistakenly applied inapposite case law addressing schemes in which defendants artificially inflate the price

4

of a publicly traded equity. And the court faulted the victim-bondholders for their supposed failure to mitigate their losses by selling their bonds after the Consent Solicitation passed.

The defendants make no effort to fit this reasoning into the applicable Guidelines provisions. Section 2B1.1 requires that a fraud be a "but-for" cause of the loss and that the loss be "reasonably foreseeable." It was reasonably foreseeable that Black Elk would end up in bankruptcy—the conspirators discussed that possibility repeatedly—and by the time the Consent Solicitation closed, it was apparent that most of the unaffiliated bondholders would not consent or tender their bonds. Moreover, the defendants cite no case holding that defendants should receive a windfall under the Guidelines for the victims' supposed failure to take steps to mitigate their losses that the court deems reasonable with hindsight nearly a decade later.

Nor can Levy, Nordlicht, or Small show that these errors were harmless. As Levy acknowledges, a decision denying a Rule 29 motion is not harmless no matter the punishment likely to be imposed. The same rule applies to *granting* a Rule 29 motion. The defendants also cannot show that the district court's fundamental misunderstanding of the

Black Elk scheme did not affect the non-custodial sentences imposed. The court's consideration of the sentencing factors was driven principally by its erroneous view that the conspirators did not intend to harm the bondholders and that there was therefore no loss from the scheme. Indeed, the court *expressly* incorporated its loss analysis into its analysis of the sentencing factors at Nordlicht's sentencing.

For these reasons and the reasons provided below, the Court should reinstate Nordlicht's and Levy's conviction on Count Seven, vacate the sentences of all three defendants, and remand for resentencing.

## ARGUMENT

## POINT ONE

### THE DISTRICT COURT ERRED BY GRANTING NORDLICHT'S AND LEVY'S MOTION FOR A JUDGMENT OF ACQUITTAL OR IN THE ALTERNATIVE A NEW TRIAL

I.    The District Court Erred by
      Considering Evidence Outside the Record

    A.    The District Court Relied on Evidence from the Wrong Trial

Nordlicht and Levy concede that the district court cited to evidence from the Small trial that was not introduced at the Nordlicht-Levy trial, as they must.[2] (LRBr.53; NRBr.31). They ask this Court to disregard these references, however, because the court also wrote that there was a "mountain of evidence that defendants were trying to get rid of debt to save the company." (NA:612). But the court discussed only documents from Small's trial. The court focused in particular on: (i) an August 9, 2014 email from Nordlicht in which he characterized the fact

---

[2]     "GBr.," "LRBr.," and "NRBr." refer to the government's opening brief and Levy's and Nordlicht's consolidated response and reply briefs, respectively. References to "LA," NA," "SA," and "GA" refer to Levy's and Nordlicht's appendices, Small's appendix, and the government's appendix, respectively. References to "NSPA" and "DE" refer to Nordlicht's special appendix and to entries on the district court docket.

that few unaffiliated bonds had been tendered as not his "desired result," (GA:647); (ii) a July 29, 2014 email from Black Elk CFO Jeffrey Shulse attaching a "sources and uses" spreadsheet that suggests Shulse assumed that $65 million in bonds would be tendered (GA:648-49);[3] and (iii) testimony from bondholder Todd Pulvino at Small's trial that a broker told him that Platinum thought it would be a "good idea" for him to tender (NA:613 (quoting GA:400)). For the reasons provided in the government's opening brief, this evidence does not support the district court's conclusion. (*See* GBr.168-80). But regardless, that was the only evidence cited by the court in support of its conclusion, and it was all from Small's trial. Whatever the court intended by its reference to a "mountain" of evidence, that mountain apparently consisted entirely of evidence outside the record of the Nordlicht-Levy trial.

---

[3]    Levy claims that this document shows that "Black Elk had indeed set aside sufficient funds to repay all non-affiliated bondholders." (LRBr.48). Shulse's email does not support that claim. It shows only that Shulse at some point created a "sources and uses" spreadsheet that contemplated paying out $65 million in tendering bonds. There is no evidence that Black Elk set aside that amount of money or demonstrating which bondholders Shulse expected to tender.

The district court did not cite to the evidence from Small's trial merely to buttress its decision or to provide examples, as Levy and Nordlicht suggest. (NRBr.31; LRBr.53-54). Instead, the court wrote: "the evidence *at Small's trial* made clear that the defendants intended to use the proceeds of the Renaissance sale to pay out all non-affiliated bondholders…." (NA:613) (emphasis added).

The chronology of the district court's decisions confirms that the court relied on evidence outside the record of the Nordlicht-Levy trial. In 2022, prior to the Small trial, the court denied Nordlicht's and Levy's renewed Rule 29 motions on the same grounds on which it ultimately granted them after the Small trial. In those motions, Nordlicht and Levy argued that the government failed to prove that the conspirators intended to deprive the bondholders of money or property, including because "Nordlicht expected and hoped that bondholders would take [the tender offer], not that they would be harmed by an amendment to the indenture." (NA:186; *see also* GA:295, 323; NA:154). The court denied the motion because a "reasonable jury could also find that the government's evidence of Mr. Nordlicht's improper motive outweighed the evidence suggesting that he expected the other bondholders to tender

9

or believed Black Elk's asset sale would reimburse all the investors." (LA:243; GBr.128-29). The only evidentiary change between May 2022—when the district court rejected this argument—and July 2023—when it granted the renewed motion—was that the Small trial had taken place. Moreover, the evidence the court cited for support was all from the motions, filed *after* the Small trial, which argued that the evidence from Small's trial was newly discovered. (*See* NA:501-12; DE:972).

Neither Nordlicht nor Levy disputes that it is improper for a district court to consider evidence outside the record in connection with a Rule 29 motion. That is a foundational principle, as the government explained in its opening brief. (*See* GBr.105-07 (citing, *inter alia*, *United States v. Orrego-Martinez*, 575 F.3d 1, 8 (1st Cir. 2009) (per curiam) ("[R]eview of sufficiency challenges is confined to evidence presented at trial.")).[4] For this reason alone, the district court's decision granting Rule 29 relief must be reversed.

---

[4] Except where indicated otherwise, all case quotations omit internal quotation marks and citations.

B.      The Evidence from the Nordlicht-Levy Trial
        Does Not Support the District Court's Decision

Although the district court did not cite any evidence from the Nordlicht-Levy trial, Nordlicht and Levy attempt to salvage the court's decision by presenting evidence from the Nordlicht-Levy trial, which, they claim, could support the court's conclusion.  But this Court has already ruled on the sufficiency of the evidence adduced at the Nordlicht-Levy trial and held that the evidence was sufficient to support the jury's guilty verdict.  *See United States v. Landesman*, 17 F.4th 298, 321 (2d Cir. 2021).   Efforts to point to a "mountain" of evidence from the Nordlicht-Levy trial ostensibly showing that they lacked criminal intent are simply attempts to relitigate an issue the jury and this Court have already decided, incompatible with the idea of "crediting any inferences that the jury might have drawn in [the government's] favor," *id.* at 305 n.1, and the Court should reject them out of hand.   Moreover, the evidence to which Levy and Nordlicht point is unpersuasive.

A jury verdict must be sustained if, "crediting every inference that could have been drawn in the government's favor and viewing the evidence in the light most favorable to the prosecution, *any* rational trier

of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Avenatti*, 81 F.4th 171, 184 (2d Cir. 2023). And a "judgment of acquittal is warranted only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Jiau*, 734 F.3d 147, 152 (2d Cir. 2013).

This Court has already found that the evidence at the Nordlicht-Levy trial established that Nordlicht and Levy intended to defraud the unaffiliated bondholders. As this Court explained:

> At trial, the government adduced evidence that: the Black Elk scheme benefitted Platinum investors to the detriment of the Black Elk bondholders; the outcome of the vote was inconsistent with the actions of a rational bondholder; and the Consent Solicitation would not have passed without the votes of Beechwood, a Black Elk affiliate.

*Landesman*, 17 F.4th at 321-22. The evidence at trial showed that the conspirators recognized the likelihood that Black Elk would declare bankruptcy and that failing to repay the Preferred Equity threatened Platinum itself. (GBr.15-17 & n.3). The conspirators designed the Consent Solicitation to divert the Renaissance Sale proceeds to the

Preferred Equity holders and avoid this outcome. The conspirators were also aware that the unaffiliated bondholders were not likely to tender in sufficient numbers to pass the Consent Solicitation—much less that "all" unaffiliated bondholders would tender. As this Court recounted, Black Elk's CEO John Hoffman told Levy the bondholders would not consent, after which Levy told Shulse not to worry because "[i]t's covered." *Landesman*, 17 F.4th at 326; (*see also* GBr.46-48). Then, after it became clear that in fact the unaffiliated bondholders had *not* tendered in sufficient numbers to pass the Consent Solicitation, the conspirators concealed ownership of the Beechwood bonds from Shearer, sending him a fraudulent officer's certificate to ensure the Consent Solicitation would pass. After diverting the proceeds, the conspirators essentially left Black Elk for dead, ensuring any loss would fall on the remaining, unaffiliated bondholders. Levy told Platinum CFO Daniel Mandelbaum that Platinum would not fund Black Elk to pay its bills but would also wait twelve months after the Renaissance Sale to file for bankruptcy to ensure its proceeds would not be clawed back. *Landesman*, 17 F.4th at 317, 321; (GA:123-24).

The minimal probative value of the evidence Nordlicht and Levy belatedly present does not come close to outweighing this evidence, much less showing that no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Avenatti*, 81 F.4th at 183-84. At best, Nordlicht's and Levy's attempts to justify the district court's decision read like an effort to find some evidence in the record that could support one permissible inference. But that is not the posture of this case. To overturn the jury's verdict, the court was required to marshal evidence so overwhelming that a reasonable jury could not have reached a contrary conclusion. The evidence supported the jury's conclusion about the conspirators' criminal intent—as this Court has already held. *Landesman*, 17 F.4th at 321-39.

Nordlicht nevertheless claims that Platinum either wanted or expected the bondholders to tender, citing the Francis Memo and testimony from Yee, Pulvino, and Shearer. (*See* NRBr.21, 31-32). The Francis Memo was not admitted at either trial and therefore could not supply the missing link between the district court's decision and the trial record. To the extent the Francis Memo relays Nordlicht's "expectation" (NRBr.21), this double hearsay does not address Nordlicht's willingness

to defraud the bondholders if they did not tender, as turned out to be the case, or Nordlicht's intent after the Consent Solicitation was launched.

Similarly, the selective portions of Yee's and Pulvino's testimony that Nordlicht cites have only a tenuous connection to Nordlicht and Levy. Pulvino testified that a broker told him that an unspecified person at Platinum thought he *should* tender. (NA:613 (quoting GA:400)). There is no evidence that this person was Nordlicht or Levy or that the conspirators even knew about the conversation. And even Platinum's recommendation that Pulvino tender would not be the same as an expectation that he would. To the contrary, the fact that someone at Platinum may have encouraged bondholders to tender could suggest that Platinum was concerned that an insufficient number of bondholders would tender to pass the Consent Solicitation. Yee's testimony is even further afield. Yee agreed on cross examination that "nothing about the offer that was made…suggests to you that the—the issuers did not want you to take [it], right?" (LA:304). Yee did not testify to conversations with Nordlicht or Nordlicht's expectations, and the

question was framed in terms of the issuer, *i.e.* Black Elk, and not Platinum.[5]

Nordlicht also cites to Shearer's testimony that Shearer expected bondholders to tender. (NRBr.31-32). Whatever Shearer's expectations were, they do not bear directly on Nordlicht's intent or expectations. Shearer's view was inconsistent with the testimony from the investors at trial, which was credited by the jury, and the conspirators' conduct. The jury credited Pulvino and Yee, who each testified that they did not expect the Consent Solicitation to pass because it did not offer the bondholders their full contractual entitlement (par plus a 6.875% call premium), would require them to forgo their interest payments, and would permit Black Elk to use its collateral to repay

---

[5]     Nordlicht's brief also quotes Nordlicht stating on an investor call that "we are in the midst of taking down debt" without any citation to the trial record. (NRBr.32). Assuming (though it is unclear) that this quotation is actually from the trial record, and further that it relates to the Consent Solicitation, it says little about Nordlicht's intent. Nordlicht did not specify which debt he was "taking down"—the Preferred Equity or the Black Elk bonds—and in fact some bonds were retired in the Consent Solicitation, albeit only $11 million of the total $150 million outstanding.   (GA:481).   This remark says nothing about whether Nordlicht expected all unaffiliated bondholders to tender.

junior creditors before them.  (GA:44-47, 184-87, 193-94; LA:304).  The jury could also infer from the conspirators' conduct that they did not believe the unaffiliated bondholders would tender in sufficient numbers to pass the Consent Solicitation.  If they had, they would not have felt it necessary to rig the Consent Solicitation.  Moreover, had the unaffiliated bondholders tendered, the proceeds of the Consent Solicitation would have been insufficient to repay the Preferred Equity, which even the district court recognized was the conspirators' overriding goal in the scheme.  *United States v. Nordlicht*, No. 16-CR-640 (BMC) 2022 WL 1469393, at *11-12 (E.D.N.Y. May 10, 2022).

Nordlicht claims that the Consent Solicitation itself suggests an intent to repay all unaffiliated bondholders in full.  (NRBr.30-31).  As the government has explained, to the extent the offer in the Consent Solicitation is relevant, it is unhelpful to Nordlicht.  The Consent Solicitation did not offer the bondholders repayment in full, as Nordlicht and Levy now insist.  (*See* NRBr.30-31; LRBr.48).  As Yee explained, the bondholders were entitled to a call premium that was not offered in the Consent Solicitation.  (GA:45).  The Consent Solicitation also required tendering unaffiliated bondholders to forgo significant interest payments

(13.75% per year). (GA:186). The conspirators also timed the Consent Solicitation to ensure that the bonds they controlled and had transferred to the Beechwood entities would be sufficient to control the outcome of the vote. (*See* GBr.35). The district court did not explain how the terms of the offer in the Consent Solicitation suggest the conspirators intended to repay the bondholders in full—and a jury could permissibly conclude that it did not.

Last, Levy refers to valuation reports for Black Elk prepared after the Consent Solicitation passed to suggest that Black Elk's equity value was sufficient to repay the unaffiliated bondholders even after the conspirators stripped Black Elk's crown jewels and used the proceeds to repay Preferred Equity holders. (LRBr.48-49). The valuation reports have no bearing on the conspirators' intent, which was the basis for the court's decision, or whether the Renaissance Sale proceeds or the bondholders' rights under the Indenture constitute "money or property." At best, the valuation reports suggest that Black Elk had unrealized assets that *could* have been sufficient to repay the unaffiliated bondholders after the Consent Solicitation if Black Elk had the money to monetize them. The reports do not show that Black Elk had the cash to

pay off the bondholders. To the contrary, trial evidence demonstrated that Black Elk was unable to pay its bills and that its senior officers discussed the likelihood of a bankruptcy, including with the defendants. (GA:505, 525, 544-45; NA:1016-20, 1074-79, 1204). Moreover, accepting the valuation reports as evidence that Black Elk had the funds to repay the bondholders (it did not, and a jury was permitted to conclude accordingly), the fact that the conspirators chose not to do so is further evidence from which the jury could have inferred their fraudulent intent. (*See* GBr.138-39).

None of the evidence Levy and Nordlicht cite addressed the conspirators' intent at the time the Consent Solicitation passed, when they provided Shearer a fraudulent officer's certificate to ensure he ratified the results—i.e., their intent when they made the material misrepresentation. In fact, when the Consent Solicitation passed, the conspirators knew that most unaffiliated bondholders would not tender, confirming Yee's and Pulvino's expectations. On August 13, 2014, after the vote closed, Small shared with Nordlicht a calculation of the results showing that an insufficient number of unaffiliated bonds had been tendered to carry the vote. (NA:1342). The conspirators chose to conceal

the Beechwood bonds from Shearer to ensure it would "pass" anyway. (NA:1344). Even assuming the conspirators expected the bondholders to tender, trial evidence showed that they were aware at the time of the misrepresentations to Shearer that not all (or even a majority) of the unaffiliated bondholders had tendered and therefore that their scheme would affect these remaining bondholders.

Trial evidence also showed that the conspirators understood that Black Elk was spiraling towards bankruptcy, in which the Preferred Equity holders would be subordinate to the bondholders, and that they rigged the Consent Solicitation to ensure that the Preferred Equity holders would be paid first instead. Around the time of the Consent Solicitation, Levy, Nordlicht, and Small discussed with Black Elk management the company's inability to pay its bills and the possibilities of laying off 95% of the company's employees or putting Black Elk into bankruptcy. (*See* NA:1016-20; GA:27-28, 525 *see also* NA:1023-24, 1031-32). In January 2014, well before the Consent Solicitation, Nordlicht wrote to Hoffman that Black Elk was moving from "crisis to crisis" and "moving towards a liquidation," and that "[t]here is not enough value after all your sales to pay everyone off." (GA:542-43). Following the

Consent Solicitation, the conspirators also sought to prevent a potential clawback of the proceeds of the Renaissance Sale. In 2015, after the Consent Solicitation passed, Levy stated that Platinum would not fund Black Elk so it could pay its bills but also would delay a bankruptcy because a receiver "could clawback on that hundred million." (GA:123-24).

The jury also heard that, in fact, the unaffiliated bondholders were harmed. Both Pulvino and Yee testified that they lost money on the bonds after Black Elk declared bankruptcy. (GA:57, 191, 195-96).

The jury's conclusion that the conspirators intended to obtain the proceeds of the Renaissance Sale and the contractual rights of the bondholders was supported by substantial evidence, and the district court's contrary conclusion was explicitly premised on evidence not admitted at trial. Nordlicht's and Levy's attempts to marshal evidence from the trial record to overturn the jury's verdict are untimely and unpersuasive.

## II. The District Court's Reliance on *Ciminelli* Was Erroneous

This case has never been about the right to control. The indictment did not allege a right-to-control theory, the jury instructions

did not mention the right to control, and in *Landesman* this Court concluded that there was sufficient evidence of the defendants' guilt without mentioning the right to control. Invoking this irrelevant theory's changed status does not undermine the validity of the jury's verdicts in this case.

A.  There Was No Basis to Revisit the Jury's Verdict

As Nordlicht and Levy concede, the jury charge in this case did not include typical right-to-control instructions like those given in *Ciminelli*. Instead, Nordlicht claims that the jury was instructed in this case on a "general" theory that could be interpreted to allow for a conviction "on a right-to-control theory." (NRBr.26). That is incorrect. The jury was instructed (properly) that it was required to find that the defendants "acted with the specific purpose of causing some deprivation of money or property." (GA:285).

This instruction required the jury to find that the bondholders' money or property was a target of the scheme. (*See* GA:282, 285). This Court has already reached this conclusion in *United States v. Tuzman*, No. 21-2229-cr, 2024 WL 1173044 (2d Cir. Mar. 19, 2024) (summary order). In *Tuzman*, the district court charged the jury on a

traditional property theory, using a substantively identical instruction to the charge in this case, and also on a right-to-control theory. *See United States v. Tuzman*, No. 15-CR-536 (PGG), DE:706 at 150, 153 (S.D.N.Y. Dec. 22, 2017). This Court affirmed because the disjunctive jury instruction included a traditional property theory—not a "general" instruction—and the evidence at trial supported that theory. *Tuzman*, 2024 WL 1173044, at *3.

Nor is there "uncertainty" in the record about the "money or property" theory relied on by the jury, as Nordlicht claims to salvage the timeliness of any Rule 33 relief. (NRBr.35).[6] Unlike in *Tuzman*, here the jury was instructed only on a correct theory. In essence, Nordlicht suggests that this Court should find a *Yates*-style error because some

---

[6]     Levy's sole effort to argue that Rule 33 relief was timely, in a footnote, erroneously ties the district court's decision granting Rule 33 relief to a filing he made in March 2022. (LRBr.54 n.16 (citing GA:350)). But while he did file that timely motion, the court denied it. (NA:462). The court later granted in part an untimely motion (DE:971) as an alternative to Rule 29 relief; the government appealed, and neither defendant persuasively defended its timeliness.

        Of course, challenges premised on the "uncertainty" permitted by the jury instructions would need to be framed as challenges to jury instructions—but there was no such challenge in this case.

different district courts, at the time of the trial in this case, occasionally used now-infirm jury instructions in relation to the same crime charged here. But those now-infirm hypothetical instructions played no part in this case. Nordlicht cites no case in which this Court or a district court sitting in this Circuit has granted such a motion based on a supervening change in law that had no impact on the jury instructions in the case on appeal. To the contrary, courts have rejected out of hand suggestions that a jury erroneously relied on an uncharged and uninstructed right-to-control theory because that theory required particular jury instructions, *see, e.g.*, *United States v. Barbera*, No. 21-CR-154 (JGK), 2023 WL 6066249, at *1 (S.D.N.Y. Sept. 18, 2023); *United States v. Fishbein*, No. 21-CR-296 (PAC), 2023 WL 5035179, at *9 (S.D.N.Y. Aug. 8, 2023), and this Court has affirmed even where the right-to-control theory *was* charged in addition to a traditional money-or-property theory, *see Tuzman*, 2024 WL 1173044, at *3.

B.    Levy Confuses the Scheme to
      Defraud with the Object of the Fraud

In seeking to distinguish *Tuzman* and reconceptualize this case as a right-to-control case, Levy conflates the fraudulent scheme and evidence of its materiality with the scheme's object.

It is of course true that the government's "theory of guilt was that the defendants rigged the vote on the Consent Solicitation by depriving the bondholders of information." (LRBr.47). By rigging the Consent Solicitation, the conspirators made a false or misleading statement or omitted material information necessary to make the statements in the Consent Solicitation accurate.[7] This is a description of the charged scheme to defraud, a separate element of wire fraud and not the object of the offense. And of course the misrepresented information was "valuable information," (LRBr.47), because it was material, as Pulvino and Yee both testified. (*See* GA:193-94, 196-97 (Pulvino); GA:36, 58 (Yee)). This is yet another element of fraud. If the government had *not* proven that the misrepresented information was important, Levy

---

[7]    The conspirators misrepresented the number of affiliated bonds disclosed in the Consent Solicitation by concealing their control of bonds held by PPCO, PPLO, and Beechwood. (GBr.38-40).

would have been entitled to an acquittal. But Levy now argues that the government's discussion of the importance of the misrepresented information is evidence that the jury must have failed to follow the district court's instructions about the object of the fraud. It is not.

In recounting the government's theory, Levy fails to address any of the traditional "money or property" interests identified by the government in this case (*see* GBr.119-30), and glosses over the portions of the government's closing argument that related to the money or property at stake in scheme (*see* LRBr.50 (quoting LA:391-92)). Since *Ciminelli*, district courts within this Circuit have repeatedly rejected similar sleight of hand: "Defendant cannot use *Ciminelli* as a shield to prevent the government from introducing the misrepresentations or omissions underlying the alleged scheme…under the guise of construing those same deceptions as exclusively relevant to a victim's property interest…." *United States v. Runner*, No. 18-CR-578 (JS), 2023 WL 3727532, at *2 (E.D.N.Y. May 30, 2023); *see also United States v. Motovich*, No. 21-CR-497 (WFK), 2024 WL 2943960, at *6 (E.D.N.Y. June 11, 2024) ("[T]his [c]ourt joins a number of in-Circuit colleagues in rejecting Defendants' attempts to improperly weaponize *Ciminelli*'s

26

holding." (collecting cases)). That conclusion is compelled by common sense—the right-to-control theory of fraud is complex, and the idea that without instruction the jury would divine it as an independent basis to convict in a traditionally charged case is absurd.

In fact, the government argued that the scheme targeted the proceeds of the Renaissance Sale to the detriment of the unaffiliated bondholders:

> The defendants, Mark Nordlicht and David Levy, wanted that money that Black Elk was going to get from the sale of those assets. They didn't want that money to go to Black Elk's other bond holders. They didn't want it to be used to pay off Black Elk's debts or to even benefit Black Elk's oil business. And those were all things that this indenture said the money could be used for. Instead, the defendants wanted to take that money.

(GA:219). The government also argued that the scheme required the conspirators to modify the bondholders' protections under the Indenture:

> But the defendants had a problem. The indenture, the document, that set out all the rights of the bondholders and the rules about the bonds[,] didn't allow the money from this asset sale to go to pay those Series E Preferred Equity holders. So the defendants decided we have to change the indenture so that that money could now go to pay us, the Series E Preferred Equity holders.

27

(GA:219-20). Levy ignores these passages from the government's summation which identify the "money or property" that was the ultimate object of the scheme.

C. The District Court Misinterpreted the Wire Fraud Statute's Intent Requirement

Alternatively, Levy, like the district court, contends that this case involves the right-to-control theory because the conspirators intended to repay the unaffiliated bondholders in full. (LRBr.45; *see also* LRBr.46 (arguing that the "objective of the fraud could not have been to deprive the non-affiliated bondholders of traditional money or property interests")). This argument is flatly inconsistent with *Landesman*, which found that there was sufficient evidence of the conspirators' fraudulent intent and did not mention the right-to-control theory. It also misapprehends *Ciminelli* and conflicts with the Supreme Court's decision in *Kousisis*.

In *Ciminelli*, the Supreme Court explained that the object of the scheme must be traditional "money or property," rather than mere information. 598 U.S. at 312-15. Instead of addressing the "money or property" at stake in this case, Levy's brief and the district court's

decision interpret *Ciminelli* to require the government to prove that defendants intended to inflict a loss. (LRBr.45-46).

The Supreme Court has made clear that the wire fraud statute has no such requirement. *See Kousisis*, 145 S. Ct. at 1391. Likewise, it has also long been the law in this Circuit that a defendant's subjective hope or expectation that everything will work out "so that the victim suffers no loss," *United States v. Rossomando*, 144 F.3d 197, 201 (2d Cir. 1998), is not a defense to wire fraud. *See, e.g.*, *United States v. Lange*, 834 F.3d 58, 79 (2d Cir. 2016); *United States v. Berkovich*, 168 F.3d 64, 67 (2d Cir. 1999).

In *Kousisis*, the defendants argued that a "federal fraud conviction cannot stand…unless the defendant sought to hurt the victim's bottom line." *Kousisis*, 145 S. Ct. at 1391. The Supreme Court rejected this argument, explaining that:

> [T]he wire fraud statute is agnostic about economic loss. The statute does not so much as mention loss, let alone require it. Instead, a defendant violates [18 U.S.C.] § 1343 by scheming to "obtain" the victim's "money or property," regardless of whether he seeks to leave the victim economically worse off.

*Id.* at 1392. The decision in *Kousisis* considers and expressly rejects the notion that a defendant must *intend* to cause a loss. But that is the exact standard upon which the district court based its holding. (NA:613-14).

The district court's finding that an "intent to harm" is synonymous with intent to cause a net pecuniary loss (NA:614) is also at odds with *Kousisis*. As the Supreme Court explained, at common law, a victim suffered an injury when fraudulently induced to enter into a transaction on the basis of material and false information. *See Kousisis*, 145 S. Ct. at 1394 n.5 (citing *MacLaren v. Cochran*, 44 Minn. 255, 258 (1890) ("If a party is induced to enter into a contract by fraudulent representations at to a fact which he deems material, and upon which he has a right to rely, the party in the wrong should not be heard to say that no real injury can result from the fact misrepresented.")).[8]

---

[8] Because the wire fraud statute criminalizes the scheme and not success, there is no requirement that the conspirators obtain property from the unaffiliated bondholders (although here they did). The crime was complete when the conspirators caused Black Elk to solicit consents based on false information about the number of affiliated bonds. The suggestion that "everyone expected that all non-affiliated bondholders would tender, at which point the result of the vote—and the fact that it was rigged—would not have mattered to them" (NA:614 n.3), is inconsistent with the fraudulent inducement theory of wire fraud. *See*

The court's decision to again overturn the jury's verdict was premised on evidence not in the record and inapplicable caselaw; accordingly, it should be reversed.

---

*Kousisis*, 145 S. Ct. at 1394 n.5 (explaining that a victim is injured when induced to part with property based on materially false information).

## POINT TWO

### THE DISTRICT COURT'S ERRORS AFFECTED
### THE GUIDELINES CALCULATION AND SENTENCING

The district court applied inapposite law addressing price manipulation in publicly traded equities to find that there was no loss from the conspirators' scheme, despite victims' testimony that they lost money and evidence that the purpose of the scheme was to obtain approximately $100 million in collateral securing the Black Elk bonds.

## I.    The Black Elk Scheme Resulted in a Loss to Investors

The trial evidence demonstrated that the conspirators' fraud was a "but-for" cause of the investors' losses and that this loss was "reasonably foreseeable," as Section 2B1.1 requires.  To begin with, and as unacknowledged by the district court, both unaffiliated bondholder witnesses testified that they lost money on their bonds in the Black Elk bankruptcy.  (GA:57, 191, 195-96).  After the Renaissance Sale, Black Elk had sufficient cash on hand to repay the unaffiliated bondholders; but after that money was diverted by the conspirators to repay the Preferred Equity holders, Black Elk was unable to repay the bondholders.

Had the unaffiliated bondholders known the Consent Solicitation was a *fait accompli*, they could have tendered and mitigated

their losses. This Court reached this commonsense conclusion in *Landesman*. Citing the testimony of the victim-investors, the Court explained that, "[t]he number of affiliated bonds was material to the bondholders *because it altered the calculus of consent*…. 'If the bondholders who opposed the amendment knew the amendment was more likely to pass, they would then be more likely to tender their bonds in the consent solicitation….'" *Landesman*, 17 F.4th at 341 (emphasis added) (quoting the district court's initial rejection of Nordlicht's Rule 29 motion). The record supported this explanation, as the Court in *Landesman* recounted. For instance, Pulvino testified that he "would have thought more about tendering his notes" had he known the Consent Solicitation was likely to pass, "because he wouldn't have wanted to hold those notes without the protective covenants that were in place." *Landesman*, 17 F.4th at 342. Instead, the unaffiliated bondholders were left in precisely the scenario Pulvino and Yee feared, holding their Black Elk bonds with none of the bargained-for protections in the Indenture, and ultimately suffering a loss on the bonds.

The loss suffered by the unaffiliated bondholders was foreseeable to the conspirators, who understood that there would not be

enough money to repay all Black Elk's creditors in a bankruptcy. Nordlicht wrote as early as January 2014, in an email to Hoffman before the Renaissance Sale was closed, that "[t]here is not enough value after all your sales to pay everyone off." (GA:542-43). The premise of the fraud was to ensure that the potential shortfall in Black Elk's value did not fall on the Preferred Equity holders, because, as Nordlicht wrote, a failure to repay the Preferred Equity "w[oul]d be the end of the fund [*i.e.*, PPVA]." (NA:1162). Nor was a Black Elk bankruptcy an unlikely contingency. All three defendants discussed with Black Elk management the fact that the company could not pay its bills and might need to declare bankruptcy. (NA:1016-20). Levy even told Mandelbaum that Platinum would not fund Black Elk but would also delay a bankruptcy until June 2015 to prevent a clawback of the Renaissance Sale proceeds. (GA:123-24). In other words, Levy made clear that Platinum would not give Black Elk the money necessary to repay the remaining bondholders.

The district court's loss decision does not address any of this evidence. (NSPA:14-20). The opposition briefs also fail to address it. Instead, Levy contends that the government was required to show that the Black Elk bankruptcy was itself caused by the fraud. (*See* LRBr.34).

That misstates the applicable loss principles. The government was required to show that the fraud made it more likely that the Black Elk bondholders would suffer a loss on their bonds and that a loss on the bonds was "reasonably foreseeable." The evidence cited above plainly met that standard. Had the unaffiliated bondholders known that the outcome of the Consent Solicitation was all but guaranteed, they could have received par value for their bonds.[9] There is no basis to require the government to show also that the precise manner in which the bondholders' loss was realized was caused by the fraud. Rather, this Court's precedents require that the risk the bonds would not be repaid, including through a bankruptcy, be one of the risks created or increased by the fraud. That was plainly the case. *See United States v. Turk*, 626 F.3d 743, 750 (2d Cir. 2010) ("By definition, a potential result of being an unsecured creditor is the loss of one's interest to the higher-priority interests of secured creditors.... It follows that a potential direct result of

---

[9] Even in that scenario, the unaffiliated bondholders would have suffered a loss of the call premium because the fraudulently passed Consent Solicitation allowed the conspirators to repurchase the bonds without paying an early re-payment penalty. (LA:431). Thus, as noted above, even the tendering bondholders were harmed by the fraud.

Woolf Turk's specific fraudulent act was the total loss of the moneys the individual investors had given her. That is enough to constitute reasonably foreseeable pecuniary harm."); *United States v. Frenkel*, 682 F. App'x 20, 23 (2d Cir. 2017) ("Here, Frenkel knew or reasonably should have known that default—and the attendant loss to Citigroup of unpaid principal that could not be recovered through foreclosure—was a potential result of deceiving Citigroup into extending a loan that did not meet its underwriting standards."); *United States v. Stitsky*, 536 F. App'x 98, 112 (2d Cir. 2013) ("Additionally, the district court reasonably determined that no offset was warranted for losses resulting from changed economic circumstances because Cobalt investors would not have been exposed to such risks had defendants not fraudulently induced them to invest in the first instance."); *see also United States v. Bryson*, 101 F. Supp. 3d 147, 156 (D. Conn. 2015) ("Further, this loss was foreseeable to defendants. These investors were fraudulently induced to invest in a junior position by the defendants. Inherent in this junior status was the risk that they would suffer a loss of their entire investment in a liquidation scenario in which priority was given to the senior investment.").

The district court disregarded the foreseeability of the bankruptcy only because it found that the unaffiliated bondholders' losses were caused instead by their failure to sell their bonds *after* the Consent Solicitation passed. (*See* SA:59 ("At this point, bondholders knew all material information and could have sold their bonds for a profit. That they declined to do so has nothing to do with defendants' misrepresentation regarding the number of affiliates voting on the indenture amendments."), 59-60 ("To the extent that investors lost money on their Black Elk bonds, those investors made strategic choices based on their understanding of the market, Black Elk's finances, and with full knowledge of the bond indenture's amended terms.")). This analysis elides the likelihood the unaffiliated bondholders would have tendered in the first place had they known the Consent Solicitation was going to pass—*i.e.*, that they would have been better positioned but-for the fraud. It also ignores the fact that the amendment itself was a product of the fraud.

Moreover, the district court cited no caselaw to support the premise that bondholders who are otherwise entitled to continuing interest and repayment must sell their securities (forgoing their

contractual entitlements) in order to mitigate damages from a fraud. The Third, Fourth, and Seventh Circuits have all rejected such an argument. *See United States v. Hart*, 273 F.3d 363, 374 (3d Cir. 2001) ("When Wilburn finally received the certificates, he was under no obligation to immediately sell them. Orlando cites to no authority which suggests that his responsibility should be diminished because the defrauded investor could have mitigated losses by selling the stocks."); *United States v. Newnam*, 4 F.3d 987 (4th Cir. 1993) (per curiam) ("Neither the Victim and Witness Protection Act, 18 U.S.C. §§ 3663, 3664, nor the Sentencing Guidelines requires a district court to offset a victim's losses by amounts that could have been avoided through proper mitigation."); *United States v. Morris,* 80 F.3d 1151, 1171 (7th Cir. 1996) (rejecting argument that a victim's failure to mitigate damages could be a basis to reduce the loss amount under the predecessor to Section 2B1.1). The Guidelines intend to approximate a defendant's culpability by looking to the actual loss or intended loss from a fraud (whichever is greater)—whether the victims avoid the worst consequences of a defendant's misconduct or not. Applying mitigation principles would accord some defendants an inappropriate windfall thanks to the conduct of their victims.

Even accepting that mitigation is required under the Guidelines—and it is not—the district court's cursory analysis failed to properly analyze the victims' conduct. Contrary to Levy's argument that it is uncontested that the bond prices were unaffected by the fraud, Yee testified that in fact he sold approximately 85% of his position ($3 million out of $3.5 million) at declining prices through the end of 2014.[10] (GA:482-84). He testified that he would have sold his entire position but was unable to find a buyer. (GA:484 ("This was the most amount we could sell, given the lack of liquidity in the market, but…whatever buyers we found, we sold bonds to the best of our ability, and that's all we could find."). The court made no effort to determine why Yee's conduct was unreasonable, at what point a reasonable bondholder should have sold, or even whether there was a market for all of the bonds held by

---

[10] Even accepting the district court's premise, the unaffiliated bondholders suffered a loss. Yee testified that he sold his bonds after the Consent Solicitation passed at declining prices and suffered a loss of approximately $300,000 on those sales alone. (GA:484). Had the unaffiliated bondholders sold in response to the passage of the Consent Solicitation to mitigate their losses, as the court required, they would also have forgone the interest payments due to them.

unaffiliated bondholders like Yee and Pulvino.[11]  Although the court focused on the press release announcing the results of the Consent Solicitation, that press release did not inform the market that the proceeds of the Renaissance Sale had in fact been used to repay the Preferred Equity holders.  That fact was not known until months later. (*See* GA:484-85).

The defendants suggest that the district court's judgment should be affirmed because the government failed to show that the specific amount of the loss could not reasonably be determined, but the court never properly reached that issue, instead concluding affirmatively and erroneously that there was no loss.

---

[11]    The district court apparently conflated Yee's position with a separate position managed by other traders at Yee's firm, who also held Black Elk bonds.  The court also concluded Yee behaved unreasonably by *buying* a relatively small amount of bonds to test the market after the Consent Solicitation passed.  According to the court, the appropriate trading strategy was to offer the bonds for sale and see if anyone was willing to purchase them.  (SA:59 n.2).  The court cited no facts in support of the investing strategy it believed the victims were required to pursue, and it did not address the risks, for example, that marketing Yee's bonds in this manner could have further depressed the already-illiquid market for the bonds.

40

The government's conservative view that it would be difficult to assess loss in a hypothetical world in which the bondholders were not defrauded may not be the only viable approach. It would also have been reasonable for the district court to conclude that, in any scenario but for the fraud, the bondholders would have been repaid at least at par and potentially in full, and therefore that the defendants were liable for all of their losses in the Black Elk bankruptcy. The appropriate course is to vacate the sentences and remand so the district court can address this issue, among others, in the first instance, applying the proper methodology, in the certainty that the conspirators committed a fraud.[12]

---

[12] Levy's suggestion that gain can only be used where victims cannot be identified or in cases involving kickbacks (LRBr.38-39), has no basis in the Guidelines. The cases Levy cites described these principles as examples of when using gain as a proxy for loss might be appropriate, including in those particular cases, not as a comprehensive list of all the circumstances in which gain may be used. *See, e.g.*, *United States v. Abiodun*, 536 F.3d 162, 167 n.4 (2d Cir. 2008) ("Such a situation could arise, for example, where authorities are unable to identify any victims of a fraud offense and, therefore, cannot ascertain the losses they suffered."). This example is clearly not intended to preclude other cases in which use of gain might be necessary.

II.   The District Court Erred by Adopting a Loss
      <u>Calculation Based on a Supposed Lack of Market Price Impact</u>

        The district court further erred by applying inapposite case

law analyzing loss from schemes to artificially inflate or deflate the price

of publicly traded equities.  (*See* SA:59).  This was not, as Levy suggests,

a choice between two reasonable methods of measuring loss from the

scheme.  (LRBr.32, 36 n.12).  Instead, the court looked to price impact

because it had concluded already that the conspirators did not intend to

harm the bondholders and expected them to be repaid in full.  The court's

methodology employed fails to capture the intended and actual harm

resulting from the fraud.[13]

        In *Rutkoske* and *United States v. Ebbers*, 458 F.3d 110 (2d Cir.

2006), this Court recognized that a district court can reasonably estimate

the loss from a scheme to manipulate the price of securities by looking to

the change in the price of the securities after the fraud was revealed.

---

[13]   This Court is required to determine "whether the trial court's
method of calculating the amount of loss was legally acceptable."  *United
States v. Rutkoske*, 506 F.3d 170, 178 (2d Cir. 2007).  This issue does not
present complex factual questions where deference to the district court
ordinarily would be appropriate.  Instead, the district court's application
of price-impact methodology presents an essentially legal question which
this Court would typically review de novo.

Likewise, the application notes to the Guidelines also contemplate this methodology in cases of "fraudulent inflation or deflation in the value of a publicly traded security or commodity." *See* U.S.S.G. § 2B1.1 app. n. 3(E)(ix).

The defendants do not cite any case applying *Rutkoske* and *Ebbers* to a scheme that does not involve price manipulation. The reasoning in *Rutkoske* shows that the Court was focused on manipulation of equity prices, not schemes to defraud holders of debt securities, like the Black Elk bondholders. The *Rutkoske* defendants were convicted of a pump-and-dump scheme in which they artificially inflated the price of a publicly traded stock and then sold their shares, causing the price to plummet. 506 F.3d at 173. This Court recognized that in "criminal *stock* fraud case[s]" it had previously approved measuring loss based on price impact, *id.* at 178-79 (emphasis added), and referred to impact on "stock" and "share" prices throughout the opinion, *id.* at 179-80. *Rutkoske* did not address whether its principles would apply to a scheme that was not intended to artificially alter the price of securities. Applying this method here fails entirely to capture the harm from the scheme, which was intended to divert the proceeds of the Renaissance Sale, rather than to

manipulate the price of the Black Elk bonds. It also ignores differences between the *stocks* in *Rutkoske* and *Ebbers* and the Black Elk *bonds*, which entitled holders to repayment and additional interest.

The Guidelines commentary Levy cites provides no support for the district court's decision to consider price impact in a case involving debt securities and no effort to manipulate prices. (LRBr.30). Application Note 3(B)(v) refers to the reduction in value of "*equity* securities," rather than debt, and the reduction in value of "other corporate assets," which here was nearly $100 million in proceeds from the Renaissance Sale. U.S.S.G. § 2B1.1 app. n. 3(B)(v) (emphasis added). If anything, this provision suggests the court should have measured the loss based on the total value of Black Elk corporate assets diverted in the scheme.

Last, Levy contends that the district court correctly rejected gain as a basis to calculate loss because the conspirators' gain was not proportional to the loss from the scheme. (*See* LRBr.37-38). The decision Levy cites, *United States v. Coscia*, 866 F.3d 782, 801 (7th Cir. 2017), did not actually apply this principle. The Guidelines provide no textual support for such a rule. Moreover, because the Guidelines speak only in

44

broad ranges of loss—for example, $9.5-25 million and $25-65 million, *see* U.S.S.G. § 2B1.1(b)(1)—any potential disproportionality between loss and gain has only a minimal impact on the Guidelines range.[14]  Instead, other circuits have required that there be a "logical relationship" between victims' losses and defendants' gain.  *See, e.g.*, *United States v. Dickler*, 64 F.3d 818, 826 (3d Cir. 1995).  That standard was surely satisfied here. The conspirators diverted the proceeds of the Renaissance Sale to pay the Preferred Equity holders instead of to benefit the unaffiliated bondholders.

---

[14]    Levy's suggestion that the government was required to show his personal gain is meritless. (*See* LRBr.28-29).  Unlike in the forfeiture context, a defendant is liable under the Guidelines for the reasonably foreseeable acts of his co-conspirators, including their gains.  *See United States v. Gordon*, 710 F.3d 1124, 1164 (10th Cir. 2013) ("As long as the gain of a co-conspirator is reasonably foreseeable, it can be attributed to a defendant."); *see also United States v. Offill*, 666 F.3d 168, 180 (4th Cir. 2011) (same; collecting cases from the Third, Ninth, Eighth, and Seventh Circuits).  The conspirators' decision to divert the proceeds of the scheme to their investors, including friends and family, does not reduce the gain or loss from the scheme.  And the conspirators benefited by repaying their investors, which was the impetus for the scheme.

<u>POINT THREE</u>

THE DISTRICT COURT'S NUMEROUS ERRORS
<u>REQUIRE REMAND AND DE NOVO RESENTENCING</u>

The district court's errors in this case were not harmless. Levy's contention—that the court's conviction-related errors were harmless because even with the wire fraud convictions the court would not have sentenced the defendants to incarceration—is frivolous. And this Court's precedents do not permit the assumption that the court's fundamental misunderstanding of the scheme had no impact on the sentencing. The record shows that the court's decision to impose non-custodial sentences on all three defendants was motivated principally by its erroneous conclusion that the conspirators did not intend to harm the bondholders and had committed an essentially victimless crime.

I.    <u>De Novo Resentencing of Nordlicht and Levy Is Required</u>

This Court's precedents do not permit an inquiry into whether the district court's decision to vacate a conviction was harmless at sentencing. Rather, de novo resentencing—and recalculation of the Guidelines to accommodate the reinstated count—is required where a conviction is re-instated on appeal, as should be the case here.

46

In the context of a conviction vacated on appeal, this Court has explained:

> When the conviction on one or more charges is overturned on appeal and the case is remanded for resentencing, the constellation of offenses of conviction has been changed and the factual mosaic related to those offenses that the district court must consult to determine the appropriate sentence is likely altered. For the district court to sentence the defendant accurately and appropriately, it must confront the offenses of conviction and the facts anew.

*United States v. Rigas*, 583 F.3d 108, 115 (2d Cir. 2009).

This Court has applied the same principle when the government successfully appeals a decision *granting* a Rule 29 motion. In *United States v. Desnoyers*, the district court entered a judgment of acquittal as to one count of conviction. 637 F.3d 105, 112 (2d Cir. 2011). This Court reversed and remanded for resentencing. *Id.* On remand, the court recalculated the Guidelines and imposed the same sentence, and the government appealed again. *See United States v. Desnoyers*, 708 F.3d 378 (2d Cir. 2013) ("*Desnoyers II*"). This Court again reversed, holding that the court "made the error made in *Rigas*: It failed to consider that

the reinstatement of Count I had changed the 'factual mosaic related to the offenses of conviction…." *Id.* at 387.

*Desnoyers II* squarely controls this case. Remand for de novo resentencing is required so that the district court can consider the full "factual mosaic" related to the offenses of conviction, which includes the conspirators' intent to defraud the unaffiliated bondholders. Remand is particularly appropriate in this case because the court's Guidelines calculations and sentencing analyses were inextricably intertwined with its erroneous view that there were neither victims nor loss because the conspirators had not intended to harm the unaffiliated bondholders. *See id.* at 387-88 (finding that the district court erred by refusing to apply a leadership enhancement after the defendants' conspiracy conviction was reinstated on appeal). The same error that led the court to dismiss Count Seven formed the crux of its evaluation of the sentencing factors. (*See, e.g.*, NSPA:73).

## II. The District Court's Grant of Rule 29 and Rule 33 Relief Is Not Harmless

Levy analogizes to the "concurrent sentence doctrine" to contend that the district court's decision does not affect the government's

substantial rights. (LRBr.41). But that doctrine has no application to a direct appeal of a Rule 29 or Rule 33 decision. The concurrent sentence doctrine provides that a *sentencing* error on one count may be harmless where the district court properly imposed the same or a greater sentence on other counts. *United States v. Torres*, No. 21-2665-cr, 2023 WL 378942, at *6 (2d Cir. Jan. 25, 2023) (summary order). As Levy acknowledges (LRBr.43), and, as this Court explained, the concurrent sentence doctrine does not apply to a direct appeal of a Rule 29 or Rule 33 decision following *Ray v. United States*, 481 U.S. 736 (1987) (per curiam): "*Ray* effectively recognized that the concurrent sentence doctrine had become moribund on direct appeal of federal criminal convictions." *Kassir v. United States* 3 F.4th 556, 562 (2d Cir. 2021). Stated differently, the concurrent sentence doctrine applies exclusively where a defendant "challenges only the length of one concurrent sentence, rather than the legality of a conviction...." *Id*. That is not this case, where the legality of a conviction is at issue.

At minimum, the statutory special assessment imposed for each count of conviction suffices to show an impact on the government's substantial rights, sufficient to render the error harmful. *Ray*, 481 U.S.

49

at 737; *see also Dhinsa v. Krueger*, 917 F.3d 70, 76 n.4 (2d Cir. 2019)
("Because all federal convictions carry a mandatory special
assessment, *see* 18 U.S.C. § 3013(a), *Ray* is understood to have abolished
the concurrent sentence doctrine for direct review of federal
convictions.").

Of course, the district court's decision vacating the jury's
verdict implicates other substantial rights of the government as well.
Because the court entered a judgment of acquittal on Count Seven for
Nordlicht and Levy, there is no sentence on that count, including no
incarceration, forfeiture, restitution for victims who lost considerable
money, or fine.

In addition to the government's interest in the outcome of the
sentencing, the district court's decision implicates the government's
broader interest in the proper application of the law and the just
sentencing of defendants before the court. Other circuits have recognized
that the government's "substantial rights" are broader than simply the
number of years in prison imposed on a particular defendant. In *United
States v. Clark*, the Eleventh Circuit concluded that the government's
substantial rights were implicated by an unlawful sentence because the

50

sentence "diminishes the fairness of the criminal sentencing scheme by allowing disparate sentences to be imposed on similarly-situated defendants, and undermines the integrity and public reputation of the judicial system." 274 F.3d 1325, 1329 (11th Cir. 2001) (per curiam); *see also United States v. Barajas-Nunez*, 91 F.3d 826, 833 (6th Cir. 1996) (error affected the "substantial rights of the government and the people of the United States that this defendant be sentenced correctly in accordance with the legal principles of the sentencing guidelines").

III.   The District Court's Guidelines Error Was Not Harmless; the Sentences Were Based on the Same Flawed Reasoning

The district court's Guidelines calculation was also not harmless.

This Court reviews a claim of procedural sentencing error for harmlessness. *See United States v. Jass*, 569 F.3d 47, 68 (2d Cir. 2009) ("Where we identify procedural error in a sentence, but the record indicates clearly that the district court would have imposed the same sentence in any event, the error may be deemed harmless, avoiding the need to vacate the sentence and to remand the case for resentencing."). This standard requires the Court to review the record in its totality. *See*

51

*United States v. Meadows*, No. 22-3155-cr, 2025 WL 786380, at \*3 n.3 (2d Cir. March 12, 2025) (summary order) (concluding that a procedural error was harmless based on "the totality of the record"). Although in many cases a district court's statement that specific Guidelines calculations did not affect the sentence should be credited, even an unambiguous statement can be overcome by powerful evidence to the contrary. *United States v. Feldman*, 647 F.3d 450, 460 (2d Cir. 2011). Such evidence is present here, where the Guidelines errors (a) were part and parcel of a fundamental misunderstanding of the crime—to wit, that there was no loss and no effort to obtain property from fraud victims; and (b) led to massive swings in the Guidelines, constituting the difference between probation and decades in prison.

Appellees bear the burden of showing that the district court's errors were harmless. *See United States v. Dhinsa*, 243 F.3d 635, 650 (2d Cir. 2001) ("The beneficiary of the alleged error bears the burden of establishing that such error was harmless.").

To meet their burden, Levy, Nordlicht, and Small must show that there is no "reasonable probability of a different outcome" had the district court calculated the Guidelines correctly. *United States v.*

*Bennett*, 839 F.3d 153, 162-63 (2d Cir. 2016).  Just as this Court does not "lightly assume that eliminating enhancements from the Guidelines calculation would not affect the sentence," *Feldman*, 647 F.3d at 460, the Court also should not lightly assume that the inverse is true as well.  This is so because the Supreme Court's precedents require the district court to begin with the Guidelines.  *See Molina-Martinez v. United States*, 578 U.S. 189, 200 (2016) (The "Guidelines are not only the starting point for most federal sentencing proceedings but also the lodestar.").

Levy, Nordlicht, and Small cannot meet their burden.  In fact, the record demonstrates the district court's sentence was based fundamentally on its erroneous Guidelines calculation, which, in turn, was based on the court's view that the defendants did not intend to harm the bondholders.  In discussing the "nature and circumstances" of the offense, 18 U.S.C. § 3553(a)(1), the court repeatedly referenced its loss decision and its holding that no bondholder suffered a financial loss.  (*See* NSPA:73 ("Nobody had any money stolen from them. What…the government is really complaining about is the inability to make an informed choice…."); GA:718 ("[a]s I found in the loss decision, what means more to me is the fact that there really weren't financial losses to

anybody"), 697 ("I just think they secured their own position making sure they wouldn't lose any money, and that makes it a different kind of fraud to me.")).  Indeed, the court went so far as to expressly incorporate its loss decision into its analysis of Nordlicht's sentencing factors: "I don't want to repeat all the things that I said on the loss calculation order, I'll just incorporate it by reference here."  (NSPA:73).

The fundamental premise of the district court's sentence was its erroneous belief, expressed in the loss decision, that the conspirators wanted to repay the bondholders and, as a result, any loss was caused by extraneous market forces after the unaffiliated bondholders made poor business decisions.  (*See* GA:696 ("What really, more than the guidelines motivates me here, is that while making a misrepresentation to public bondholders is, without a doubt, a serious crime, this was a somewhat atypical kind of fraud in that it wasn't stealing money from people.  You don't see that often.  It was, for sure, a demonstration of avarice, that is, the conspirators here wanted to make sure that they got paid."); NSPA:73).  Indeed, when explaining Nordlicht's sentence, the court again specifically expressed its belief that any loss was solely the responsibility of the bondholders, who "wanted to take the risk that the company, which

wasn't doing all that well, but that the company would continue to pay the coupon in the years ahead." (NSPA:67).

The overriding focus on the ostensible absence of loss as a driver for the sentencing decision was also made clear when the district court refused to find that a four-level Guidelines enhancement for affecting more than ten victims was applicable because there was no loss. (*See* NSPA:39 ("[S]ince I'm proceeding on the basis that there wasn't [any loss], then there can't be ten or more victims.")).[15] This compounded the court's Guidelines error.

On this record, the district court's cursory statement that it "would impose the same sentence that [it was] going to impose now, regardless of the loss calculation," (NSPA:78), is insufficient to find the Guidelines error harmless. As this Court stated in *Feldman*, "if a district court errs in calculating a defendant's Guidelines sentencing range, this Court cannot assume, without unambiguous indication to the contrary,

---

[15]     Similarly, the district court relied at sentencing on the fact that it did not "have victims coming into court and saying, '[t]his changed my life,' or 'This put me out-of-pocket,' or, 'I was deprived of this opportunity.'" (GA:718).  But, by then, the court had already determined that they did not suffer a loss.  (NSPA:14-20).

that the sentence would be the same absent the error." 647 F.3d at 459; *see also United States v. Seabrook*, 968 F.3d 224, 233-34 (2d Cir. 2020). The court did not provide such an "unambiguous indication"; instead, it simply proclaimed that "the guidelines don't work in this case," while incorporating a written Guidelines opinion into the sentencing analysis (NSPA:78, 73) and sentencing within or below the vastly decreased ranges.

The district court's cursory assertion that the Guidelines did not influence the sentence is especially incredible given the significant impact of its errors on the applicable Guidelines range. In *United States v. Binday*, a case cited by Levy for support, this Court reasoned that it is "especially wary of concluding that a Guidelines calculation error did not affect a sentence where, if the appellant's procedural challenge were correct, his Guidelines sentencing range would have been cut by more than half." 804 F.3d 558, 599 n.45 (2d Cir. 2015), *abrogated on other grounds by Ciminelli*, 598 U.S. 306; *see also id.* at 599 (denying challenge to sentence in part because "this was not a situation in which the district court imposed a 22-level increase based on an actual loss amount of $38 million, where arguably there should have been no increase because no

56

loss could be identified"). In contrast to *Binday*, here, the district court's errors had an enormous impact on the applicable Guidelines range. The government estimated Levy's Guidelines range as 135 to 168 months (GA:363) and Nordlicht's as 210 to 262 months (DE:1042 at 8-9).[16] The court made no effort to explain why its reasoning justified a downward variance of over a decade from the bottom of the Guidelines, notwithstanding that such a major variance from the Guidelines "should be supported by a more significant justification than a minor one." *Gall v. United States*, 552 U.S. 38, 50 (2007). As calculated by the court, the Guidelines ranges were all under 12 months' custody. (NSPA:41; GA:681, 712). The court made no effort to explain why it had so substantially varied because it did not believe it was imposing variant sentences to begin with.

---

[16] The government did not present an alternative Guidelines calculation for Small. The government's sentencing submission noted its objection to the district court's ruling on the Guidelines, which predated Small's PSR. (DE:1015 at 8 & n.3). Had the court calculated the Guidelines based on the defendants' gain and applied a sophisticated means enhancement, as the government argued it should, Small's Guidelines range would have been 135 to 168 months' imprisonment. (*See* DE:922, 1015, 1042).

57

CONCLUSION

For the reasons stated above, the court-entered judgments of acquittal as to Levy and Nordlicht on the wire fraud conspiracy count should be reversed, all judgments of conviction should be affirmed, all sentences should be vacated, and all cases should be remanded for resentencing.

Dated:      Brooklyn, New York
            June 20, 2025

                              Respectfully submitted,

                              JOSEPH NOCELLA, JR.,
                              *United States Attorney*,
                              *Eastern District of New York*.

                   By:   /s/ NICHOLAS AXELROD
                         NICHOLAS AXELROD
                         Assistant U.S. Attorney

NICHOLAS J. MOSCOW,
DAVID C. PITLUCK,
NICHOLAS AXELROD,
AMANDA SHAMI
*Assistant United States Attorneys*,
      (*Of Counsel*).

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.     In accordance with the Court's Order of June 18, 2025, this brief does not comply with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Second Circuit Rule 32.1(a)(4) because the brief contains 10,997 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Dated:  Brooklyn, New York
        June 20, 2025

/s/ NICHOLAS J. MOSCOW
NICHOLAS J. MOSCOW
Assistant U.S. Attorney